# Exhibit 25



# UNITED STATES GOVERNMENT
# MEMORANDUM

**Metropolitan Correctional Center, New York, New York**

**DATE:** November 23, 2009

**TO:** Roderick Jenkins, Intelligence Research Specialist

**FROM:** Dee Messam, Lead Employee Services Specialist

**SUBJECT: Acknowledgment for Receipt of Documents**

I, _Rodrict Jenkins_ certify that I have received the below
      Print Name

listed documents related to the proposed disciplinary action issued to me on
November 19, 2009.

- ➡ Position Description (Intelligence Research Specialist. SPA202).
- ➡ Standards of Employee Conduct (P.S. 3420.09, dated, February 5, 1999.
- ➡ Acknowledgment of Receipt for Standards of Employee Conduct (MCC-NY-93), dated 1/2/90.
- ➡ BOP Employee Training Transcript, dated August 24, 2009.
- ➡ Affidavit w/Oath (Jay Arries), dated February 20, 2008.
- ➡ Warning of Issuance to Employee (BP-S194.012), dated February 26, 2008.
- ➡ Affidavit w/Oath (Roderick Jenkins), dated February 26, 2008.
- ➡ Memorandum from J. Arries, dated November 28, 2007.
- ➡ Memorandum from Roderick Jenkins, dated November 16, 2007.
- ➡ MCC, NY Daily Assignment Roster (6-pages), dated Friday, November 16, 2007.
- ➡ Transportation Security Administration statement with attached sign-in log
- ➡ Memorandum of Investigation (Warden Marvin Morrison, dated May 1, 2006
- ➡ Memorandum of Investigation from TSA with 3 pages attached statement, dated August 1, 2006.
- ➡ Memorandum of Investigation from Federal Air Marshals Service with 6 pages of Activity Report, dated May 3, 2006.
- ➡ Warning and Assurances to Employee (Roderick Jenkins) attached with Memorandum of Investigation and
- ➡ Affidavit from US Department of Justice, Office of the Inspector General, dated January 25, 2007.
- ➡ Memorandum of Investigation (Roderick Jenkins) from the New York Field Office, dated January 26, 2007.
- ➡ Memorandum of Investigation attached with IAD Investigative Action Report from Port Authority Police Department, dated May 10, 2007.
- ➡ Acknowledgment Receipt (Roderick Jenkins) of LEOSA Safety Act of 2004, dated April 11, 2006.
- ➡ Memorandum for All Staff from the Office of the Director, BOP, dated February 27, 2006.
- ➡ Memorandum of Guidance on the Application of LEOSA Safety Act from the Office of the Attorney General, dated, January 31, 2005.
- ➡ N.Y.S. Department of State Filing Receipt, dated January 17, 2006.
- ➡ Excerpts of TSA procedures dated August 21, 2009.

_____       11/23/09
Signature                           Date



UNITED STATES GOVERNMENT
# MEMORANDUM
### FEDERAL BUREAU OF PRISONS

<u>DATE</u>:  November 23, 2009

<u>REPLY TO</u>: Roderick Jenkins, IRS

<u>TO</u>: L. N'Diaye

This memo is regarding the letter, dated November 16, 2009, provided to me by Lamine N'Diaye, Captain and witnessed by Dee Messam, Assistant Human Resource Manager on November 20, 2009.  This letter was a proposal to remove me as Intelligence Research Specialist based on certain charges. I would like to request all investigative documents relating to the specifications of these charges as described in the letter and any other documents relating to these charges that may have not been specified.





## POSITION DESCRIPTION

### Correctional Program Specialist
### (Intelligence Research Specialist)
### GS-0006-09

**INTRODUCTION**

This position is assigned in select metropolitan areas (or similar institutions) as designated by agency's Executive Staff. The Intelligence Officer (Counter-terrorism), located in Washington, DC, supervises and is the "direct link" for the Intelligence Research Specialist (IRS). For coordination purposes, tasking will often be coordinated by the supervisor with the local Chief Executive Officer (CEO), Captain and the local Intelligence Operations Officer (I/O). The incumbent serves as a member of a team led by an I/O.

**MAJOR DUTIES AND RESPONSIBILITIES**

The incumbent serves as the IRS for the Intelligence Section, Central Office, an entity of the Federal Bureau of Prisons (BOP). The IRS plays an integral role in gathering, processing, and distributing intelligence information within/outside of their local institution and geographical coverage area, BOP field/regional/central office staff, law enforcement and correctional components. Because of the sensitivity of information handled by the incumbent, it is paramount that the incumbent protect the integrity and confidentiality of sensitive records.

The incumbent's primary role is to serve as the link between the I/O and local institution staff to gather/share raw information and intelligence derived from the assigned I/O's collection activities into lawful, meaningful, timely, concise intelligence databases, summaries, briefing papers, threat assessments, training materials, and similar intelligence products for potential BOP-wide use in strategic planning, security threat group management, and training activities.

By way of background, the intelligence team serves as a corrections expert on inmate activities within the institution; conducts BOP database and Sentry research for task forces and other law enforcement agencies; assists with criminal investigations; provides meaningful intelligence information regarding offenders already in BOP custody or projected to enter BOP custody in the future. Such liaison will ordinarily include detailed on-site coordination with numerous Federal law enforcement initiatives such as the Joint Terrorism Task Force (JTTF), Safe Streets Task Force, Fugitive Task Force, High Intensity Drug Trafficking Area Task Force (HIDTA), Organized Crime & Drug Enforcement Task Force (OCDETF), DOJ Joint Drug

SPA202

D000004

Intelligence Group (JDIG), and various special initiatives, such as Triggerlock, Gunsmoke, Achilles, etc.

Special intelligence consortiums might include (as appropriate) California Major Gang Task Force, National Major Gang Task Force, Midwest Gang Investigators Association, various chapters of the Regional Information Sharing System (RISS), and any local intelligence groups. Active on-site liaison shall also be maintained with the U.S. Attorney's Office, as well as the appropriate Pretrial Services Officer and U.S. Probation & Parole Officer.

The incumbent develops such raw information and inter-agency intelligence into BOP intelligence products which will directly aid in identification of individual security threat group members entering custody, their individual threat characteristics, their group threat characteristics, and information regarding feuds, treaties, alliances, outside support groups, and similar information of value to BOP security planners.

Specifically, the incumbent uses accepted intelligence analysis procedures to analyze indictments, arrest warrant affidavits, sentencing memoranda, pretrial detention reports, bail determination reports, USPO form #1 working papers, and similar sensitive original source law enforcement documentation regarding groups pending indictment, or already being held in BOP custody. Particular attention would be given to high threat trials, such as those involving international terrorists, domestic terrorists, drug cartels, or the leadership structure for "super gangs". Such information would be used not only for operational intelligence purposes, but also for use in intelligence forecasting.

In addition to performing analysis of materials obtained by the Intelligence Operations Office, the incumbent directly collects "open source" materials from the press, broadcast media, internet, and similar sources which will aid in the analysis of issues of security concern to the BOP.

During the course of such intelligence collection, collation, evaluation, analysis and dissemination, the incumbent is expected to develop into the alternate BOP Subject Matter Expert (SME) for the specific Security Threat Groups home-based in the assigned BOP geographical area, and accordingly, assist as appropriate during emergencies, training activities, strategic planning sessions, expert witness testimony, and inter-agency intelligence sharing.

As appropriate, the incumbent assists the I/O in coordinating the release and sharing of BOP intelligence with law enforcement agencies, consistent with BOP policy, federal rules, statutes, and DOJ guidelines.

SPA202

As the designated alternate SME for specific Security Threat Groups, the incumbent may on occasion be called upon by the BOP Central Office to conduct detailed intelligence debriefs of inmates wishing to "drop out" of the group, or alternately provide detailed debrief strategies and supporting background intelligence materials to the team that conducts the interview.

The incumbent directly assists those BOP staff involved in the Disruptive Group validation process, and in those cases where possible, "pre-validates" known members who are entering custody in the future.  In concern with the assigned I/O, directly assists in making appropriate SENTRY STG Selection Category entries, PP10 "0400" intelligence remarks, as well as proposing appropriate entries in the institution hotfiles, posted picture card files, and special accountability listings (two hour watch, etc.).

The incumbent must develop such training skills as to be highly effective in institution, region, and MSTC training programs, such as gang seminars and SIA/SIS/SIST training.

The incumbent directly assists the institution in identifying those inmates or groups with the highest likelihood of continuing their criminal enterprise once incarcerated, and directly assists in developing interdiction strategies, to include inmate telephone monitoring strategies, work assignments, housing, posted picture card status, and special accountability controls.

As an intelligence team member, the incumbent helps manage the local intelligence collection plan, determining desired information, potential sources, and desired format.  The incumbent conducts an evaluation of intelligence in terms of reliability of sources and credibility of contents.  He/she plans and conducts collation activities such as data entry and intelligence file management.  The incumbent conducts threat analysis and produces threat assessments regarding security threat groups or security threat profile inmates so as to support informed decisions and strategic planning by the institution in particular and security planners in general.  He/she performs risk assessments of proposed high risk operations regarding inmates within the assigned Security Threat Groups (such as hospital or funeral trips).  The incumbent also executes the local intelligence dissemination plan, producing intelligence briefs, security alerts, and similar notices as appropriate.  In addition, the incumbent gives direct briefings to the SIS staff, Captain, or institution Executive Staff as appropriate.

Through the use of accepted threat analysis procedures and protocols, the incumbent directly supports strategic intelligence activities such as the identification and tracking of emerging groups which pose a security threat to Bureau facilities, inmates, and staff.  Analysis activities include the evaluation of violence and illicit activities in the community which could reasonably impact BOP facilities.  Such data is used in direct

SPA202

D000006

support of threat assessments and the justification procedure necessary to classify an emerging group as a "security threat group".

The incumbent serves as alternate COMSEC custodian for the institution and as such, orders, controls, and issues seed key, crypto ignition keys (CIK's), STU-III secure phones, and secure fax equipment.  The incumbent complies as appropriate with all directives of the National Security Agency.

Along with all other correctional institution employees, incumbent is charged with responsibility for maintaining security of the institution.  The staff correctional responsibilities precede all others required by this position and are performed on a regular and recurring basis.

Specific correctional responsibilities include custody and supervision of inmates, responding to emergencies and institution disturbances, participating in fog and escape patrols, and assuming correctional officer posts when necessary.  The incumbent is required to shakedown inmates, conduct visual searches of inmate work and living areas for contraband, and is responsible for immediately responding to any institution emergencies.  The incumbent must be prepared and trained to use physical control in situations where necessary, such as in fights among inmates, assaults on staff, and riots or escape attempts.

Incumbent has the authority to enforce criminal statutes and/or judicial sanctions, including investigative, arrest and/or detention authority on institution property.  When necessary, incumbent also has the authority to carry firearms and exercise appropriate force to establish and/or maintain control over individuals.  When conditions warrant, the employee may enter into hostile or life threatening situations and may be required to make decisions affecting the life, well-being, civil liberties, and/or property of others.  The actions of the incumbent could result in personal sanctions and legal liability.

Incumbent must successfully complete specialized training in firearms proficiency, self defense, management of medical emergencies, safety management and interpersonal communication skills.

## FACTOR 1 - KNOWLEDGE REQUIRED BY THE POSITION

The incumbent must be skilled in working with issues involving security related policy and procedures within the BOP, and must have significant BOP investigative or investigative support experience.  The incumbent must continually exercise significant judgement regarding immediate actions to be taken in support of high priority intelligence/investigative needs of the agency. Such intelligence operations will frequently enhance the effectiveness of major BOP investigations regarding inmates/ inmates with staff assistance involved in planned or actual

SPA202

D000007



escapes, murders, serious inmate assaults, violence towards staff, drug introductions, domestic and international terrorism, espionage, organized crime, and similar issues.

The incumbent must have detailed knowledge with regard to conducting global searches, telephone searches, paracons database management, and associated Automated Intelligence Management System (AIMS) routines.  Similarly, the incumbent must have detailed knowledge of institution record keeping systems of value in the link analysis process, such as visiting records, form 199 records, money order postings, firm mailing logs, and similar records.

The incumbent may be required to qualify for and maintain a TOP SECRET SCI clearance, with special access for SI, TK, and G national security materials.  The incumbent must utilize appropriate procedures to confirm the security clearances of others before disclosing or discussing classified materials.  If cleared, the incumbent manages all classified documents and approved classified document storage containers assigned to the institution.  The incumbent assists in managing the issuance, testing, and accountability for all STU-III classified telephones and secure FAX equipment for the institution, and maintains expertise in ordering and managing classified seed key, crypto ignition keys, and similar materials in accordance with directives by the National Security Agency.

The incumbent must master such data management skills as necessary to assist in managing the data collection, collation, and analysis necessary for the incumbent to produce comprehensive Intelligence Summaries, Threat Assessments, SENTRY STG entries, hotfiles entries, and similar intelligence activities which will assist in identifying those inmates with the greatest likelihood of continued criminal activity, and developing appropriate interdiction strategies.

The incumbent must also master WordPerfect skills to the extent necessary to assist in the managing of all major publications issued by the Intelligence Team.

The incumbent must possess detailed knowledge of all aspects of SIS computer operations, with an emphasis on those skills required for SIS staff in the field.  The incumbent must assist in developing and maintaining detailed knowledge of query procedures for NCIC, NLETS, EPIC, and similar federal law enforcement database systems.  The incumbent must also be skilled in constructing direct NLETS administrative message queries to all levels of law enforcement as necessary.

The incumbent must possess advanced writing and editing skills, as well as being capable of developing analytical reports, threat assessments, risk assessments, Sentry messages, advisories, and briefing papers as appropriate. The incumbent must possess strong verbal skills and be capable of providing clear, concise

SPA202

intelligence briefings to interagency executive staff and representatives as appropriate.  Possesses at least limited technical briefing experience.

The incumbent possesses thorough knowledge of professional protocol and must be discrete in all contacts when handling sensitive information, and projects an exceptionally professional image when dealing with other staff, the public, and law enforcement community.

The incumbent must be familiar with relevant BOP Program Statements and manuals, and perform all intelligence database management activities in a manner that is consistent with established policy, and federal rules and relevant statutes.

Must be familiar with safety procedures for staff and inmate workers.

Skill in the identification of narcotics and narcotic paraphernalia.

Knowledge of search procedures of persons and property for contraband.

Thorough knowledge of BOP regulations to enforce security measures and protect life and property.  Work within a prison environment requires a special ability for alertness requiring keen mental and physical effort.  Incumbent must be aware of group or individual tensions, alert to unpredictable behavior, and generally sensitive to signs of trouble which could result in injury.

## FACTOR 2 - SUPERVISORY CONTROLS

The incumbent reports directly to the I/O (Counter-terrorism).  A major portion of duties are performed at the request of the team leader (I/O), or at the employees own initiative, often being indicated during various stages of intelligence analysis and data evaluation, or in response to general strategic goals established by the institution or the BOP Intelligence Section.  The employee also works closely with the Captain of the assigned correctional institution.  Activities are frequently performed in immediate support of investigative needs in the field, or the analytical needs of the Executive Staff.  Completed intelligence management activities will be subject to final review by the I/O (Counter-terrorism).

## FACTOR 3 - GUIDELINES

The guidelines for performing such assigned activities, with the assistance of the team leader (I/O), are established in Intelligence Section SOP's, the Special Investigative Supervisors Manual, Security & Designations Manual, SENTRY Manuals, NCIC Manuals, NLETS Manuals, various BOP Program Statements,

SPA202

D000009



# UNITED STATES GOVERNMENT
# MEMORANDUM

**Metropolitan Correctional Center, New York, New York**

**DATE:** November 23, 2009

**TO:** Roderick Jenkins, Intelligence Research Specialist

**FROM:** Dee Messam, Lead Employee Services Specialist

**SUBJECT: Acknowledgment for Receipt of Documents**

I, _Roderick Jenkins_ certify that I have received the below
Print Name

listed documents related to the proposed disciplinary action issued to me on
November 19, 2009.

- ➡ Position Description (Intelligence Research Specialist. SPA202).
- ➡ Standards of Employee Conduct (P.S. 3420.09, dated, February 5, 1999.
- ➡ Acknowledgment of Receipt for Standards of Employee Conduct (MCC-NY-93), dated 1/2/90.
- ➡ BOP Employee Training Transcript, dated August 24, 2009.
- ➡ Affidavit w/Oath (Jay Arries), dated February 20, 2008.
- ➡ Warning of Issuance to Employee (BP-S194.012), dated February 26, 2008.
- ➡ Affidavit w/Oath (Roderick Jenkins), dated February 26, 2008.
- ➡ Memorandum from J. Arries, dated November 28, 2007.
- ➡ Memorandum from Roderick Jenkins, dated November 16, 2007.
- ➡ MCC, NY Daily Assignment Roster (6-pages), dated Friday, November 16, 2007.
- ➡ Transportation Security Administration statement with attached sign-in log
- ➡ Memorandum of Investigation (Warden Marvin Morrison, dated May 1, 2006 ✓
- ➡ Memorandum of Investigation from TSA with 3 pages attached statement, dated August 1, 2006. ✓
- ➡ Memorandum of Investigation from Federal Air Marshals Service with 6 pages of Activity Report, dated May 3, 2006.
- ➡ Warning and Assurances to Employee (Roderick Jenkins) attached with Memorandum of Investigation and ✓
- ➡ Affidavit from US Department of Justice, Office of the Inspector General, dated January 25, 2007.
- ➡ Memorandum of Investigation (Roderick Jenkins) from the New York Field Office, dated January 26, 2007.
- ➡ Memorandum of Investigation attached with IAD Investigative Action Report from Port Authority Police Department, dated May 10, 2007.
- ➡ Acknowledgment Receipt (Roderick Jenkins) of LEOSA Safety Act of 2004, dated April 11, 2006.
- ➡ Memorandum for All Staff from the Office of the Director, BOP, dated February 27, 2006.
- ➡ Memorandum of Guidance on the Application of LEOSA Safety Act from the Office of the Attorney General, dated, January 31, 2005.
- ➡ N.Y.S. Department of State Filing Receipt, dated January 17, 2006.
- ➡ Excerpts of TSA procedures dated August 21, 2009.

_____          _____
Signature                                          Date

D000010



UNITED STATES GOVERNMENT
# MEMORANDUM
### FEDERAL BUREAU OF PRISONS

**DATE:** November 23, 2009

**REPLY TO:** Roderick Jenkins, IRS

**TO:** L. N'Diaye

This memo is regarding the letter, dated November 16, 2009, provided to me by Lamine N'Diaye, Captain and witnessed by Dee Messam,Assistant Human Resource Manager on November 20, 2009. This letter was a proposal to remove me as Intelligence Research Specialist based on certain charges.I would like to request all investigative documents relating to the specifications of these charges as described in the letter and any other documents relating to these charges that may have not been specified.

RECEIVED
NOV 2 3 2009
Federal Bureau of Prisons
MDC, BROOKLYN, NY
Employee Relations Department



POSITION DESCRIPTION

Correctional Program Specialist
(Intelligence Research Specialist)
GS-0006-09

## INTRODUCTION

This position is assigned in select metropolitan areas (or similar institutions) as designated by agency's Executive Staff. The Intelligence Officer (Counter-terrorism), located in Washington, DC, supervises and is the "direct link" for the Intelligence Research Specialist (IRS).  For coordination purposes, tasking will often be coordinated by the supervisor with the local Chief Executive Officer (CEO), Captain and the local Intelligence Operations Officer (I/O).  The incumbent serves as a member of a team led by an I/O.

## MAJOR DUTIES AND RESPONSIBILITIES

The incumbent serves as the IRS for the Intelligence Section, Central Office, an entity of the Federal Bureau of Prisons (BOP). The IRS plays an integral role in gathering, processing, and distributing intelligence information within/outside of their local institution and geographical coverage area, BOP field/regional/central office staff, law enforcement and correctional components.  Because of the sensitivity of information handled by the incumbent, it is paramount that the incumbent protect the integrity and confidentiality of sensitive records.

The incumbent's primary role is to serve as the link between the I/O and local institution staff to gather/share raw information and intelligence derived from the assigned I/O's collection activities into lawful, meaningful, timely, concise intelligence databases, summaries, briefing papers, threat assessments, training materials, and similar intelligence products for potential BOP-wide use in strategic planning, security threat group management, and training activities.

By way of background, the intelligence team serves as a corrections expert on inmate activities within the institution; conducts BOP database and Sentry research for task forces and other law enforcement agencies; assists with criminal investigations; provides meaningful intelligence information regarding offenders already in BOP custody or projected to enter BOP custody in the future.  Such liaison will ordinarily include detailed on-site coordination with numerous Federal law enforcement initiatives such as the Joint Terrorism Task Force (JTTF), Safe Streets Task Force, Fugitive Task Force, High Intensity Drug Trafficking Area Task Force (HIDTA), Organized Crime & Drug Enforcement Task Force (OCDETF), DOJ Joint Drug

SPA202

Intelligence Group (JDIG), and various special initiatives, such as Triggerlock, Gunsmoke, Achilles, etc.

Special intelligence consortiums might include (as appropriate) California Major Gang Task Force, National Major Gang Task Force, Midwest Gang Investigators Association, various chapters of the Regional Information Sharing System (RISS), and any local intelligence groups.  Active on-site liaison shall also be maintained with the U.S. Attorney's Office, as well as the appropriate Pretrial Services Officer and U.S. Probation & Parole Officer.

The incumbent develops such raw information and inter-agency intelligence into BOP intelligence products which will directly aid in identification of individual security threat group members entering custody, their individual threat characteristics, their group threat characteristics, and information regarding feuds, treaties, alliances, outside support groups, and similar information of value to BOP security planners.

Specifically, the incumbent uses accepted intelligence analysis procedures to analyze indictments, arrest warrant affidavits, sentencing memoranda, pretrial detention reports, bail determination reports, USPO form #1 working papers, and similar sensitive original source law enforcement documentation regarding groups pending indictment, or already being held in BOP custody. Particular attention would be given to high threat trials, such as those involving international terrorists, domestic terrorists, drug cartels, or the leadership structure for "super gangs". Such information would be used not only for operational intelligence purposes, but also for use in intelligence forecasting.

In addition to performing analysis of materials obtained by the Intelligence Operations Office, the incumbent directly collects "open source" materials from the press, broadcast media, internet, and similar sources which will aid in the analysis of issues of security concern to the BOP.

During the course of such intelligence collection, collation, evaluation, analysis and dissemination, the incumbent is expected to develop into the alternate BOP Subject Matter Expert (SME) for the specific Security Threat Groups home-based in the assigned BOP geographical area, and accordingly, assist as appropriate during emergencies, training activities, strategic planning sessions, expert witness testimony, and inter-agency intelligence sharing.

As appropriate, the incumbent assists the I/O in coordinating the release and sharing of BOP intelligence with law enforcement agencies, consistent with BOP policy, federal rules, statutes, and DOJ guidelines.

SPA202

As the designated alternate SME for specific Security Threat Groups, the incumbent may on occasion be called upon by the BOP Central Office to conduct detailed intelligence debriefs of inmates wishing to "drop out" of the group, or alternately provide detailed debrief strategies and supporting background intelligence materials to the team that conducts the interview.

The incumbent directly assists those BOP staff involved in the Disruptive Group validation process, and in those cases where possible, "pre-validates" known members who are entering custody in the future.  In concern with the assigned I/O, directly assists in making appropriate SENTRY STG Selection Category entries, PP10 "0400" intelligence remarks, as well as proposing appropriate entries in the institution hotfiles, posted picture card files, and special accountability listings (two hour watch, etc.).

The incumbent must develop such training skills as to be highly effective in institution, region, and MSTC training programs, such as gang seminars and SIA/SIS/SIST training.

The incumbent directly assists the institution in identifying those inmates or groups with the highest likelihood of continuing their criminal enterprise once incarcerated, and directly assists in developing interdiction strategies, to include inmate telephone monitoring strategies, work assignments, housing, posted picture card status, and special accountability controls.

As an intelligence team member, the incumbent helps manage the local intelligence collection plan, determining desired information, potential sources, and desired format.  The incumbent conducts an evaluation of intelligence in terms of reliability of sources and credibility of contents.  He/she plans and conducts collation activities such as data entry and intelligence file management.  The incumbent conducts threat analysis and produces threat assessments regarding security threat groups or security threat profile inmates so as to support informed decisions and strategic planning by the institution in particular and security planners in general.  He/she performs risk assessments of proposed high risk operations regarding inmates within the assigned Security Threat Groups (such as hospital or funeral trips).  The incumbent also executes the local intelligence dissemination plan, producing intelligence briefs, security alerts, and similar notices as appropriate.  In addition, the incumbent gives direct briefings to the SIS staff, Captain, or institution Executive Staff as appropriate.

Through the use of accepted threat analysis procedures and protocols, the incumbent directly supports strategic intelligence activities such as the identification and tracking of emerging groups which pose a security threat to Bureau facilities, inmates, and staff.  Analysis activities include the evaluation of violence and illicit activities in the community which could reasonably impact BOP facilities.  Such data is used in direct

SPA202

D000014

support of threat assessments and the justification procedure necessary to classify an emerging group as a "security threat group".

The incumbent serves as alternate COMSEC custodian for the institution and as such, orders, controls, and issues seed key, crypto ignition keys (CIK's), STU-III secure phones, and secure fax equipment.  The incumbent complies as appropriate with all directives of the National Security Agency.

Along with all other correctional institution employees, incumbent is charged with responsibility for maintaining security of the institution.  The staff correctional responsibilities precede all others required by this position and are performed on a regular and recurring basis.

Specific correctional responsibilities include custody and supervision of inmates, responding to emergencies and institution disturbances, participating in fog and escape patrols, and assuming correctional officer posts when necessary.  The incumbent is required to shakedown inmates, conduct visual searches of inmate work and living areas for contraband, and is responsible for immediately responding to any institution emergencies.  The incumbent must be prepared and trained to use physical control in situations where necessary, such as in fights among inmates, assaults on staff, and riots or escape attempts.

Incumbent has the authority to enforce criminal statutes and/or judicial sanctions, including investigative, arrest and/or detention authority on institution property.  When necessary, incumbent also has the authority to carry firearms and exercise appropriate force to establish and/or maintain control over individuals.  When conditions warrant, the employee may enter into hostile or life threatening situations and may be required to make decisions affecting the life, well-being, civil liberties, and/or property of others.  The actions of the incumbent could result in personal sanctions and legal liability.

Incumbent must successfully complete specialized training in firearms proficiency, self defense, management of medical emergencies, safety management and interpersonal communication skills.

## FACTOR 1 - KNOWLEDGE REQUIRED BY THE POSITION

The incumbent must be skilled in working with issues involving security related policy and procedures within the BOP, and must have significant BOP investigative or investigative support experience.  The incumbent must continually exercise significant judgement regarding immediate actions to be taken in support of high priority intelligence/investigative needs of the agency. Such intelligence operations will frequently enhance the effectiveness of major BOP investigations regarding inmates/ inmates with staff assistance involved in planned or actual

SPA202

escapes, murders, serious inmate assaults, violence towards staff, drug introductions, domestic and international terrorism, espionage, organized crime, and similar issues.

The incumbent must have detailed knowledge with regard to conducting global searches, telephone searches, paracons database management, and associated Automated Intelligence Management System (AIMS) routines. Similarly, the incumbent must have detailed knowledge of institution record keeping systems of value in the link analysis process, such as visiting records, form 199 records, money order postings, firm mailing logs, and similar records.

The incumbent may be required to qualify for and maintain a TOP SECRET SCI clearance, with special access for SI, TK, and G national security materials. The incumbent must utilize appropriate procedures to confirm the security clearances of others before disclosing or discussing classified materials. If cleared, the incumbent manages all classified documents and approved classified document storage containers assigned to the institution. The incumbent assists in managing the issuance, testing, and accountability for all STU-III classified telephones and secure FAX equipment for the institution, and maintains expertise in ordering and managing classified seed key, crypto ignition keys, and similar materials in accordance with directives by the National Security Agency.

The incumbent must master such data management skills as necessary to assist in managing the data collection, collation, and analysis necessary for the incumbent to produce comprehensive Intelligence Summaries, Threat Assessments, SENTRY STG entries, hotfiles entries, and similar intelligence activities which will assist in identifying those inmates with the greatest likelihood of continued criminal activity, and developing appropriate interdiction strategies.

The incumbent must also master WordPerfect skills to the extent necessary to assist in the managing of all major publications issued by the Intelligence Team.

The incumbent must possess detailed knowledge of all aspects of SIS computer operations, with an emphasis on those skills required for SIS staff in the field. The incumbent must assist in developing and maintaining detailed knowledge of query procedures for NCIC, NLETS, EPIC, and similar federal law enforcement database systems. The incumbent must also be skilled in constructing direct NLETS administrative message queries to all levels of law enforcement as necessary.

The incumbent must possess advanced writing and editing skills, as well as being capable of developing analytical reports, threat assessments, risk assessments, Sentry messages, advisories, and briefing papers as appropriate. The incumbent must possess strong verbal skills and be capable of providing clear, concise

SPA202

intelligence briefings to interagency executive staff and representatives as appropriate.  Possesses at least limited technical briefing experience.

The incumbent possesses thorough knowledge of professional protocol and must be discrete in all contacts when handling sensitive information, and projects an exceptionally professional image when dealing with other staff, the public, and law enforcement community.

The incumbent must be familiar with relevant BOP Program Statements and manuals, and perform all intelligence database management activities in a manner that is consistent with established policy, and federal rules and relevant statutes.

Must be familiar with safety procedures for staff and inmate workers.

Skill in the identification of narcotics and narcotic paraphernalia.

Knowledge of search procedures of persons and property for contraband.

Thorough knowledge of BOP regulations to enforce security measures and protect life and property.  Work within a prison environment requires a special ability for alertness requiring keen mental and physical effort.  Incumbent must be aware of group or individual tensions, alert to unpredictable behavior, and generally sensitive to signs of trouble which could result in injury.

**FACTOR 2 – SUPERVISORY CONTROLS**

The incumbent reports directly to the I/O (Counter-terrorism).  A major portion of duties are performed at the request of the team leader (I/O), or at the employees own initiative, often being indicated during various stages of intelligence analysis and data evaluation, or in response to general strategic goals established by the institution or the BOP Intelligence Section.  The employee also works closely with the Captain of the assigned correctional institution.  Activities are frequently performed in immediate support of investigative needs in the field, or the analytical needs of the Executive Staff.  Completed intelligence management activities will be subject to final review by the I/O (Counter-terrorism).

**FACTOR 3 - GUIDELINES**

The guidelines for performing such assigned activities, with the assistance of the team leader (I/O), are established in Intelligence Section SOP's, the Special Investigative Supervisors Manual, Security & Designations Manual, SENTRY Manuals, NCIC Manuals, NLETS Manuals, various BOP Program Statements,

SPA202



Department of Justice Orders, the Code of Federal Regulations, and federal law, such as the Privacy Act of 1974.

**FACTOR 4 – COMPLEXITY**

The incumbent assists the team leader (I/O) in developing and maintaining a thorough understanding of accepted procedures and practices in threat analysis and risk assessment, as well as accepted practices within various investigative support functions. The incumbent is expected to develop technical proficiency in appropriate computer software languages to the extent that he/she can perform data entry, data integrity audits, link analysis, data transfers, data backup and similar intelligence database activities.  The incumbent assists in producing intelligence products and executive briefing packages to report his/her findings.

Security concerns that are inherent in a correctional environment further increase the extent and nature of complexity.  Incumbent has direct and frequent daily contact with inmates.  Motivation of inmates to want to learn must be encouraged and developed.  In addition to regular duties, the staff are also responsible for maintaining security of the institution through observation of inmate behavior, maintenance of discipline, accountability of tools, and counseling of inmates on institutional and personal problems.  Security concerns are a regular and recurring part of the job.

**FACTOR 5 – SCOPE AND EFFECT**

The incumbent will assist the team leader (I/O) with the accuracy, timeliness, reliability, discretion, and total professionalism of the services provided are essential to ensure the quality and integrity of investigative services, as well as directly provide for the security of the BOP.

**FACTOR 6 – PERSONAL CONTACTS**

Most contacts are with BOP Intelligence staff, SIS staff in the field, federal law enforcement agents, analysts, and technicians and administrators, as well as various technical and security representatives of private corporations. As such, the incumbent will assist the team leader (I/O) in representing the professionalism and integrity of the investigative services of the assigned institution in particular, and the BOP as a whole. The incumbent is responsible for assuring all information and research disseminated is lawful, accurate, and professional in tone.

Incumbent has direct and frequent contacts with inmates and through these contacts, may impact their attitudes and behavior.

SPA202

**FACTOR 7 - PURPOSE OF CONTACTS**

The purpose of these contacts is to assist the team leader (I/O) by conducting investigative research and coordinating intelligence collection and distribution.

Contacts with inmates are primarily to attempt to change their undesirable attitudes and behavior patterns towards socially acceptable behavior and to establish positive correctional attitudes.  Incumbent has frequent opportunities to influence the attitudes and behavior of inmates by informal guidance and counseling.

**FACTOR 8 - PHYSICAL DEMANDS**

The position requires good vision, a clear speaking voice, manual dexterity, stooping, bending, moderate walking, basic driving skills, stairs, moderate lifting of equipment, and similar physical activities.  The incumbent must be prepared to travel by air or ground transportation as required.  The work is typically sedentary.

**FACTOR 9 - WORK ENVIRONMENT**

While the work environment normally involves secure office space within the assigned institution, technical assistance and research trips to other institutions in the field are possible. Such correctional facilities house inmates convicted of crimes such as murder, rape, kidnaping, arson, robbery, and assault. The incumbent moves freely throughout such institutions to perform research or technical assistance as required.

The incumbent observes normal safety precautions on a daily basis.  In addition, the incumbent must consistently provide for the security of various hardware, software and filing systems involved in the assigned projects, as well as provide for his/her personal security.  As with all correctional workers, the incumbent must be constantly aware of hostile inmates, escape plots, riot plans, hostage taking, drug traffic, potential assaults, and psychologically disturbed inmates.  In addition, due to the unique nature of the position, the incumbent must be aware of various groups in the community that would view his/her intelligence operations as a threat to their elicit activities.

All staff in the correctional facility, regardless of their occupations, are expected to perform law enforcement functions. As a result, the incumbent is regularly subject to physical hazards and dangerous conditions such as assaults and hostage situations.  Due to the potential for uncontrollable situations to occur in a correctional institution, the level of risk for hazardous and stressful working conditions is very high.

The duties of this position require frequent direct contact with individuals in detention suspected or convicted of offenses

SPA202

D000019

against the criminal laws of the United States.  Daily stress and exposure to potentially dangerous situations such as physical attack are an inherent part of this position; consequently, it has been designated as a law enforcement position.  Accordingly, the incumbent is covered under the special retirement provisions for law enforcement officers contained in Chapters 83 and 84 of Title 5, United States Code.

D000020

 

**U.S. Department of Justice**
Federal Bureau of Prisons

# Change Notice

DIRECTIVE AFFECTED: 3420.09
CHANGE NOTICE NUMBER: 3420.09
DATE: 2/5/99

1. <u>PURPOSE AND SCOPE</u>.  To revise the Standards of Employee Conduct.

2. <u>SUMMARY OF CHANGES</u>.  The changes include expanding the time frames for personal use of government property as well as removing some limitations on outside employment.

The change in Attachment A modifies the definition of "reckoning period" to conform with the Department of Justice Order pertaining to disciplinary and adverse actions and added an addition offense (#54), "Failure to report a violation of the Standards of Conduct, or retaliation or discrimination against those who make such a report."

Additionally, the Request for Outside Employment forms have been removed as attachments.  These forms may now be located in the forms area of BOPDOCS.

There are also various formatting changes, including conversion to WordPerfect 6.1, which caused some pagination changes.  The sections changed are marked by asterisks.  These changes can be found on pages 5, 6, 8, 15, 18, and 19.

3. <u>ACTION</u>.  All Wardens shall ensure each employee receives and signs for receipt of the revised pages.

File this Change Notice in front of the Program Statement on Standards of Employee Conduct.

/s/
Kathleen Hawk Sawyer
Director





**U.S. Department of Justice**
Federal Bureau of Prisons

# Program Statement

**OPI:** OGC
**NUMBER:** 3420.09
**DATE:** 2/5/99
**SUBJECT:** Standards of Employee Conduct

1. <u>PURPOSE AND SCOPE</u>.  To provide policies and procedures, herein referred to as the "Standards of Conduct," to complement those issued by the Office of Government Ethics on:

- employee conduct and responsibility,
- ethics in matters involving conflicts of interest,
- post-employment restrictions,
- procurement integrity issues,
- attorney ethics, and
- outside employment.

These standards apply to all employees of the Bureau of Prisons (Bureau), including employees of the Public Health Service and the National Institute of Corrections, and to any person detailed to any of those agencies under the Intergovernmental Personnel Act.  Such employees are subject to certain standards and prohibitions -- some statutory, some regulatory, and some a matter of good ethical and moral practice that is essential to the efficiency of the organization.  Contractors and volunteers working in Bureau facilities also are expected to conduct themselves by these standards.  This policy will not override the Master Agreement.

While issuances from the Office of Government Ethics and the Department of Justice address the basic standards and prohibitions applicable to Bureau employees, this Program Statement more specifically addresses situations that are especially applicable to Bureau employment.  It does not and cannot, however, attempt to detail every incident which could violate the Standards of Conduct.

2.  <u>PROGRAM OBJECTIVES</u>.  The expected results of this program are:

a.  Employees will conduct themselves in a manner that creates and maintains respect for the Bureau of Prisons, the Department of Justice, and the U.S. Government.

b.  Employees will avoid situations which involve conflicts of interest with their employment.

c.  Employees will comply with restrictions on employment outside the Bureau and after employment with the Bureau.

d.  Employees will conform with procurement integrity regulations.

e.  Employees will uphold the ethical rules governing their professions.

f. Employees will immediately report any violation, or apparent violation, of standards of conduct to their Chief Executive Officer (CEO) or another appropriate authority.

g.  Employees who fail to conduct themselves in accordance with these standards will be subject to appropriate sanctions.

3.  <u>DIRECTIVES AFFECTED</u>

a.  <u>Directive Rescinded</u>

PS 3420.08     Standards of Employee Conduct and Responsibility  (3/7/96)

b.  <u>Directives Referenced</u>

PS 3735.04     Drug Free Workplace Program (6/30/97)
PS 5510.09     Searching, Detaining, or Arresting Persons Other Than Inmates (3/6/98)
PS 5840.03     Staff Correspondence About Inmates (3/4/93)

18 U.S.C. § 201        Bribery; Illegal Gratuities
18 U.S.C. § 203        Representational Issues
18 U.S.C. § 205        Representational Issues
18 U.S.C. § 207        Post-Employment Statute
18 U.S.C. § 208        Conflict of Interest Statute
18 U.S.C. § 2241-45    Sexual Abuse
41 U.S.C. § 423        Procurement Integrity Act

D000023

| | |
|---|---|
| 5 CFR § 2635 | Standards of Ethical Conduct for Employees of the Executive Branch (8/7/92) |
| 5 CFR § 2637 | Post-Employment (12/30/93) |
| 5 CFR § 2641 | Post-Employment (1/28/92) |
| 28 CFR § 50.15 | Representation of Federal Employees Sued, Subpoenaed or Charged in Their Individual Capacities (4/9/90) |
| 28 CFR § 500.1 | Contraband |
| Executive Orders 12674 and 12731 | Prescribing Standards of Ethical Conduct |
| DOJ Order 1735.1 | Procedures for Complying with Uniform Standards and Other Ethics Requirements (9/17/92) |
| ABA Model Rule 1.11 | Successive Government and Private Employment Rules for Lawyers (2/7/87) |
| ABA Model Rule 1.6 | Confidentiality of Information (8/2/83) |

4.  STANDARDS REFERENCED

   a.  American Correctional Association, 3rd Edition, Standards for Adult Correctional Institutions:  3-4048, 3-4067.

   b.  American Correctional Association, 3rd Edition, Standards for Adult Local Detention Facilities:  3-ALDF-1C-23.

   c.  American Correctional Association, 2nd Edition, Standards for Administration of Correctional Agencies:  2-CO-1C-04, 2-CO-1C-20, 2-CO-1C-24.

   d.  American Correctional Association Standards for Adult Correctional Boot Camp Programs:  1-ABC-1A-23.

5.  GENERAL REFERENCES.  The Standards of Ethical Conduct for Employees of the Executive Branch, found at 5 CFR Part 2635, sets forth ethical standards, statutory provisions, and other matters governing the conduct of federal employees.  Various resolutions, messages, memoranda, and Executive Orders are included, as are requirements for informing employees and the authority for regulating their conduct.

6.  <u>DEFINITIONS</u>.  For the purposes of this Program Statement, the following definitions apply:

a.  <u>Chief Executive Officer (CEO)</u>.  The Warden at institutions, the Director at Staff Training Centers, the Community Corrections Manager at community corrections offices, the Regional Director at the regional offices, and the Assistant Director of each division at the Central Office.

b.  <u>Conflict of Interest</u>.  A conflict between public interests and the private interests of the individual involved.

c.  <u>Criminal Matters</u>.  Involvement with a federal, state or local law enforcement agency, or with inmates as defined by this section, or with state and local inmates.

d.  <u>During the Conduct of a Procurement</u>.  The time between the beginning and end of a procurement.  The conduct of a procurement begins on the earliest date an authorized official directs that a specific action be taken to initiate a procurement.  These actions include:

- Drafting a specification or a statement of work;
- Reviewing and approving a specification;
- Computing requirements or a purchase request;
- Preparing or issuing a solicitation;
- Evaluating bids or proposals;
- Selecting sources;
- Conducting negotiations; or
- Reviewing and approving the award of a contract or contract modification.

The conduct of a procurement ends with the award or modification of a contract or the cancellation of the procurement.

e.  <u>Employment</u>.  Any form of employment or business relationship, compensated or uncompensated, involving the provision of personal services by the employee, whether to be undertaken at the same time as or subsequent to current federal employment.  It includes, but is not limited to, personal services as an officer, director, employee, agent, attorney, consultant, contractor, general partner, or trustee.

f.  <u>Inmate</u>.  Any person found guilty of committing a felony or misdemeanor and who has been placed in Bureau custody or under supervision of a federal court.  This includes individuals participating in home-monitoring programs, parole, probation, halfway house placement, pretrial and non-sentenced inmates,

PS 3420.09
2/5/99
Page 5

detainees, and inmates with state sentences under federal
supervision.

   g.  <u>Former Inmate</u>.  Any inmate for whom less than one year has
elapsed since their release from Bureau custody or supervision of
a federal court.

   h.  <u>Official Investigation</u>.  Includes, but is not limited to,
investigations conducted by the Federal Bureau of Investigation,
Office of the Inspector General, Office of Professional
Responsibility, Office of Internal Affairs, Office of Personnel
Management, Special Investigative Agent, Special Investigative
Supervisor, Equal Employment Opportunity Investigator or any
other employee the CEO authorizes or orders to conduct an
investigation.

   i.  <u>Negotiations</u>.  Discussion or communication with another
person, or such person's agent or intermediary, mutually
conducted with a view toward reaching an agreement regarding
possible employment with that person.

   j.  <u>Participate</u>.  To take action as an employee through
decision, approval, disapproval, recommendation, rendering of
advice, or investigation.

   k.  <u>Particular Matter</u>.  Matters that involve deliberation,
decision, or action that is focused upon the interests of
specific persons, or a discrete and identifiable class of
persons.  The particular matters covered by this subpart include
a judicial or other proceeding, application, request for a ruling
or other determination, contract, claim, controversy, charge,
accusation, or arrest.

   l.  <u>Procurement Official</u>.  Any officer or employee of an agency
who has participated personally and substantially in any of the
activities involved "during the conduct of a procurement."  This
definition includes acting as a procuring contracting officer,
the source selection authority, a member of the source selection
evaluation board, or the chief of a financial or technical
evaluation team in a procurement in which that contractor was
selected for award of a contract in excess of $10,000,000.

   This definition also includes serving as a program manager,
deputy program manager, or administrative contracting officer,
and extends to officials who personally make the decision to
award a contract, task order, or delivery order, establish
overhead or other rates, approve the issuance of contract

D000026

payments, or decide to pay or settle a claim, in excess of
$10,000,000.  (See definition "during the conduct of a
procurement.")

7.  <u>PUBLICATION AND INTERPRETATION</u>

   a.  The CEO of each facility has the primary responsibility for
ensuring that the Standards of Employee Conduct are provided and
made known to each employee, contractor and volunteer.

   b.  Only actions made in reliance on advice received from the
Ethics Officer, or his or her designees, may be protected from
disciplinary action.  When an employee's conduct violates a
criminal statute, however, reliance on the advice of an ethics
official cannot ensure the employee will not be prosecuted, but
may be used as a factor in making this determination.

   c.  Each new employee, contractor, and volunteer shall receive
and sign for this Program Statement at the time of appointment.
In addition, all employees, contractors, and volunteers shall
receive and sign for any updated versions of this Program
Statement when issued.  The responsibility for ensuring that
employees, contractors and volunteers receive and sign for this
Program Statement shall be delegated in the following manner:

   ▪ Human Resource Managers shall be responsible for
   employees;
   ▪ Department heads who oversee a contractor shall be
   responsible for that contractor;
   ▪ Employee Development Managers shall be responsible for
   volunteers.

   All receipts are to be filed on the left side of the Official
Personnel Folder.

   d.  Employee Development Managers shall ensure that supervisors
and employees receive annual training on their responsibilities
under these regulations and policies.

8.  <u>GENERAL POLICY</u>.  Employees of the Bureau are governed by the
regulations published in 5 CFR Part 2635.  While this Program
Statement expounds on those regulations to clarify their
application in the Bureau, it does not and cannot specify every
incident which would violate the Standards of Conduct.  In
general, the Bureau expects its employees to conduct themselves
in such a manner that their activities both on and off duty will
not discredit themselves or the agency.

D000027

Employees shall:

a.  Conduct themselves in a manner that creates and maintains respect for the Bureau of Prisons, the Department of Justice, and the U.S. Government.

b.  Not abuse their position by giving any false impression of having arrest authority through use of Bureau credentials or otherwise.  Bureau employees may only arrest in their official capacity in very limited circumstances as permitted by 18 U.S.C. § 3050 or other authority officially granted to them, such as U.S. Marshal deputation.

c.  Avoid any action which might result in, or create the appearance of, adversely affecting the confidence of the public in the integrity of the U.S. Government.

d.  Avoid conflicts of interest in matters that affect their financial interests.

e.  Comply with post-employment restrictions.

f.  Conform with procurement integrity regulations.

g.  Uphold the ethical rules governing their professions including complying with applicable licensing authority rules, except when they conflict with federal law.

h.  Follow special rules to avoid conflicts of interest when seeking employment outside the Bureau.

i.  Immediately report to their CEOs, or other appropriate authorities, such as the Office of Internal Affairs or the Inspector General's Office, any violation or apparent violation of these standards.

Failure by employees to follow these regulations or this policy could result in appropriate disciplinary action, up to and including removal (see Attachment A).

9. PERSONAL CONDUCT.  It is essential to the orderly running of any Bureau facility that employees conduct themselves professionally.  The following are some types of behavior that cannot be tolerated in the Bureau.

a.  Alcohol/Narcotics.  The use of illegal drugs or narcotics or the abuse of any drug or narcotic is strictly prohibited at any time.  Use of alcoholic beverages or being under the influence of alcohol while on duty or immediately prior to

D000028

PS 3420.09
2/5/99
Page 8

reporting for duty, is prohibited.  Employees shall be subject to
disciplinary action if found to possess a .02 blood alcohol
content level or greater while on duty.

   b.  <u>Sexual Relationships/Contact With Inmates</u>.  Employees may
not allow themselves to show partiality toward, or become
emotionally, physically, sexually, or financially involved with
inmates, former inmates, or the families of inmates or former
inmates.  Chaplains, psychologists, and psychiatrists may
continue a previously established therapeutic relationship with a
former inmate in accordance with their respective codes of
professional conduct and responsibility.

     (1)  An employee may not engage in, or allow another person
to engage in, sexual behavior with an inmate.  Regardless of
whether force is used, or threatened, there is never any such
thing as "consensual" sex between staff and inmates.

     (2)  Title 18, U.S. Code Chapter 109A provides penalties of
up to life imprisonment for sexual abuse of inmates where force
is used or threatened.  "Sexual contact" is defined as the
intentional touching of "the genitalia, anus, groin, breast,
inner thigh, or buttocks."  Penetration is not required to
support a conviction for sexual contact.  All allegations of
sexual abuse shall be thoroughly investigated and, when
appropriate, referred to authorities for prosecution.

     (3)  Employees are subject to administrative action, up to
and including removal, for any inappropriate contact or
relationship with inmates, regardless of whether such contact
constitutes a prosecutable crime.  Physical contact is not
required to subject an employee to sanctions for sexual
misconduct.

   c.  <u>Additional Conduct Issues</u>.  An employee may not offer or
give to an inmate or a former inmate or any member of his or her
family, or to any person known to be associated with an inmate or
former inmate, any article, favor, or service, which is not
authorized in the performance of the employee's duties.  Neither
shall an employee accept any gift, personal service, or favor
from an inmate or former inmate, or from anyone known to be
associated with or related to an inmate or former inmate.  This
prohibition includes becoming involved with families or
associates of inmates.  If such contact occurs, it must be
reported using the procedure in subsection c(5).

     (1)  An employee may not show favoritism or give
preferential treatment to one inmate, or a group of inmates, over
another.

(2)  An employee may not use brutality, physical violence, or intimidation toward inmates, or use any force beyond that which is reasonably necessary to subdue an inmate.

(3)  An employee may not use physical violence, threats or intimidation toward fellow employees, family members of employees, or any visitor to a Bureau work site.

(4)  An employee may not use profane, obscene, or otherwise abusive language when communicating with inmates, fellow employees, or others.  Employees shall conduct themselves in a manner which will not be demeaning to inmates, fellow employees, or others.

(5)  An employee who becomes involved in circumstances as described above (or any situation that might give the appearance of improper involvement with inmates or former inmates or the families of inmates or former inmates, including employees whose relatives are inmates or former inmates) must report the contact, in writing, to the CEO as soon as practicable.  This includes, but is not limited to, telephone calls or written communications with such persons outside the normal scope of employment.  The employee will then be instructed as to the appropriate course of action.

(6)  Employees shall avoid situations which give rise to a conflict of interest or the appearance of a conflict of interest (see Section 6, Definitions).

(7)  Employees shall not participate in conduct which would lead a reasonable person to question the employee's impartiality (see Section 20, Conflicts of Interest).

10.  <u>RESPONSIVENESS</u>

a.  Inattention to duty in a correctional environment can result in escapes, assaults, and other incidents.  Therefore, employees are required to remain fully alert and attentive during duty hours.

b.  Because failure to respond to an emergency may jeopardize the security of the institution, as well as the lives of staff or inmates, it is mandatory that employees respond immediately and effectively to all emergency situations.

c.  Employees are to obey the orders of their superiors at all times.  In an emergency situation, carrying out the orders of those in command is imperative to ensure the security of the institution.

PS 3420.09
2/5/99
Page 10

11.  <u>ILLEGAL ACTIVITIES</u>.  Illegal activities on the part of any employee, in addition to being unlawful, reflect on the integrity of the Bureau and betray the trust and confidence placed in it by the public.  It is expected that employees shall obey, not only the letter of the law, but also the spirit of the law while engaged in personal or official activities.  Should an employee be charged with, arrested for, or convicted of any felony or misdemeanor, that employee must immediately inform and provide a written report to the CEO.  Traffic violations resulting in fines under $150 shall be exempt from the reporting requirement.

12.  <u>INTRODUCTION OF CONTRABAND</u>.  The introduction of contraband into or upon the grounds of any federal penal or correctional institution, or taking or attempting to take therefrom, anything whatsoever without the Warden's knowledge and consent, is prohibited.  Pursuant to 28 CFR § 500.1(h), contraband is defined as any material that can reasonably be expected to cause physical injury or adversely affect the security, safety, or good order of the institution.  Contraband includes, but is not limited to, the following:

- letters,
- stamps,
- money,
- tools,
- weapons,
- paper,
- food,
- implements,
- writing material,
- messages,
- instruments,
- alcoholic beverages,
- drugs,
- photographic equipment,
- computer software,
- recording devices,
- cellular phones, etc.

13.  <u>OFFICIAL INVESTIGATION</u>

a.  Every employee is required to report to management immediately any violation or attempted violation of any law or regulation and any act or omission by any person which could result in a breach of institution security.

b.  It is not Bureau policy to routinely search employees or their property; however, when the CEO has a reasonable suspicion to suspect that an employee is in possession of contraband items

D000031



PS 3420.09
2/5/99
Page 11

which, if introduced, could endanger the safety of staff or inmates or the security of the institution, the CEO may authorize the search of an employee or his or her personal property. Searches may also be authorized when the CEO has a reasonable suspicion that an employee is transporting contraband. Other circumstances may warrant an order by the CEO to randomly search employees or any person or their property when entering or leaving the institution.

c.  During the course of an official investigation, employees are to cooperate fully by providing all pertinent information which they may have.  Full cooperation requires truthfully responding to all questions and providing a signed affidavit, if requested.  Any employee who fails to cooperate fully or who hinders an investigation is subject to disciplinary action, up to and including removal.

14.  <u>JUST DEBTS</u>.  Failure on the part of any employee, without good reason and in a proper and timely manner, to honor debts acknowledged by him or her to be valid or reduced to judgment by a court, or to adhere to satisfactory arrangements for the settlement thereof, may be cause for disciplinary action. Depending on the circumstances, an employee who receives a legally valid garnishment order may be subject to disciplinary action.

15.  <u>CONFIDENTIALITY</u>.  Employees of the Bureau have access to official information ranging from personal data concerning staff and inmates to information involving security.  Because of the varying degrees of sensitivity of such information, it may be disclosed or released only as required in the performance of an employee's duties or upon specific authorization from someone with the authority to release official information.
The only persons authorized to release official information are:

- in the Central Office, the Director, or designee;
- in a Regional Office, the Regional Director, or designee;
- in other locations, the CEO, or designee.

The above shall not be construed as a reason to deny authorized persons access to official records and files.  The Bureau has an obligation to supply official information in response to requests from organizations or individuals upon determining that such individuals are properly identified and acting in an official capacity.  To ensure the proper use of official information, the following rules of conduct are established:

D000032

a.  Employees shall verify the identification and authority of individuals requesting access to information prior to giving or discussing records, personnel files, or other official information.

b.  Employees may not deny authorized persons access to official information.

c.  Employees may not use, or release for use, official information for private purposes unless that information is available to the general public.

d.  Employees may not remove information from files or make copies of records or documents, except in accordance with established procedures or upon proper authorization.

e.  Employees may not make statements or release official information which could breach the security of the institution or unduly endanger any person.

f.  Former employees may be granted access only to information available to the general public and may have no greater standing than the general public, irrespective of their past employment and any associations developed in the course of such employment.

16.  <u>GOVERNMENT PROPERTY</u>.  Government property is to be used for authorized purposes only.

a.  <u>Authorized Purposes</u>.  Authorized purposes includes personal use of Government office equipment such as computers, printers, fax machines, telephones, copiers, and calculators.  Use may not involve more than merely negligible cost to the Government.

b.  <u>Negligible Cost</u>.  Negligible cost to the Government includes the cost of electricity, ink, and ordinary wear and tear.  Employees shall provide their own paper.

c.  <u>Personal Use</u>.  Personal use of Government property may take place before or after official working hours or during non-paid meal breaks, provided such use does not adversely affect the performance of official duties by the employee or the Bureau, with the following exception:

<u>Telephones</u>.  Employees may place a personal call on a Government telephone during official working hours if the call:

- does not adversely affect the performance of official duties by the employee or the Bureau;
- is of reasonable duration and frequency;

D000033



PS 3420.09
2/5/99
Page 13

> ■ could not reasonably have been made at another time; and
> ■ is within the employee's local commuting area.

d. <u>Fitness Equipment</u>.  Employees may use Government-owned fitness equipment during breaks if such equipment is intended exclusively for employee use.

e. <u>Existing Prohibitions</u>.  This rule does not override already existing prohibitions on use of Government property, including those rules established by a supervisor for business reasons.

17. <u>CREDENTIALS</u>.  Bureau of Prisons credentials, identification cards, Government drivers licenses, or badges may not be used to coerce, intimidate, or deceive others or to obtain any privilege or article not otherwise authorized in the performance of official duties.

a. Employees may not obtain or use identification badges issued by other sources which give the appearance of being an official Bureau or law enforcement credential.

b. Employees may not use credentials or otherwise represent themselves as Department of Justice personnel to obtain a gun permit to be used in their unofficial capacity.

c. Employees may use credentials to prove Government employment for purposes of permissible discounts offered to a broad class of Government employees.

18. <u>OUTSIDE EMPLOYMENT</u>

a. There are limitations as to the type of outside employment an employee may obtain.  Employees may not:

> ■ engage in any outside employment or activity that involves criminal matters, although the Director reserves the authority to approve uncompensated correctional work on a case-by-case basis;
>
> ■ engage in any outside employment which would require the use of a firearm, except for military reserve duty; or
>
> ■ testify as an expert witness in any legal proceeding, with or without compensation, in which the Bureau does not have an interest.

D000034



b.  Any employee who wishes to engage in employment outside the Bureau must obtain prior written approval for each activity using BP-S543.033 or BP-S166.033.  Employment includes compensated speaking, writing, and teaching.  Outside employment, including self-employment, must not result in, or create the appearance of, a conflict of interest with official duties or tend to impair the employee's mental or physical capacity to perform official duties and responsibilities.  Written approval must be resubmitted when there is a change of duty station.

c.  Any employee who wishes to serve as an officer or director of any organization, whether it is compensated or uncompensated, must also complete an outside employment request form.  Employees who perform voluntary service involving church, employee's club, credit union, or union activities, which do not conflict with their official duties or with the mission of the Federal Bureau of Prisons, will be exempted from the requirement to request approval for these activities.

d.  An employee may not have a direct or indirect financial interest that could be affected by the performance or nonperformance of his or her Government duties and responsibilities.

e.  Certain professional employees are prohibited from engaging in the private practice of their professions.  Exceptions may be granted, however, in accordance with subsection (1).  Professional employees who wish to engage in outside employment **not** within their profession should follow instructions provided in subsection (2) and should complete BP-S166.033.  For the purpose of this subsection, teaching, writing, and speaking are not considered practicing within one's profession.

(1)  <u>Employment in Certain Professions</u>.  Persons currently employed by the Bureau in the professions listed below who would like to work **within** that profession during off-duty hours must have the approval of his or her immediate supervisor, CEO, Regional Director, and the Director:

- Architect
- Attorney
- Chaplain
- Doctor
- Psychologist

The Bureau Ethics Officer shall review each request to ensure that there are no conflicts of interest.

PS 3420.09
2/5/99
Page 15

Attorneys who seek to practice law outside of the Bureau must also refer to Section 19, Rules for Attorneys.

The form entitled "Request for Approval for Outside Employment Within One's Profession" (BP-S543.033) must be completed with all appropriate signatures affixed before the employee may engage in the outside practice of his or her profession.  The form requires such basic information as the name of the employee, the employee's job title, grade, institution and a brief description of the outside employment contemplated.  The brief description, at a minimum, should include:

- a summary of the duties to be performed,
- the work address of the employer,
- the hours of employment, and
- any information deemed relevant to support the request.

Failure to provide the required information could result in delays in processing or a denial of the request.

(2)  Other Outside Employment.  Any other employee who wishes to engage in outside employment must obtain prior approval from his or her supervisor and CEO by initiating a Request for Approval for Outside Employment.  Forms may be found on BOPDOCS.

(3) Change of Outside Employment.  Any approval granted for outside employment is specific to the particular position referenced in the application and approval.  Any employee who wishes to change outside employment, (e.g., to work for a different company, accept a different position with the same company, etc.), must submit a new request form, and receive approval before doing so.

(4) One-Time Review of Outside Employment.  All employees who have received approval for outside employment prior to the effective date of this Program Statement must submit a new request form by December 31, 1998.  Request for Outside Employment forms may be found on BOPDOCS.  This requirement applies even if the employee is still in the same outside position for which approval had previously been granted. The purpose of this one-time review is to ensure compliance with the Supplemental Standards Of Ethical Conduct For Employees Of The Department Of Justice (5 CFR Part 3801).

PS 3420.09
2/5/99
Page 16

19.  RULES FOR ATTORNEYS

   a.  Approval of Exceptions.  Attorneys for the Bureau may not
practice law on behalf of any other person or entity, for
compensation, without the written approval of the Deputy Attorney
General.  Bureau attorneys, however, may perform uncompensated
legal practice outside the Bureau if:

   - the work does not violate 18 U.S.C. §§ 203 and 205,
   - the General Counsel has approved the request, and
   - the work does not involve criminal matters.

   b.  Confidentiality.  Only under limited circumstances shall
the attorney/client privilege of confidentiality apply to
communications with a Bureau employee.

   c.  Successive Government and Private Employment

      (1)  A former Bureau attorney may not represent a private
client in connection with a matter in which the attorney
participated personally and substantially as a public officer.
In such a case, the attorney's firm may continue representation
in the matter only if the attorney is screened from any
participation in the matter in which he or she participated
personally and is apportioned no part of the fee therefrom.

      (2)  A Bureau attorney who came from private practice may
not participate in a matter before the Bureau in which the
attorney participated personally and substantially while in
private practice.  Like any Bureau employee, an attorney may not
negotiate for private employment with any party involved in a
Bureau matter in which the attorney is participating in
personally and substantially.

   d.  Other Duties.  In addition to the ethical rules attorneys
must follow, the duties of a Bureau attorney are further defined
by federal regulations and Bureau policy.

20.  CONFLICTS OF INTEREST.  Bureau employees should avoid
situations where their official actions affect or appear to
affect their private interests, financial or non-financial.

   a.  Prohibitions.  Employees are prohibited from taking
official action on matters that affect the financial interests
of:

   - The employee, a spouse, minor child, or a general
     partner of an employee;

D000037

- An organization where the employee is an officer, director, trustee, partner or employee; or
- An organization the employee is negotiating with for future employment.

b. <u>Waivers</u>

(1)  The Director may grant an individual waiver if the interest is found not to be so substantial as to affect the employee's service to the Bureau.

(2)  Employee's holdings in mutual funds are exempt if the employee's share is no more than one percent of the total assets of the fund.

(3)  An employee with a conflict of interest may ask to have himself or herself recused from the matter, sell the asset, or resign.

(4)  An employee must seek written authorization prior to participating in a matter which could lead a reasonable person to question the employee's impartiality, even if there is not a statutory conflict of interest.

(5)  Procurement officials must refer to Section 23, Procurement Integrity.

21.  <u>SEEKING OTHER EMPLOYMENT</u>.  Any Bureau employee who wishes to seek employment with persons who otherwise would be affected by the performance or nonperformance of the employee's official duties are required to disqualify themselves from participation in any particular matter that will have a direct and predictable effect on the financial interests of the person with whom he or she is negotiating.

When an employee is not actually negotiating for employment, but lacks impartiality in dealing with a prospective employer, the employee should disqualify himself or herself.  A Bureau employee who is aware of, or should be aware of, the need to disqualify himself or herself from participation in a particular matter must contact his or her supervisor and request, in writing, to be removed from the matter.

22.  <u>POST-EMPLOYMENT</u>.  The Office of Government Ethics, in accordance with statutes, has issued post-employment restrictions for federal employees who leave federal service.  There is a general restriction on the representation of parties in matters related to their federal employment.  This regulation is not designed to bar an individual from accepting employment with any

D000038

PS 3420.09
2/5/99
Page 18

private or public employer after his or her service at the Bureau, but certain acts that are detrimental to public confidence in Government are prohibited.

    a.  Lifetime Prohibition.  All former Bureau employees are prohibited from representing another party before the Government on a particular matter involving specific parties in which they participated personally and substantially while working for the Government.  This prohibition does not apply to an appearance or communication involving purely social contacts, a request for publicly available documents, or a request for purely factual information or the supplying of such information.  This restriction is found at 18 U.S.C. § 207(a)(1).

    b.  Two-Year Prohibition.  After leaving the Bureau, a former employee is restricted from acting as a representative on a particular matter for which the employee had official responsibility, rather than personal participation.  The restriction applies if the former employee knew, or reasonably should have known, that the matter was pending under his or her official responsibility during his or her last year of Government service.  This restriction is found at 18 U.S.C. § 207(a)(2).

    c.  One-Year Prohibition.  Former senior level employees are restricted from lobbying the Bureau, on behalf of another person on a matter in which that person seeks official action, for one year.  This ban only applies to Executive Schedule or SES level 5 and 6 employees.  The purpose of this restriction is to allow for a period of adjustment for incoming senior employees of an agency and to diminish any appearance that Government decisions might be affected by the improper influence of a former senior employee. This restriction is found at 18 U.S.C. § 207(c).

23.  PROCUREMENT INTEGRITY.  During the conduct of a procurement, a procurement official is prohibited from knowingly, directly or indirectly, soliciting or accepting any promise of future employment or business from any officer, employee, representative, agent, or consultant of a competing contractor. This prohibition includes engaging in any discussion of future employment or business opportunity.  This restriction is found in the Procurement Integrity Act, 41 U.S.C. § 423.  Any procurement official who participates personally and substantially in a procurement in excess of $100,000 (the simplified acquisition threshold) and who is contacted concerning employment by a person who is a bidder or offeror in such procurement must promptly report the contact in writing both to the employee's supervisor as well as to the Ethics Officer.

PS 3420.09
2/5/99
Page 19

    a.  <u>Recusal To Discuss Employment</u>.  In certain instances, a procurement official may obtain permission to withdraw from further participation in a procurement to discuss future employment with a competing contractor.  An eligible procurement official may, in accordance with specific procedures in the regulations, request authorization to be recused from participation in the procurement.  A procurement official is not eligible for recusal if, during the period beginning with the issuance of a procurement solicitation and ending with the award of a contract, he or she has participated personally and substantially in the evaluation of bids or proposals, the selection of sources, or the conduct of negotiations.

    An individual may not commence discussions with a competing contractor until he or she has received written approval of the recusal request from his or her supervisor.  Rejection of a recusal request is not an adverse personnel action.

    b.  <u>Post-Employment Restrictions For Procurement Officials</u>. The Procurement Integrity Act places restrictions on employees involved in procurement who leave federal service.  A former procurement official cannot, for one year after his or her last personal and substantial involvement in a procurement in excess of $10,000,000 accept compensation from such contractor as an employee, officer, director, or consultant.  This does not prohibit former procurement officials from accepting compensation from any division or affiliate of a contractor that does not produce the same or similar products or services for which the employee contracted while a government employee.


                  /s/
             Kathleen Hawk Sawyer
             Director

PS 3420.09
2/5/99
Attachment A, Page 1

<u>Standard Schedule of Disciplinary Offenses and Penalties</u>

1.  This table is intended to be used as a guide in determining appropriate discipline to impose according to the type of offense committed.  The offenses listed are not inclusive of all offenses.

2.  Ordinarily, penalties imposed should be within the range of penalties provided for an offense.  In aggravated cases, a penalty outside the range of penalties may be imposed.  For example, supervisors, because of their responsibility to demonstrate exemplary behavior, may be subject to greater penalty than is provided in the range of penalties.  When a more severe penalty than provided for in the range of penalties is proposed, the notice of proposed action must provide a justification.

3.  The deciding official will consider relevant circumstances, including mitigating and aggravating factors, when determining the appropriate penalty.  The range of penalties provided for most offenses is intentionally broad, ranging from official reprimand to removal.  While the principles of progressive discipline will normally be applied, it is understood that there are offenses so egregious as to warrant severe sanctions for the first offense up to and including removal.  This is especially true in cases where there is no indication that the employee would be corrected by a lesser penalty, or if the offense is of such a nature that reoccurrence of the conduct could jeopardize security or bring disrepute on the Bureau of Prisons.  For example, if an employee failed to respond to an emergency, even if that emergency turned out to be a false alarm, removal would be appropriate if the deciding official was not convinced that the employee would respond promptly to any future emergency.

4.  Where appropriate, consideration may be given to a demotion or other action in lieu of removal.

5.  Suspension penalties on this schedule refer to calendar days.  Except for emergency suspensions and indefinite suspensions, all disciplinary suspensions are to begin on the first workday of the employee's next regularly scheduled work week.

6.  The reckoning period is defined as that period of time following the date management becomes aware of the offense during which that offense can be used to determine the sanction for a subsequent offense.



PS 3420.09
2/5/99
Attachment A, Page 2

7.  Offenses falling within the reckoning period, even though
unrelated, should be considered when determining the appropriate
action.

8.  Where the deciding official substitutes a letter of reprimand
in lieu of a greater proposed sanction, the letter of reprimand
itself is to be separate from the decision letter and is not to
refer to the greater sanction proposed.

D000042

| NATURE OF OFFENSE | EXPLANATION | FIRST OFFENSE | SECOND OFFENSE | THIRD OFFENSE | RECKONING PERIOD |
|---|---|---|---|---|---|
| 1. Unexcused or unauthorized absence of 8 hours or less. | Unauthorized absence of 8 hours or less, tardiness, leaving the job without permission. | Official reprimand to 1-day suspension. | Official reprimand to 5-day suspension. | Official reprimand to removal. | 6 months. |
| 2. Unexcused or unauthorized absence of between 1 and 5 consecutive workdays. | Unauthorized absence of 8 to 40 hours. | 1-day to 5-day suspension. | 5-day suspension to 14-day suspension. | 14-day suspension to removal. | 1 year. |
| 3. Excessive unauthorized absence. | Unauthorized absence of more than 5 consecutive workdays. | 5-day suspension to removal. | 14-day suspension to removal. | Removal. | 2 years. |
| 4. Careless workmanship or negligence resulting in spoilage or waste of materials or delay in work production. | | Official reprimand to removal. | 14-day suspension to removal. | Removal. | 2 years. |
| 5. Failure or delay in carrying out orders, work assignments, or instructions of superiors. | | Official reprimand to removal. | 14-day suspension to removal. | Removal. | 2 years. |

D000043

| NATURE OF OFFENSE | EXPLANATION | FIRST OFFENSE | SECOND OFFENSE | THIRD OFFENSE | RECKONING PERIOD |
|---|---|---|---|---|---|
| 6. Loafing, wasting time, sleeping on the job, or inattention to duty. | Potential danger to safety of persons and/or actual damage to property is considered in determining severity of the penalty, as is potential or actual adverse impact on government operation. | Official reprimand to removal. | 14-day suspension to removal. | Removal. | 2 years. |
| 7. Insubordination. | Disobedience to constituted authorities, or refusal to carry out a proper order from any supervisor or other official having responsibility for the work of the employee. | Official reprimand to removal. | 14-day suspension to removal. | Removal. | 2 years. |

D000045

| NATURE OF OFFENSE | EXPLANATION | FIRST OFFENSE | SECOND OFFENSE | THIRD OFFENSE | RECKONING PERIOD |
|---|---|---|---|---|---|
| 8. Disorderly conduct, fighting, threatening, or attempting to inflict bodily injury to another, engaging in dangerous horseplay. | | Official reprimand to removal. | 14-day suspension to removal. | Removal. | 2 years. |
| 9. Disrespectful conduct, use of insulting, abusive or obscene language to or about others. | Includes verbal abuse of inmates, ex-inmates, their families or friends. | Official reprimand to removal. | 14-day suspension to removal. | Removal. | 2 years. |
| 10. Reporting for duty or being under the influence of intoxicants or other drugs; unauthorized possession of intoxicants or drugs on government or leased premises. | | Official reprimand to removal. | 14-day suspension to removal. | 30-day suspension to removal. | 2 years. |
| 11. Failure to follow orders during an emergency situation. | Potential danger to safety and/or damage to property is a primary consideration in determining severity of the penalty. | 5-day suspension to removal. | 14-day suspension to removal. | Removal. | 2 years. |

D000046

| NATURE OF OFFENSE | EXPLANATION | FIRST OFFENSE | SECOND OFFENSE | THIRD OFFENSE | RECKONING PERIOD |
|---|---|---|---|---|---|
| 12. Failure to respond immediately to an emergency situation. | Potential danger to safety of persons and/or damage to property is a primary consideration in determining severity of the penalty. | Official reprimand to removal. | 14-day suspension to removal. | Removal. | 2 years. |
| 13. Failure to observe safety precautions. | To include: (1) precautions for personal safety; (2) posted rules; (3) signs; (4) written or oral safety instructions, or failure to use protective clothing and equipment. | Official reprimand to removal. | 14-day suspension to removal. | Removal. | 2 years. |
| 14. Endangering the safety of or causing injury to staff, inmates or others through carelessness or failure to follow instructions. | | Official reprimand to removal. | 14-day suspension to removal. | Removal. | 2 years. |

D000047

| NATURE OF OFFENSE | EXPLANATION | FIRST OFFENSE | SECOND OFFENSE | THIRD OFFENSE | RECKONING PERIOD |
|---|---|---|---|---|---|
| 15. Giving an inmate an order which could be hazardous to health and safety. | Potential danger to safety of persons and/or actual damage to property is a primary consideration in determining severity of the penalty. | Official reprimand to removal. | 14-day suspension to removal. | Removal. | 2 years. |
| 16. Unauthorized possession or use of, loss of, or damage to government property or property of others. | | Official reprimand to removal. | 14-day suspension to removal. | Removal. | 2 years. |
| 17. Willful use or authorization of use of a U.S. government owned or leased motor vehicle or aircraft for other than an official purpose. | 31 U.S.C. Section 1349 provides for a minimum 30-day suspension. | 30-day suspension to removal. | 45-day suspension to removal. | Removal. | 2 years. |
| 18. Theft or attempted theft or misappropriation of government property or the property of others. | | Official reprimand to removal. | 14-day suspension to removal. | Removal. | 2 years. |

D000048

Case 1:11-cv-00268-NGG-CLP   Document 55-25   Filed 06/10/13   Page 49 of 139 PageID #: 1580

| NATURE OF OFFENSE | EXPLANATION | FIRST OFFENSE | SECOND OFFENSE | THIRD OFFENSE | RECKONING PERIOD |
|---|---|---|---|---|---|
| 19. Conversion of government funds or funds in government custody to personal use. | Includes, but is not limited to, travel advances, imprest funds, amounts received as collections and inmate funds. | Official reprimand to removal. | 14-day suspension to removal. | Removal. | 2 years. |
| 20. Malicious damage to government property or the property of others. | | Official reprimand to removal. | 14-day suspension to removal. | Removal. | 2 years. |
| 21. Gambling or unlawful betting on government-owned or leased premises. | | Official reprimand to 10-day suspension. | 10-day suspension to removal. | 14-day suspension to removal. | 2 years. |
| 22. Promotion of gambling on government-owned or leased premises. | | Official reprimand to removal. | 14-day suspension to removal. | Removal. | 2 years. |

D000049

| NATURE OF OFFENSE | EXPLANATION | FIRST OFFENSE | SECOND OFFENSE | THIRD OFFENSE | RECKONING PERIOD |
|---|---|---|---|---|---|
| 23. Physical abuse of an inmate. | In determining the severity of the penalty, the circumstances of the incident (were the employee's actions totally unwarranted) should be given more consideration than the presence or absence of physical injury. | Official reprimand to removal. | 14-day suspension to removal. | Removal. | 2 years. |
| 24. Loss of temper in the presence of inmates, former inmates, their families or friends. | Potential of creating a disturbance is a primary consideration in determining severity of penalty. | Official reprimand to removal. | 5-day suspension to removal. | 14-day suspension to removal. | 2 years. |
| 25. Receiving or soliciting gifts, favors, or bribes in connection with official duties. | | Official reprimand to removal. | 14-day suspension to removal. | Removal. | 2 years. |

D000050

| NATURE OF OFFENSE | EXPLANATION | FIRST OFFENSE | SECOND OFFENSE | THIRD OFFENSE | RECKONING PERIOD |
|---|---|---|---|---|---|
| 26. Acceptance of any gift or favor from an inmate or former inmate. | Value of gift or favor and the reasons for accepting are primary considerations in determining severity of penalty. | Official reprimand to removal. | 14-day suspension to removal. | Removal. | 2 years. |
| 27. Giving or offering an unauthorized article or favor to any inmate, their families or friends. | Value of article or favor and the reasons for giving are primary considerations in determining the severity of penalty. | Official reprimand to removal. | 14-day suspension to removal. | Removal. | 2 years. |
| 28. Preferential treatment of inmates. | Potential or actual negative reaction of other inmates is a primary consideration in determining severity of penalty. | Official reprimand to removal. | 5-day suspension to removal. | 14-day suspension to removal. | 2 years. |

Case 1:11-cv-00268-NGG-CLP   Document 55-25   Filed 06/10/13   Page 52 of 139 PageID #: 1583

| NATURE OF OFFENSE | EXPLANATION | FIRST OFFENSE | SECOND OFFENSE | THIRD OFFENSE | RECKONING PERIOD |
|---|---|---|---|---|---|
| 29. Improper relationship with inmates, former inmates, their families or friends. | Degree of involvement is a primary consideration in determining severity of penalty. | Official reprimand to removal. | 14-day suspension to removal. | Removal. | 2 years. |
| 30. Aiding or abetting inmate violation or attempted violation of any law, rule, regulation or commission of any prohibited act. | Degree of aid and seriousness of violation is a primary consideration in determining severity of penalty. | Official reprimand to removal. | 14-day suspension to removal. | Removal. | 2 years. |
| 31. Failure to report to management any violation or attempted violation of unprofessional contacts with inmates, former inmates, their families or friends. | | Official reprimand to removal. | 5-day suspension to removal. | 14-day suspension to removal. | 2 years. |

D000052

| NATURE OF OFFENSE | EXPLANATION | FIRST OFFENSE | SECOND OFFENSE | THIRD OFFENSE | RECKONING PERIOD |
|---|---|---|---|---|---|
| 32. Falsification, misstatement, exaggeration or concealment of material fact in connection with employment, promotion, travel voucher, any record, investigation or other proper proceeding. | Includes, but is not limited to, the destruction of records to conceal facts, and a concealed conflict of interest in the performance of official duties. | Official reprimand to removal. | 14-day suspension to removal. | Removal. | 2 years. |
| 33. Refusal or failure to cooperate in any official U.S. government inquiry or investigation, including a refusal to answer work-related questions or attempting to influence others involved in the inquiry. | Includes administrative or criminal investigation, grievance inquiry, EEO investigation, and any other administrative inquiry. | Official reprimand to removal. | 14-day suspension to removal. | Removal. | 2 years. |
| 34. Refusal to undergo a search of person or property. | | Removal. | Removal. | Removal. | 2 years. |

| NATURE OF OFFENSE | EXPLANATION | FIRST OFFENSE | SECOND OFFENSE | THIRD OFFENSE | RECKONING PERIOD |
|---|---|---|---|---|---|
| 35. Criminal, dishonest, infamous, or notoriously disgraceful conduct. | Includes conduct on or off duty. | Official reprimand to removal. | 14-day suspension to removal. | Removal. | 2 years. |
| 36. Conduct which could lead others to question an employee's impartiality. | Includes, but is not limited to, a financial, sexual, or emotional relationship with a subordinate in a supervisor's chain of command. | Official reprimand to removal. | 14-day suspension to removal. | Removal. | 2 years. |
| 37. Discrimination in official action against an employee or applicant because of race, religion, sex, national origin, age, handicapping condition, sexual orientation or any reprisal action taken against an employee for filing a discrimination complaint. | | Official reprimand to removal. | 14-day suspension to removal. | Removal. | 2 years. |

D000054

| NATURE OF OFFENSE | EXPLANATION | FIRST OFFENSE | SECOND OFFENSE | THIRD OFFENSE | RECKONING PERIOD |
|---|---|---|---|---|---|
| 38. Use of Department of Justice identification for other than authorized purposes. | Example: Use to coerce, intimidate, or deceive (Includes ID cards, badges, and other Bureau credentials.) | Official reprimand to removal. | 14-day suspension to removal. | Removal. | 2 years. |
| 39. Intentional violations of rules governing searches and seizures. | | Official reprimand to removal. | 14-day suspension to removal. | Removal. | 2 years. |
| 40. Reckless disregard of rules governing searches and seizures. | | Official reprimand to removal. | 14-day suspension to removal. | Removal. | 1 year. |
| 41. Negligent violations of rules governing searches and seizures. | | Official reprimand to 1-day suspension. | Official reprimand to 5-day suspension. | Official reprimand to removal. | 1 year. |
| 42. Unauthorized dissemination of official information. | | Official reprimand to 5-day suspension. | 5-day suspension to 14-day suspension. | 14-day suspension to removal. | 2 years. |

D000055

| NATURE OF OFFENSE | EXPLANATION | FIRST OFFENSE | SECOND OFFENSE | THIRD OFFENSE | RECKONING PERIOD |
|---|---|---|---|---|---|
| 43. Use of official information for private purposes. | Potential personal gain is a primary consideration in determining severity of the penalty. | Official reprimand. | 14-day suspension to removal. | Removal. | 2 years. |
| 44. Unauthorized removal of records or documents. | Consequences of loss, or breach of security is a primary consideration in determining severity of the penalty. | Official reprimand to removal. | 5-day suspension to removal. | 14-day suspension to removal. | 2 years. |
| 45. Release of information which could breach the security of the institution. | Consequences or potential consequences is a primary consideration in determining severity of the penalty. | 3-day suspension to removal. | 5-day suspension to removal. | 14-day suspension to removal. | 2 years. |
| 46. Improper denial of official information to an authorized official. | | Official reprimand to 5-day suspension. | 5-day suspension to 14-day suspension. | 14-day suspension to removal. | 2 years. |

D000056

PS 3420.09
2/5/99

Attachment A - Page 16

| NATURE OF OFFENSE | EXPLANATION | FIRST OFFENSE | SECOND OFFENSE | THIRD OFFENSE | RECKONING PERIOD |
|---|---|---|---|---|---|
| 47. Breach of facility security. | | Official reprimand to removal. | 14-day suspension to removal. | Removal. | 2 years. |
| 48. Failure to report any breach or possible breach of facility security. | | Official reprimand to removal. | 5-day suspension to removal. | 14-day suspension to removal. | 2 years. |
| 49. Trafficking contraband. | Nature of article and degree of involvement are primary considerations in determining severity of the penalty. | Official reprimand to removal. | 14-day suspension to removal. | Removal. | 2 years. |
| 50. Engaging in outside employment without approval. | | Official reprimand to removal. | 5-day suspension to removal. | 14-day suspension to removal. | 2 years. |

D000057

PS 3420.09
2/5/99
Attachment A - Page 17

| NATURE OF OFFENSE | EXPLANATION | FIRST OFFENSE | SECOND OFFENSE | THIRD OFFENSE | RECKONING PERIOD |
|---|---|---|---|---|---|
| 51. Failure to honor just debts without good cause. | A just finan-cial obliga-tion is one acknowledged by the employee, re-duced to judg-ment by a court or ar-ranged by set-tlement. | Official reprimand. | Official rep-rimand to 5-day suspen-sion. | Official repri-mand to removal. | 2 years. |
| 52. Failure to report arrest. | | Official reprimand to removal. | 5-day suspen-sion to re-moval. | 14-day suspen-sion to removal. | 2 years. |

D000058

| NATURE OF OFFENSE | EXPLANATION | FIRST OFFENSE | SECOND OFFENSE | THIRD OFFENSE | RECKONING PERIOD |
|---|---|---|---|---|---|
| 53. Misconduct off the job. | | Official reprimand to removal. | 5-day suspension to removal. | 14-day suspension to removal. | 2 years. |
| * 54. Failure to report a violation of the Standards of Conduct, or retaliation or discrimination against those who make such a report. | Offense includes failure to report violation of Program Statement, government ethics regulations, EEO laws and criminal laws. In particular, supervisors or managers must report sexual harassment observed by or reported to them. No retaliation can be taken against staff or inmates who report any such violations. | Official reprimand to removal. | 14-day suspension to removal. | Removal. | 2 years.* |

D000059

MCC-NY-93

ACKNOWLEDGEMENT OF RECEIPT OF:

1) STANDARDS OF EMPLOYEE CONDUCT AND RESPONSIBILITY
2) CARRYING AND USE OF GOVERNMENT-ISSUED FIREARMS
   AND AUTHORIZATION BADGES.
3) SEARCHING/DETAINING OF NON-INMATES; ARRESTING
   AUTHORITY; USE OF METAL DETECTORS.
4) MASTER AGREEMENT BETWEEN FEDERAL PRISON SYSTEM
   AND AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES.
5) MERIT PROMOTION PLAN; BARGAINING UNIT EMPLOYEES.

I, _____
        (First Name)                    (Job Title)

do acknowledge that I have received copies of the following on

_____     1-2-90
        (Day)                          (Date)


PROGRAM STATEMENTS:

1) STANDARDS OF EMPLOYEE CONDUCT AND RESPONSIBILITY
2) CARRYING AND USE OF GOVERNMENT-ISSUED FIREARMS
   AND AUTHORIZATION BADGES. 5558.8 dated 1/15/88
3) SEARCHING/DETAINING OF NON-INMATES; ARRESTING
   AUTHORITY; USE OF METAL DETECTORS
4) MASTER AGREEMENT BETWEEN FEDERAL PRISON SYSTEM AND
   AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES.
5) MERIT PROMOTION PLAN;  BARGAINING UNIT EMPLOYEES.

RECEIVED: _____
                    (Signature)

DATE: _____

INSTITUTION: METROPOLITAN CORRECTIONAL CENTER, N.Y.

D000060

 

**U.S. Department of Justice**

Federal Bureau of Prisons

*Metropolitan Correctional Center*

*150 Park Row*
*New York, New York 10007*

November 16, 2009

Roderick Jenkins
Intelligence Research Officer
Metropolitan Correctional Center
150 Park Row
New York, NY 10007

Dear Mr. Jenkins:

This is notice I propose you be removed from your position of Intelligence Research Specialist, GL-006-09, with the Federal Bureau of Prisons, no sooner than thirty (30) calendar days from the date you receive this letter. This proposal is based on the following charges and specifications thereof:

**Charge I: Misuse of your Bureau of Prisons Credential**

Specifically, on April 29, 2006, you used your Bureau of Prisons (BOP) credential to register as an Armed Law Enforcement Officer with the Transportation Security Administration (TSA), prior to boarding Delta Airlines Flight 615 departing LaGuardia Airport. You were not authorized by the Agency to carry a weapon in connection with any official duties that day. Nor did you have a need to have the weapon and ammunition accessible for any official purpose that day. During this time, you were engaged in outside employment as a personal security escort for a celebrity, not performing official duties for the institution or agency. By using your BOP credential while checking in, you registered with the airline and TSA as a law enforcement officer, and were permitted to carry a weapon and ammunition on-board the airplane. You did not secure your weapon and ammunition with checked baggage.

Program Statement 3420.09, Standards of Employee Conduct, which you signed receipt of on January 2, 1990, states in pertinent part, "Bureau of Prisons credentials, identification cards,...may not be used to coerce, intimidate, or deceive others or to obtain any privilege or article not otherwise authorized in the performance of official duties." Title 49 of the Code of Federal Regulations, part 1544 authorizes the TSA to allow armed law enforcement officers (LEOs) aboard flights only when the LEO is authorized by the employing agency to have the weapon in connection with assigned duties. At the time you signed the "Armed Law Enforcement Officer Entry Log," you were not on official duty nor were you performing official duties, which you did specify on the log. The Agency did not authorize you to carry a weapon in connection with any official duties that day. Nor did you have a need to have the weapon and ammunition accessible for any official purpose that day. You misused the credential in order to carry a weapon and ammunition onboard an airplane instead of placing them in checked baggage, which is a privilege that was not authorized when not on official travel.

### Charge II: Off-Duty Misconduct

Specifically, on April 29, 2006, you carried your personally owned firearm on board Delta Airlines Flight 615 without securing the weapon and ammunition in checked baggage.  Law Enforcement Officers Safety Act of 2004 (LEOSA) does not permit you to carry your personally owned firearm onboard a commercial aircraft.  Transportation Security Administration (TSA) regulation 49 C.F.R. 1544.219 requires, in part, that the armed individual have completed the training program "Law Enforcement Officers Flying Armed" and the armed law enforcement officers (LEOs) must have a need to have a weapon accessible from the time he or she would otherwise check the weapon until the time it would be claimed after deplaning.  The need to have the weapon accessible must be determined by the employing agency, department, or service.  As you were not acting in an official capacity, you did not have a need to have the weapon accessible.

On April 11, 2006, you signed receipt for the Department of Justice guidance on how the Act would be applied to its law enforcement officers and the Bureau of Prisons clarification and implementation memorandum dated February 27, 2006, which contained agency and employee responsibilities.  You failed to secure your personally owned firearm and ammunition in checked baggage, as required by TSA regulations prior to boarding Delta flight 615.

As a federal law enforcement agency, the Bureau of Prisons has an obligation to ensure its employees act in a manner that promotes trust and confidence with the general public, for whom we provide a service.  While HR 218 was enacted to allow certain qualified federal LEOs the ability to maintain concealed weapons outside of their official work capacity, the LEO is still responsible for complying with law for other firearm-related activities.

The Bureau of Prisons Guidance memorandum, dated February 27, 2006, states in part, "Off-duty staff will be individually and personally responsible for any event that may relate to the carrying or use of a concealed personal firearm under LEOSA.....  LEOSA's language does not include exemptions from State and local laws for any other firearms-related activities, for example, ... the permissible use of firearms.  It is, therefore, incumbent upon off-duty staff to be aware of the laws, ordinances, regulations, etc., within their jurisdiction that may impact any aspect of their ability to obtain, carry, or use a personal firearm under LEOSA."

Bureau policy mandates the transportation of firearms, ammunition and firearm parts are prohibited from carry-on baggage and must be transported in checked baggage.  According to TSA regulations, federal officers and agents, whether on official or non-official travel, are not to transport prohibited items which are not necessary for the performance of their official duties.  By carrying your weapon irrespective of LEOSA and TSA requirements, you placed yourself in a position of carrying your concealed weapon for reasons other than those intended by the "Act."

### Charge III: Engaging in Outside Employment Without Approval

Specifically, on April 29, 2006, you engaged in outside employment without approval.  In your written statement dated February 22, 2007, you admitted you incorporated your business, True Familia Entertainment, in December 2005, to manage and consult for various artists and producers.

On April 29, 2006, you escorted a celebrity on a commercial airline flight while carrying your personal firearm. There is however, no record of your seeking or receiving approval to engage in any outside employment. As you were not in an official capacity, such an assessment was not made by the Agency.

On March 25, 2004, Yvonne Hinkson, Associate General Counsel/Ethics Officer issued a memorandum Change to Reporting Procedures for Outside Employment. Within the memorandum it provides, "Examples of outside employment for which employees should still seek prior approval include...security guard positions..." On April 11, 2006, you signed the Acknowledgment of Receipt of Guidance Materials regarding the Law Enforcement Officers Safety Act of 2004. The Bureau of Prisons Guidance memorandum, dated February 27, 2006, states in part, "All requests for outside employment that require the carrying of a firearm must be reviewed and approved by the staff member's immediate supervisor, CEO, and the Ethics Office prior to beginning the outside employment." You served as an armed escort on April 29, 2006, thereby engaging in outside employment that involved carrying a firearm without seeking prior approval.

### Charge IV: Failure to Maintain Accountability

Specifically, on November 16, 2007, the 24-hour keys issued to you were found on the floor near the Control Center key issue window. When you were informed your keys were found, you were unaware you did not have the keys in your possession and stated in your affidavit, dated February 26, 2008, you had probably left them in the Control Center key slot. Staff are required to securely attach all issued prison keys to a key chain which must be securely attached to a belt. Key chains and belt clips are issued to all employees.

Key control is a basic vital function of any correctional facility. A compromise of these procedures could result in inmate access to restricted areas and information, assaults, escapes, and endangering staff and the community. In addition to safety and security, the cost to replace keys and locks throughout an institution is staggering.

The Metropolitan Correctional Center, as a component of the Federal Prison System, is responsible for the care, custody, and correction of individuals convicted or awaiting trial for violations of the criminal laws of the United States. As an employee of this institution, you are also considered a federal law enforcement officer and are held to a higher standard of ethical conduct both on and off duty. The trust, confidence, and authority that was placed in you as a public servant, necessitates you not only refrain from engaging in misconduct, but that you endeavor to avoid any actions that create the appearance of engaging in misconduct.

Your actions as stated above, undermine the very trust with which you were endowed to successfully perform your duties as a law enforcement officer. As an Intelligence Research Specialist, you are responsible for protecting the integrity and confidentiality of sensitive records, collecting and analyzing intelligence information, and serving as a corrections expert on inmate activities within the institution. However, given the extent of your duplicitous behavior and the fact your actions are completely contrary to the essence of your position and the mission of this agency, you have demonstrated that you are not someone to whom the care, custody, and correction of federal criminal offenders may be entrusted. If this proposal is sustained, your removal would be fully warranted and in the interest of the efficiency of the service.

Jenkins, Roderick
Page: 4

The Warden will make the final decision on this proposal. You may reply to the Warden orally, in writing, or both orally and in writing. Your reply may include affidavits or other supporting documents. Any reply which you make must be received by the Warden within fifteen (15) calendar days from the date you receive this letter. Consideration will be given to extending this time limit if you submit a written request, to the Warden, stating your reasons for desiring more time. No final decision on this proposal will be made until after your reply, if any, is received and considered. Your present duty and pay status are not affected by this letter.

You have the right to a representative of your choice to assist you in the preparation and presentation of any reply you may wish to submit. You and your representative, if your representative is an employee of this institution, will be allowed a reasonable amount of official time to review the materials, if copies have not been provided, upon which this action is based and present a reply. You may review these materials during normal office hours by contacting, several hours in advance, the Employee Services Manager of this institution.

Should you have any questions or need assistance in this matter, contact Elizabeth Marin-Rodriguez, Employee Services Manager, at 718-840-4200, extension 5328.

Sincerely,

Lamine N'Diaye
Captain

I have received the original and one copy of this letter.

Signature_____ Date_____

*Employee is refusing to sign the proposal. Employee stated the matter is in court and has to go through his attorney. The statement was witnessed by Dee Messam.*

D000064

# FEDERAL BUREAU OF PRISONS
## Employee Transcript

**JENKINS, RODERICK (xxx-xxx-5394)**
**NYM/CORRECTIONAL SERVICES**

Print Date: 08-24-2009

| Date(s) | Item # | Course Name/Product Name | Duration (Hours) |
|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| 12/06/2005 | GNR-0150-BXX | Correctional Training, Annual -BOP | 20 |
| 12/06/2005 | CSV-0770-BXX | Self-Defense, Annual Refresher -BOP | 4 |
| 12/08/2005 | GNR-0090-BXX | Cardio Pulmonary Resuscitation (CPR) -BOP | 4 |
| 12/07/2005 | CSV-0350-BXX | Disturbance Control, Annual Refresher -BOP | 4 |
| 09/21/2005 | IPD-0080-BXX | NCIC / NLETS, Operator -BOP | 8 |
| 09/09/2005 | CSV-0430-BXX | Firearms, All Weapons, Annual Certification -BOP | 2 |
| 09/09/2005 | CSV-0670-BXX | Prisoner Transportation, Basic, Armed, Requalification -BOP | 2 |
| 01/28/2005 | CSV-0870-BXX | Video Camera Techniques, Correctional Services -BOP | 2 |
| 01/07/2005 | CSV-0251-BXX | Correctional Services, Job Specialty -BOP | 8 |
| 01/06/2005 | GNR-0150-BXX | Correctional Training, Annual -BOP | 8 |
| 01/05/2005 | GNR-0150-BXX | Correctional Training, Annual -BOP | 4 |
| 01/05/2005 | CSV-0350-BXX | Disturbance Control, Annual Refresher -BOP | 4 |
| 01/04/2005 | GNR-0150-BXX | Correctional Training, Annual -BOP | 4 |
| 01/04/2005 | CSV-0770-BXX | Self-Defense, Annual Refresher -BOP | 4 |
| 01/03/2005 | CSV-0251-BXX | Correctional Services, Job Specialty -BOP | 8 |
| 09/13/2004 | CSV-0821-BXX | Crisis Management, Regional -BOP | 32 |
| 09/08/2004 | CSV-0340-BXX | Disturbance Control Team -BOP | 8 |

This report is intended for official use and does contain SENSITIVE but not CLASSIFIED information. It should be properly delivered, labeled, stored and disposed of according to policy.

D000065

# FEDERAL BUREAU OF PRISONS
## Employee Transcript
### JENKINS, RODERICK (XXX-XXX-5394)
### NYM/CORRECTIONAL SERVICES

This report is intended for official use and does contain SENSITIVE but not CLASSIFIED information. It should be properly delivered, labeled, stored and disposed of according to policy.

| Date(s) | Event # | Course Name/Product Name | Daily Hours |
|---|---|---|---|
| 09/07/2004 | CSV-0430-BXX | Firearms, All Weapons, Annual Certification -BOP | 2 |
| 09/07/2004 | CSV-0670-BXX | Prisoner Transportation, Basic, Armed, Requalification -BOP | 2 |
| 08/31/2004 | CSV-0340-BXX | Disturbance Control Team -BOP | 2 |
| 07/27/2004 | GNR-0784-BXX | Interpersonal Communications -BOP | 4 |
| 06/22/2004 | CSV-0340-BXX | Disturbance Control Team -BOP | 8 |
| 04/21/2004 | CSV-0340-BXX | Disturbance Control Team -BOP | 16 |
| 12/08/2003 | GNR-0150-BXX | Correctional Training, Annual -BOP | 23 |
| 12/11/2003 | CSV-0770-BXX | Self-Defense, Annual Refresher -BOP | 4 |
| 12/09/2003 | CSV-0340-BXX | Disturbance Control Team -BOP | 3 |
| 09/05/2003 | CSV-0400-BXX | Firearms Instructor, Recertification -BOP | 4 |
| 09/05/2003 | CSV-0670-BXX | Prisoner Transportation, Basic, Armed, Requalification -BOP | 2 |
| 09/05/2003 | CSV-0430-BXX | Firearms, All Weapons, Annual Certification -BOP | 2 |
| 06/30/2003 | CSV-0560-BXX | Inmate Disciplinary Certification -BOP | 2 |
| 06/25/2003 | OLD-10001 | Course - Human Resources | 24 |
| 05/19/2003 | CSV-0340-BXX | Disturbance Control Team -BOP | 2 |
| 05/19/2003 | GNR-0150-BXX | Correctional Training, Annual -BOP | 8 |
| 04/15/2003 | CSV-0340-BXX | Disturbance Control Team -BOP | 28 |
| 03/28/2003 | CSV-0430-BXX | Firearms, All Weapons, Annual Certification -BOP | 4 |
| 03/28/2003 | CSV-0670-BXX | Prisoner Transportation, Basic, Armed, Requalification -BOP | 2 |
| 03/19/2003 | CSV-0770-BXX | Self-Defense, Annual Refresher -BOP | 2 |
| 01/29/2003 | OLD-11150 | Course - Other | 4 |
| 01/15/2003 | IPD-0070-BXX | NCIC / NLETS, Terminal Operator, Biennual -BOP | 1 |
| 12/05/2002 | EDM-0050-BXX | Instructor Skills -BOP | 2 |
| | | | 4 |

Print Date    08-24-2009

D000066

# FEDERAL BUREAU OF PRISONS
## Employee Transcript
### JENKINS, RODERICK (XXX-XX-5394)
### NYM/CORRECTIONAL SERVICES

| Date(s) | | Item # | Course Name/Product Type | Duty Hours |
|---|---|---|---|---|
| 12/02/2002 | 12/02/2002 | CSV-0340-BXX | Disturbance Control Team -BOP | 4 |
| 10/29/2002 | 10/29/2002 | CSV-0340-BXX | Disturbance Control Team -BOP | 8 |
| 09/15/2002 | 09/15/2002 | OLD-51150 | Course = Other | 40 |
| 09/04/2002 | 09/04/2002 | CNR-0050-BXX | Cardio Pulmonary Resuscitation (CPR) -BOP | 4 |
| 06/27/2002 | 06/27/2002 | CSV-0340-BXX | Disturbance Control Team -BOP | 4 |
| 06/06/2002 | 06/06/2002 | CSV-0340-BXX | Disturbance Control Team -BOP | 16 |
| 05/28/2002 | 05/28/2002 | CSV-0340-BXX | Disturbance Control Team -BOP | 8 |
| 05/28/2002 | 05/28/2002 | CSV-0340-BXX | Disturbance Control Team -BOP | 8 |
| 05/14/2002 | 05/14/2002 | CSV-0340-BXX | Disturbance Control Team -BOP | 8 |
| 05/14/2002 | 05/14/2002 | CSV-0340-BXX | Disturbance Control Team -BOP | 8 |
| 04/22/2002 | 04/26/2002 | CSV-0340-BXX | Disturbance Control Team -BOP | 40 |
| 03/26/2002 | 03/26/2002 | CSV-0430-BXX | Firearms, All Weapons, Annual Certification -BOP | 2 |
| 03/26/2002 | 03/26/2002 | OLD-51003 | Course - Corrections | 1 |
| 03/26/2002 | 03/26/2002 | CSV-0520-BXX | Firearms, Sub-Machine Gun, Recertification -BOP | 1 |
| 03/26/2002 | 03/26/2002 | CSV-0640-BXX | Munitions, Stun -BOP | 2 |
| 03/26/2002 | 03/26/2002 | CSV-0670-BXX | Prisoner Transportation, Basic, Armed, Requalification -BOP | 2 |
| 03/05/2002 | 03/14/2002 | CSV-0600-BXX | Investigative Intelligence -BOP | 68 |
| 02/05/2002 | 02/08/2002 | GNR-0150-BXX | Correctional Training, Annual -BOP | 28 |
| 02/07/2002 | 02/07/2002 | CSV-0770-BXX | Self-Defense, Annual Refresher -BOP | 4 |
| 02/06/2002 | 02/06/2002 | CSV-0340-BXX | Disturbance Control Team -BOP | 4 |
| 12/20/2001 | 12/20/2001 | EDM-0050-BXX | Instructor Skills -BOP | 2 |
| 12/20/2001 | 12/20/2001 | EDM-0050-BXX | Instructor Skills -BOP | 2 |
| 09/11/2001 | 09/11/2001 | CSV-0340-BXX | Disturbance Control Team -BOP | 8 |

This report is intended for official use and does contain SENSITIVE but not CLASSIFIED information. It should be properly delivered, labeled, stored and disposed of according to policy.

Print Date   08-24-2009

D000067

# FEDERAL BUREAU OF PRISONS
## Employee Transcript
### JENKINS, RODERICK (XXX-XXX-5354)
### NYM/CORRECTIONAL SERVICES

| Date(s) | Item # | Course Name/Product Name | Duty Hours |
|---|---|---|---|
| 04/04/2001 | OLD-11150 | Course - Other | 12 |
| 06/26/2001 | OLD-0340-BXX | Disturbance Control Team -BOP | 8 |
| 06/25/2001 | OLD-51003 | Course - Corrections | 12 |
| 07/23/2001 | CSV-0550-BXX | Hostage Negotiation Team, Monthly -BOP | 8 |
| 07/23/2001 | OLD-51003 | Course - Corrections | 12 |
| 06/25/2001 | OLD-51003 | Course - Corrections | 40 |
| 06/19/2001 | CSV-0340-BXX | Disturbance Control Team -BOP | 8 |
| 06/12/2001 | CSV-0340-BXX | Disturbance Control Team -BOP | 8 |
| 05/31/2001 | CSV-0560-BXX | Inmate Disciplinary Certification -BOP | 24 |
| 05/17/2001 | OLD-51003 | Course - Corrections | 16 |
| 04/27/2001 | OLD-51003 | Course - Corrections | 6 |
| 04/10/2001 | OLD-11150 | Course - Other | 8 |
| 04/04/2001 | OLD-51003 | Course - Corrections | 1 |
| 04/04/2001 | CSV-0640-BXX | Munitions, Stun -BOP | 2 |
| 04/04/2001 | CSV-0670-BXX | Prisoner Transportation, Basic, Armed, Requalification -BOP | 2 |
| 04/04/2001 | CSV-0430-BXX | Firearms, All Weapons, Annual Certification -BOP | 4 |
| 03/28/2001 | CSV-0340-BXX | Disturbance Control Team -BOP | 8 |
| 03/28/2001 | CSV-0340-BXX | Disturbance Control Team -BOP | 8 |
| 03/05/2001 | CPG-0170-BXX | Witness Security Protection Certification -BOP | 76 |
| 01/30/2001 | GNR-0150-BXX | Correctional Training, Annual -BOP | 28 |
| 02/01/2001 | GNR-0090-BXX | Cardio Pulmonary Resuscitation (CPR) -BOP | 4 |
| 01/22/2001 | TPD-0080-BXX | NCIC / NLETS, Operator -BOP | 8 |
| 01/02/2001 | EDM-0050-BXX | Instructor Skills -BOP | 2 |
| 10/24/2000 | CSV-0340-BXX | Disturbance Control Team -BOP | 8 |

This report is intended for official use and does contain SENSITIVE but not CLASSIFIED information. It should be properly delivered, labeled, stored and disposed of according to policy.

Print Date     08-24-2009

D000068

This report is intended for official use and does contain SENSITIVE but not CLASSIFIED information. It should be properly delivered, labeled, stored and disposed of according to policy.

# FEDERAL BUREAU OF PRISONS
## Employee Transcript
### JENKINS, RODERICK (XXX-XXX-5394)
### NYM/CORRECTIONAL SERVICES

| Date(s) | Item # | Course Name/Product Name | Duty Hours |
|---|---|---|---|
| 09/18/2000 | 09/22/2000 | CSV-0550-BXX | Hostage Negotiation Team, Monthly -BOP | 40 |
| 08/24/2000 | 08/24/2000 | OLD-51003 | Course - Corrections | 8 |
| 08/15/2000 | 08/15/2000 | OLD-51003 | Course - Corrections | 8 |
| 07/27/2000 | 07/27/2000 | OLD-51003 | Course - Corrections | 8 |
| 06/27/2000 | 06/27/2000 | CSV-0340-BXX | Disturbance Control Team -BOP | 8 |
| 05/16/2000 | 05/16/2000 | CSV-0340-BXX | Disturbance Control Team -BOP | 8 |
| 05/01/2000 | 05/05/2000 | OLD-11150 | Course - Other | 40 |
| 04/25/2000 | 04/25/2000 | CSV-0340-BXX | Disturbance Control Team -BOP | 8 |
| 04/04/2000 | 04/04/2000 | CSV-0430-BXX | Firearms, All Weapons, Annual Certification -BOP | 6 |
| 04/04/2000 | 04/04/2000 | CSV-0670-BXX | Prisoner Transportation, Basic, Armed, Requalification -BOP | 2 |
| 01/11/2000 | 01/14/2000 | GNR-0150-BXX | Correctional Training, Annual -BOP | 32 |
| 01/11/2000 | 01/11/2000 | IPD-0060-BXX | NCIC / NLETS, Practitioner -BOP | 2 |
| 12/28/1999 | 12/28/1999 | EDM-0050-BXX | Instructor Skills -BOP | 4 |
| 11/19/1999 | 11/19/1999 | CSV-0340-BXX | Disturbance Control Team -BOP | 8 |
| 10/19/1999 | 10/28/1999 | CSV-0330-BXX | Disturbance Control Lead Instructor, Recertification -BOP | 64 |
| 05/28/1999 | 05/28/1999 | CSV-0340-BXX | Disturbance Control Team -BOP | 8 |
| 04/23/1999 | 04/23/1999 | CSV-0340-BXX | Disturbance Control Team -BOP | 8 |
| 04/08/1999 | 04/08/1999 | CSV-0670-BXX | Prisoner Transportation, Basic, Armed, Requalification -BOP | 2 |
| 03/04/1999 | 03/04/1999 | CSV-0770-BXX | Self-Defense, Annual Refresher -BOP | 2 |
| 03/01/1999 | 03/04/1999 | GNR-0150-BXX | Correctional Training, Annual -BOP | 26 |
| 03/03/1999 | 03/03/1999 | GNR-0090-BXX | Cardio Pulmonary Resuscitation (CPR) -BOP | 4 |
| 02/19/1999 | 02/19/1999 | CSV-0340-BXX | Disturbance Control Team -BOP | 8 |
| 11/20/1998 | 11/20/1998 | CSV-0340-BXX | Disturbance Control Team -BOP | 8 |

This report is intended for official use and does contain SENSITIVE but not CLASSIFIED information. It should be properly delivered, labeled, stored and disposed of according to policy.

Print Date 08-24-2009

D000069

# FEDERAL BUREAU OF PRISONS
## Employee Transcript
### JENKINS, RODERICK (XXX-XXX-5394)
### NYPJ/CORRECTIONAL SERVICES

| Date(s) | | Item # | Course Name/Product Name | Policy Number |
|---|---|---|---|---|
| 06/13/1998 | 06/13/1998 | CSV-0340-BXX | Disturbance Control Team -BOP | 8 |
| 05/01/1998 | 05/01/1998 | CSV-0340-BXX | Disturbance Control Team -BOP | 8 |
| 04/20/1998 | 04/20/1998 | CSV-0440-BXX | Firearms, All Weather, Annual Certification -BOP | 4 |
| 03/20/1998 | 03/20/1998 | CSV-0770-BXX | Self-Defense, Annual Refresher -BOP | 4 |
| 03/16/1998 | 03/19/1998 | GNR-0150-BXX | Correctional Training, Annual -BOP | 32 |
| 01/06/1998 | 01/06/1998 | EDM-0050-BXX | Instructor Skills -BOP | 8 |
| 12/19/1997 | 12/19/1997 | CSV-0340-BXX | Disturbance Control Team -BOP | 8 |
| 11/19/1997 | 11/19/1997 | OLD-51172 | 9-MM Annual Training (51172) | 8 |
| 11/14/1997 | 11/14/1997 | GNR-0090-BXX | Cardio Pulmonary Resuscitation (CPR) -BOP | 4 |
| 11/03/1997 | 11/04/1997 | CSV-0340-BXX | Disturbance Control Team -BOP | 16 |
| 04/09/1997 | 04/09/1997 | OLD-11150 | Course - Other | 8 |
| 03/31/1997 | 04/04/1997 | GNR-0150-BXX | Correctional Training, Annual -BOP | 40 |
| 01/24/1997 | 01/24/1997 | EDM-0050-BXX | Instructor Skills -BOP | 8 |
| 12/06/1996 | 12/06/1996 | CSV-0770-BXX | Self-Defense, Annual Refresher -BOP | 4 |
| 11/18/1996 | 11/20/1996 | CSV-0340-BXX | Disturbance Control Team -BOP | 24 |
| 08/05/1996 | 08/08/1996 | CSV-0320-BXX | Disturbance Control Lead Instructor -BOP | 32 |
| 06/17/1996 | 06/17/1996 | CSV-0440-BXX | Firearms, M-16 -BOP | 8 |
| 02/20/1996 | 02/22/1996 | GNR-0150-BXX | Correctional Training, Annual -BOP | 24 |
| 01/12/1996 | 01/12/1996 | EDM-0050-BXX | Instructor Skills -BOP | 4 |
| 04/03/1995 | 04/06/1995 | CSV-0550-BXX | Hostage Negotiation Team, Monthly -BOP | 32 |
| 01/23/1995 | 01/27/1995 | GNR-0150-BXX | Correctional Training, Annual -BOP | 40 |
| 01/23/1995 | 01/23/1995 | LGL-0310-BXX | Sexual Harrassment -BOP | 1 |
| 12/06/1994 | 12/06/1994 | EDM-0050-BXX | Instructor Skills -BOP | 4 |

This report is intended for official use and does contain SENSITIVE but not CLASSIFIED information. It should be properly delivered, labeled, stored and disposed of according to policy.

Print Date    08-24-2009

D000070

This report is intended for official use and does contain SENSITIVE but not CLASSIFIED information. It should be properly delivered, labeled, stored and disposed of according to policy.

# FEDERAL BUREAU OF PRISONS
## Employee Transcript
### JENKINS, RODERICK (XXX-XXX-5394)
### NYM/CORRECTIONAL SERVICES

| Date(s) | Item # | Course Name/Product Name | Duty Hours |
|---|---|---|---|
| 10/07/1994 | OLD-51003 | Course - Corrections | 1 |
| 08/23/1994 | OLD-51016 | 9-MM Quarterly Training | 4 |
| 08/23/1994 | OLD-51016 | 9-MM Quarterly Training | 4 |
| 05/26/1994 | CSV-0340-BXX | Disturbance Control Team -BOP | 16 |
| 05/09/1994 | CSV-0680-BXX | Prisoner Transportation, Basic, Armed -BOP | 40 |
| 02/14/1994 | GNR-0150-BXX | Correctional Training, Annual -BOP | 40 |
| 12/20/1993 | EDM-0050-BXX | Instructor Skills -BOP | 4 |
| 10/25/1993 | GNR-0150-BXX | Correctional Training, Annual -BOP | 40 |
| 09/20/1993 | OLD-51319 | Ethics Prong II | 2 |
| 08/31/1993 | CSV-0360-BXX | Disturbance Control, Instructor -BOP | 64 |
| 07/29/1992 | OLD-22150 | AIDS Training | 1 |
| 06/24/1992 | SFT-0220-GXX | Hazardous Waste Management, OSHA -GOV | 1 |
| 02/07/1992 | CSV-0430-BXX | Firearms, All Weapons, Annual Certification -BOP | 4 |
| 02/07/1992 | GNR-0150-BXX | Correctional Training, Annual -BOP | 26 |
| 02/05/1992 | CSV-0770-BXX | Self-Defense, Annual Refresher -BOP | 4 |
| 2/05/1992 | OLD-22168 | CPR Certification | 4 |
| 02/03/1992 | OLD-94467 | Computer Security Awareness Briefing | 2 |
| 10/23/1991 | OLD-94467 | Computer Security Awareness Briefing | 2 |
| 03/22/1991 | CSV-0430-BXX | Firearms, All Weapons, Annual Certification -BOP | 4 |
| 03/22/1991 | OLD-22168 | CPR Certification | 4 |
| 03/22/1991 | CSV-0770-BXX | Self-Defense, Annual Refresher -BOP | 4 |
| 03/21/1991 | GNR-0150-BXX | Correctional Training, Annual -BOP | 26 |
| 07/02/1990 | OLD-51062 | Accelerated Correctional Officers Training | 880 |

Print Date   08-24-2009

This report is intended for official use and does contain SENSITIVE but not CLASSIFIED information. It should be properly delivered, labeled, stored and disposed of according to policy.

D000071

This report is intended for official use and does contain SENSITIVE but not CLASSIFIED information. It should be properly delivered, labeled, stored and disposed of according to policy.

# FEDERAL BUREAU OF PRISONS
## Employee Transcript

JENKINS, RODERICK (XXX-XX-5394)
NVM/CORRECTIONAL SERVICES

This report is intended for official use and does contain SENSITIVE but not CLASSIFIED information. It should be properly delivered, labeled, stored and disposed of according to policy.

| Date(s) | Item # | Course Name/Project Name | Delv. Hours |
|---|---|---|---|
| 01/22/1996 | HRM-0100-BXX | Correctional Training Program Phase III, Introduction - BOP | 112 |
| 01/08/1996 | | | |
| 01/08/1996 | CSV-0500-BXX | Correctional Training Program Phase I, Introduction - BOP | 80 |

Number Summary=>=>=>  Number of Course Completions:  103      2,940

D000072

**U.S. DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF PRISONS**
*MCC New York, 10007*

## A F F I D a V I T

State of New York)
                        ss
Country of U.S.A.)

County of Manhattan)

I, Mr. Jay Arries, Operations Lieutenant, at the Metropolitan Correctional Center, New York, New York after being duly sworn, do hereby make the following statement freely without any promises or assurances:

1. I affirm that I have not taken any medication nor have I consumed any alcoholic beverages nor any illicit drugs prior to being interviewed by the Special Investigative Agent.

2. I affirm that I do not have a recording device on my person or in my effects and I understand that this interview is not being recorded by the Special Investigative Agent.

3. I affirm that I understand this is an official information inquiry, and that I am not to discuss this interview without the permission of the Special Investigative Agent.

On November 16, 2007, as I exited the staff elevator on the first floor I saw a key ring laying on the floor near the Control Center issue window. There were no staff in the first floor sally port area at the time. I secured the key ring which was identified as a twenty-four hour key ring for the Urinalysis Officer. I then turned the key over to the Acting Captain.

Page 1 of 1        Affiant's Initials

DEPARTMENT OF JUSTICE
**FEDERAL BUREAU OF PRISONS**
*MCC New York , New York 10007*

## OATH

I declare, under the pains and penalty of perjury, that the
foregoing statement consisting of 1 page(s) is true and accurate
to the best of my knowledge and belief.

_____

*AFFIANT*

*Subscribed and sworn to before me this 20th day of February 2008.*

*Authorized by 5 U.S.C. 303*
*to Administer Oaths*

M. Wade-Jones
*SIA*
*Federal Bureau of Prisons*

BP-S194.012 **WARNING AND ASSURANCE TO EMPLOYEE**
          **REQUIRED TO PROVIDE INFORMATION** CDFRM
AUG 01
**U.S. DEPARTMENT OF JUSTICE**          **FEDERAL BUREAU OF PRISONS**

This is an official administrative inquiry regarding misconduct or improper performance of official duties.

| This inquiry pertains to: Breach of Security. |
|---|

The purpose of this interview is to obtain information which will assist in the determination of whether administrative action is warranted.

You are going to be asked a number of questions regarding the performance of your official duties.

You have a duty to reply to these questions and agency disciplinary action, including dismissal, may be undertaken if you refuse or fail to reply fully and truthfully.

Neither your answers nor any information or evidence gained by reason of your answers can be used against you in any criminal proceeding, except that if you knowingly and willfully provide false statements or information in your answers, you may be criminally prosecuted for that action. The answers you furnish and any information or evidence resulting therefrom may be used in the course of agency disciplinary proceedings which could result in disciplinary action, including dismissal.

If you are a member of the bargaining unit and you believe your rights are being threatened, you may request the presence of a representative. If you desire a representative, no further questioning will take place until your representative is present. However, if your representative is not available within a reasonable period of time, questioning may proceed without a representative being present.

### ACKNOWLEDGMENT

I have read and understand my rights and obligations set forth above:

| Employee Signature | Date |
|---|---|
| *[signature]* | 02/26/08 |
| Signature of Bureau of Prisons Official Conducting inquiry | Date |
| *[signature]* | 2/26/08 |

(This form may be replicated via WP)      This form replaces BP-S194 dated AUG 93.

**_SBU - Sensitive But Unclassified_**

D000075

**U.S. DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF PRISONS**
*MCC New York, 10007*

### A F F I D a V I T

State of New York)
                          ss
Country of U.S.A.)

County of Manhattan)

I, Mr. Roderick Jenkins, Intelligence Research Specialist, at the Metropolitan Correctional Center, New York, New York after being duly sworn, do hereby make the following statement freely without any promises or assurances.

1. I affirm that I have not taken any medication nor have I consumed any alcoholic beverages nor any illicit drugs prior to being interviewed by the Special Investigative Agent.

2. I affirm that I do not have a recording device on my person or in my effects and I understand that this interview is not being recorded by the Special Investigative Agent.

3. I affirm that I understand this is an official information inquiry, and that I am not to discuss this interview without the permission of the Special Investigative Agent.

On November 16, 2007, at approximately 7:55 p.m., I was informed by the Acting Captain(Jones) that my twenty-four-hour key ring was found on the first floor sally port. I stated to Ms. Jones that I don't think that I dropped the keys and that I may have left them in the Control Center key slot. After I reviewed the tape, it's obvious that I did not realize that I had dropped my twenty four-hour keys. If I had known or heard the keys dropped of course I would have picked them up it wasn't intentional. It was an unintentional accident.

          Page 1 of 1          Affiant's Initials

DEPARTMENT OF JUSTICE
**FEDERAL BUREAU OF PRISONS**
*MCC New York , New York 10007*

## OATH

I declare, under the pains and penalty of perjury, that the foregoing statement consisting of 1 page(s) is true and accurate to the best of my knowledge and belief.

*AFFIANT*

*Subscribed and sworn to before me this 26th day of February 2008.*

*Authorized by 5 U.S.C. 303*
*to Administer Oaths*

M. Wade-Jones
*SIA*
*Federal Bureau of Prisons*

D000077



# UNITED STATES GOVERNMENT

# MEMORANDUM

Metropolitan Correctional Center, New York, New York

**DATE:** November 28, 2007

**TO:** Mary Wade-Jones, SIA

**FROM:** J. Arries, SIS Lieutenant

**SUBJECT:** Found Keys

On November 16, 2007, I exited the staff elevator on the first floor, where I observed a key ring laying on the floor near the Control Center issue window. No staff were in the first floor sallyport at the time. I secured the key which was identified as a 24 hour ring for the U/A Officer keys. The key ring was turned into Mary Wade-Jones, Acting Captain.

*FOI Exempt-Sensitive But Unclassified*

D000078



# UNITED STATES GOVERNMENT
## MEMORANDUM

Metropolitan Correctional Center, New York, New York

DATE:   November 16, 2007

TO:   ~~S. I. A. Ms. Jones~~

FROM: Roderick Jenkins I.R.S

SUBJECT: U/A 24 Hour KEYS

     On the above date approxmitley 7:55 p.m. I was informed by Ms. Jones that my 24-hour key was found on the first floor sallyport, and to come to her office to retreive the key.  I then stated to Jones that I don't think that I drop the key and that I may have left them in the slot of control center.

D000079

**MCC NEW YORK**
**NEW YORK, NY**
**Daily Assignment Roster**

Friday November 16, 2007

Page 1

| Post | Split Shift | 1  00:00 - 08:00 | 2  06:00 - 14:30 | 3  07:45 - 16:15 | 4  12:00 - 20:30  / 5  14:30 - 22:30 | 6  16:00 - 00:00 |
|---|---|---|---|---|---|---|
| CAPTAIN | | | | **3 Wade-jones, m. | | |
| OPS LT | | 1 Galletta, A | | 3 Hampton, k. | | 6 Luongo, d. |
| ACT LT | | | **2 Miller, s. | | **5 Barber, P | |
| ADMIN LT | | | | 3 Beard, jO | | |
| SHU LT | | | | **3 Walker, m. | | |
| SIA | | | **2 <unassigned> | | | |
| SIS LT | | | | **3 Arries, j. 13:00 20:00 | | |
| INVEST ASST | | | 2 Pearson, A | | | |
| PHONE MON | | | | 3 Olivares, F | | |
| SEC OFFICER #1 | | | 2 Scotto, R | | | |
| SEC OFFICER #2 | | | | 3 Govia, E | | |
| TOOL ROOM OFF | | | 2 Cruz G | | | |
| IRS | | | | 3 <unassigned> | | |
| IRO | | | | 3 <unassigned> | | |
| CONTROL #1 | | 1 Woolery, J | | 3 Lee, T | | 6 Cooper, c. |
| CONTROL #2 | | 1 Butler, T | | 3 Legrand, C | | **6 Pipkin, L 14:30 22:30 |
| REAR GATE OFF | | | | 3 Schuppel, C | | |
| INTERNAL | | **1 Bailey, M OT 00:00 08:00 | | 3 Monge, M | | **6 Gonzalez, L |
| UNIT 2 | | **1 Singh, T OT 00:00 08:00 | | 3 Duran, d. | | 6 Tabac, a. |
| 2 SALLY | | | | 3 Taylor, S | | |
| CAPTAIN SEC | | | | 3 Mathers, C | | |
| 3 SALLY OFF | | | | 3 Stallworth, D | | |
| UNIT 3 | | 1 Antonio, A | | 3 Rodriguez, john | | **6 Kennedy, V |
| ATTY CON | | | | 3 Scott, d. | | 6 Scruggs, C |
| 5 NORTH | | 1 Rosado, r. | | 3 Montoya, h. | | 6 Kearins, m. |
| 5 SOUTH | | **1 York-boyle, k. | | 3 Rodriguez, L | | **6 Mojica, v. |
| 7 NORTH | | **1 Roberts, j. | | 3 Connell, t. | | 6 Cole, c. |
| 7 SOUTH | | 1 <unassigned> | | 3 Amadeo, j. | | **6 <unassigned> |
| 9 NORTH | | 1 Johnson, C | | 3 Graham, r. | | 6 Singh, T 15:00 00:00 |
| SHU #1 | | 1 Douglas, D | | 3 Hardy, K | | 6 Berrios, e. |
| SHU #2 | | 1 Merrick, c, | | 3 Guirty, G | | 5 Hodge, j. |
| SHU #3 | | | | 3 Guerrero, r. | | 6 Caie, K |
| SHU #4 | | | | **3 Dubenezic, D | | 6 Akparanta, c. |
| REC OFF #1 | | | **2 Lampley, D 07:45 16:15 | | | |
| REC OFF #2 | | | 2 Mcdermott, V | | | |
| 10 SOUTH #1 | | 1 Pukhovitskiy, B | | **3 Rodriguez, joel 07:45 14:30 | | 6 Bailey, M 16:00 00:00 |
| 10 SOUTH #2 | | | **2 Ortega, r. 07:45 14:30 | | **5 Long, d. 16:00 00:00 | |
| 11 NORTH | | 1 Jenkins, j. | | 3 Pena, l | | **6 <unassigned> |
| 11 NORTH #2 | | | | | | 6 Ferguson, P |
| 11 SOUTH | | 1 White, D | | 3 Garvin, D | | 6 Baptiste, A |
| 11 SOUTH #2 | | | | | | 6 Pina, a. |
| LOBBY #1 | | | 2 Mondesir, c. | | | |

2/28/2008 7:14:25 PM

D000080

Friday November 16, 2007

| | | |
|---|---|---|
| LOBBY #2 | | 5 Polito, B |
| VISIT #1 | | 4 Rodriguez, S |
| VISIT #2 | | 4 St. john, S |
| VISIT #3 | | 4 Hickman, D |
| SANITATION OFF | **1 Gillespie, A | |
| OSP | 1 Lawrence, J | 3 Camacho, D | **6 Collier, S |
| UTILITY OFF | | | **6 <unassigned> |
| U/A OFFICER | | 3 Rodriguez, Juan |

**** Special Assignments ****

| | |
|---|---|
| QTRS LT | 3 Delaney, p. |
| DUTY OFFICER | 4 Veneroni, J |
| TAD | 3 Lee-bowe, c. |
| HOME DUTY | **3 Derezil, j. |
| BLDG #4 | **3 Santomaggio, M |

**** Back Page Categories ****

### DAY OFF

| | | | |
|---|---|---|---|
| Agar, S | Alvarado, A | Anderson, A | Cannata, m. |
| Covington, T | Darmalingum, R | Davis, C | Diggins, a. |
| Dupree, J | Eliassaint, J | Fletcher, R | Garber, R |
| Hope, D | Jackson, J | Luke, b. | Luzcando-way, J |
| Mason, D | Matos, E | Matthews, A | Mendez, A |
| Ortiz, d. | Perlaza, a. | Quamina, C | Reyes, d. |
| Richardson, D | Sanabria, i. | Shakir, S | Solomon, S |
| Spencer, K | Tawadrous, b. | Thomas, A | West, R |

### ANNUAL LEAVE

| | | |
|---|---|---|
| Farag, s. | Greene, G (NC) | Hawkins, A |

### SICK LEAVE

| | | | |
|---|---|---|---|
| Abreu, j. | Cappiello, J | Flores, b. 12:00 16:00 | Johnson, c.a. |
| Murray, R | St. john, P | | |

### COMPTIME USED

Arries, j.
20:00 21:00

### C.O.P.

Altieri

### A.W.O.L.

| | | | |
|---|---|---|---|
| Bogan, E | Calderon, P | Jean, s. | Williams, V |

### L.W.O.P.

| | | | |
|---|---|---|---|
| Hodges, J | Jenkins, R 20:00 00:00 | Johnson, D | Pepe, L |
| Quiroz, C | Yturbe, m. | | |

### F.F.L.A.

Dixon, Z

### E.A.L.

| | | |
|---|---|---|
| Jackson, M | Kilpatrick, A | Rodriguez, joel 14:30 16:15 |

### TRAVEL

Thomas, m.

D000081

## LOAN

De Jesus, C

## 3-SHAKEDOWN

Ortega, r.                    Silva, y.
14:30 16:15

## 6 TAD

Jenkins, R
16:00 20:00

## 3 EPO LT

Flores, b.
08:00 12:00

## ****Change Records****

| Post | Splt | Shft | Officer | Relieved Officer's New Status | Relieving Officer | Relieving Officer's Previous Status | Ret Shft | Changed By |
|------|------|------|---------|-------------------------------|-------------------|-------------------------------------|----------|------------|
| [Inserted NCS] | | | Greene, G | [Sick/Annual] | | | | JAB 11/6 02:53 |
| L.W.O.P. | Y | 0 | Jenkins R | 6 TAD | | | | JAB 11/6 02:53 |

| | | | | | Shift | Staff | OT/CT | Start | End |
|---|---|---|---|---|-------|-------|-------|-------|-----|
| | | | | | 6 TAD | Jenkins R | | 16:00 | 20:00 |
| | | | | | L.W.O.P. | Jenkins R | | 20:00 | 00:00 |

| Post | Splt | Shft | Officer | Relieved Officer's New Status | Relieving Officer | Relieving Officer's Previous Status | Ret Shft | Changed By |
|------|------|------|---------|-------------------------------|-------------------|-------------------------------------|----------|------------|
| Sick Leave | Y | 0 | Flores, B. | 6 TAD | | | | JAB 11/6 02:54 |

| | | | | | Shift | Staff | OT/CT | Start | End |
|---|---|---|---|---|-------|-------|-------|-------|-----|
| | | | | | 6 TAD | Flores, B. | | 20:00 | 00:00 |
| | | | | | Sick Leave | Flores, B. | | 16:00 | 20:00 |

| Post | Splt | Shft | Officer | Relieved Officer's New Status | Relieving Officer | Relieving Officer's Previous Status | Ret Shft | Changed By |
|------|------|------|---------|-------------------------------|-------------------|-------------------------------------|----------|------------|
| [Sick / Annual] | | | Greene, G | 1-SHAKEDOWN | | | | JAB 11/6 02:55 |
| 10 SOUTH #2 | | 2 | York-Boyle, K. | 2-SHAKEDOWN | <Unassigned> | | | JAB 11/6 03:10 |
| Day Off | | | Walker, M. | 3 SHU LT | | | | JA 11/8 07:40 |
| Annual Leave | | 0 | Diggins, A. | Day Off | | | | JA 11/8 08:33 |
| (sp)HOME DUTY | | 3 | <Unassigned> | | Derezil, J. | Day Off | | JA 11/9 01:02 |
| (sp)BLDG #4 | | 3 | <Unassigned> | | Santomaggio, M | 1 SANITATION OFF | | JA 11/9 01:12 |
| ACT LT | | 2 | Lampley, D | 3 HOSP ESCT #2 | <Unassigned> | | | JA 11/9 01:23 |
| Day Off | | | Miller, S. | 2 ACT LT | | | | JA 11/9 01:27 |
| CAPTAIN | | 3 | Williams, R. | [Sick / Annual] | <Unassigned> | | | JAB 11/13 08:39 |
| SIA | | 2 | Wade-Jones, M. | 3 CAPTAIN | <Unassigned> | | | JAB 11/13 08:40 |
| [Sick / Annual] | | | Williams, R. | [Removed] | | | | JAB 11/13 08:46 |
| 10 SOUTH #1 | | 3 | Altieri | C.O.P. | <Unassigned> | | | JAB 11/13 13:12 |
| Annual Leave | | 0 | Arries, J. | Day Off | | | | JA 11/13 13:17 |
| UNIT 3 | | 6 | Cappiello, J | Sick Leave | <Unassigned> | | | JAB 11/14 10:02 |
| note on file | | | | | | | | |
| 1-SHAKEDOWN | | | Greene, G | Annual Leave | | | | JAB 11/14 14:31 |
| Sick Leave | | 0 | Flores, B. | [Sick / Annual] | | | | JAB 11/14 14:54 |
| 6 TAD | | 0 | Flores, B. | [Sick / Annual] | | | | JAB 11/14 14:54 |
| [Sick / Annual] | | | Flores, B. | [Removed] | | | | JAB 11/14 14:54 |
| [Sick / Annual] | | 0 | Flores, B. | Sick Leave | | | | JAB 11/14 14:54 |
| Sick Leave | Y | 0 | Flores, B. | 3 EPO LT | | | | JAB 11/14 14:55 |

| | | | | | Shift | Staff | OT/CT | Start | End |
|---|---|---|---|---|-------|-------|-------|-------|-----|
| | | | | | 3 EPO LT | Flores, B. | | 08:00 | 12:00 |
| | | | | | Sick Leave | Flores, B. | | 12:00 | 16:00 |

D000082

| Post | Splt | Shft | Officer | Relieved Officer's New Status | Relieving Officer | Relieving Officer's Previous Status | Ret Shft | Changed By |
|------|------|------|---------|-------------------------------|-------------------|-------------------------------------|----------|-----------|
| SANITATION OFF | | 1 | <Unassigned> | | Gillespie, A | 1-SHAKEDOWN | | AG 11/15 02:23 |
| 7 NORTH | | 1 | <Unassigned> | | Roberts, J. | 1-SHAKEDOWN | | AG 11/15 02:23 |
| 10 SOUTH #1 | | 3 | <Unassigned> | | Rodriguez, Joel | 3-SHAKEDOWN | | AG 11/15 03:30 |
| 10 SOUTH #2 | | 2 | <Unassigned> | | Ortega, R. | 3-SHAKEDOWN | | AG 11/15 03:31 |
| 10 SOUTH #2 | | 2 | Ortega, R. | [Sick / Annual] | <Unassigned> | | | AG 11/15 03:31 |
| [Sick / Annual] | | 0 | Ortega, R. | 3-SHAKEDOWN | | | | AG 11/15 03:32 |
| 10 SOUTH #2 | | 2 | <Unassigned> | | Ortega, R. | 3-SHAKEDOWN | Y | AG 11/15 03:32 |

| | Shift | Staff | OT/CT | Start | End |
|---|-------|-------|-------|-------|-----|
| | 10 SOUTH #2 | Ortega, R. | | 07:45 | 14:30 |
| | 3-SHAKEDOWN | Ortega, R. | | 14:30 | 16:15 |

| Post | Splt | Shft | Officer | Relieved Officer's New Status | Relieving Officer | Relieving Officer's Previous Status | Ret Shft | Changed By |
|------|------|------|---------|-------------------------------|-------------------|-------------------------------------|----------|-----------|
| 5 SOUTH | | 1 | Hawkins, A | Annual Leave | York-Boyle, K. | 2-SHAKEDOWN | | JAB 11/15 08:38 |
| Staff agreed to schedule change | | | | | | | | |
| UNIT 2 | | 1 | Jackson, M | E.A.L. | <Unassigned> | | | JAB 11/15 11:19 |
| C.O.P. | | | Quiroz, C | L.W.O.P. | | | | JAB 11/15 12:16 |
| INTERNAL | | 1 | Kilpatrick, A | E.A.L. | <Unassigned> | | | DL 11/15 20:10 |
| INTERNAL | | 1 | <Unassigned> | | Bailey, M | 6 10 SOUTH #1 | Y | DL 11/15 20:25 |

| | Shift | Staff | OT/CT | Start | End |
|---|-------|-------|-------|-------|-----|
| | INTERNAL | Bailey, M | OT | 00:00 | 08:00 |
| | 10 SOUTH #1 | Bailey, M | | 16:00 | 00:00 |

| Post | Splt | Shft | Officer | Relieved Officer's New Status | Relieving Officer | Relieving Officer's Previous Status | Ret Shft | Changed By |
|------|------|------|---------|-------------------------------|-------------------|-------------------------------------|----------|-----------|
| UNIT 2 | | 1 | <Unassigned> | | Singh, T | 6 9 NORTH | Y | DL 11/15 20:32 |

| | Shift | Staff | OT/CT | Start | End |
|---|-------|-------|-------|-------|-----|
| | UNIT 2 | Singh, T | OT | 00:00 | 08:00 |
| | 9 NORTH | Singh, T | | 16:00 | 00:00 |

| Post | Splt | Shft | Officer | Relieved Officer's New Status | Relieving Officer | Relieving Officer's Previous Status | Ret Shft | Changed By |
|------|------|------|---------|-------------------------------|-------------------|-------------------------------------|----------|-----------|
| REC OFF #1 | | 2 | Murray, R | Sick Leave | Lampley, D | 3 HOSP ESCT #2 | | AG 11/16 04:58 |
| REC OFF #1 | | 2 | Lampley, D | [Time Change] | | | | AG 11/16 04:58 |

| | Shift | Staff | OT/CT | Start | End |
|---|-------|-------|-------|-------|-----|
| | REC OFF #1 | Lampley, D | | 07:45 | 16:15 |

| Post | Splt | Shft | Officer | Relieved Officer's New Status | Relieving Officer | Relieving Officer's Previous Status | Ret Shft | Changed By |
|------|------|------|---------|-------------------------------|-------------------|-------------------------------------|----------|-----------|
| ACT LT | | 5 | <Unassigned> | | Barber, P | 6 INTERNAL | | AG 11/16 04:59 |
| INTERNAL | | 6 | <Unassigned> | | Gonzalez, L | 6 11 NORTH | | AG 11/16 04:59 |
| SHU #4 | | 3 | Dixon, Z | F.F.L.A. | Dubenezic, D | 3 HOSP ESCT #1 | | AG 11/16 05:44 |
| OSP | | 6 | Johnson, C.A. | Sick Leave | <Unassigned> | | | KH 11/16 11:12 |
| OSP | | 6 | <Unassigned> | | Collier, S | 6 7 SOUTH | | KH 11/16 11:13 |
| UTILITY OFF | | 6 | Abreu, J. | Sick Leave | <Unassigned> | | | KH 11/16 11:44 |
| L.W.O.P. | | | Jean, S. | A.W.O.L. | | | | JAB 11/16 12:31 |
| 10 SOUTH #1 | | 3 | Rodriguez, Joel | E.A.L. | <Unassigned> | | | KH 11/16 14:39 |
| 10 SOUTH #1 | | 3 | <Unassigned> | | Rodriguez, Joel | E.A.L. | Y | KH 11/16 14:41 |

| | Shift | Staff | OT/CT | Start | End |
|---|-------|-------|-------|-------|-----|
| | 10 SOUTH #1 | Rodriguez, Joel | | 07:45 | 14:30 |
| | E.A.L. | Rodriguez, Joel | | 14:30 | 16:15 |

| Post | Splt | Shft | Officer | Relieved Officer's New Status | Relieving Officer | Relieving Officer's Previous Status | Ret Shft | Changed By |
|------|------|------|---------|-------------------------------|-------------------|-------------------------------------|----------|-----------|
| UNIT 3 | | 6 | <Unassigned> | | Kennedy V | 6 5 SOUTH | | KH 11/16 15:20 |
| 5 SOUTH | | 6 | <Unassigned> | | Mojica, V. | 6-SHAKEDOWN | | KH 11/16 15:21 |
| SIS LT | | 3 | <Unassigned> | | Arries, J. | Day Off | | JA 11/16 15:58 |
| SIS LT | | 3 | Arries, J. | [Time Change] | | | | JA 11/16 16:00 |

| | Shift | Staff | OT/CT | Start | End |
|---|-------|-------|-------|-------|-----|
| | SIS LT | Arries, J. | | 13:00 | 18:00 |

| Post | Splt | Shft | Officer | Relieved Officer's New Status | Relieving Officer | Relieving Officer's Previous Status | Ret Shft | Changed By |
|------|------|------|---------|-------------------------------|-------------------|-------------------------------------|----------|-----------|
| SIS LT | | 3 | Arries, J. | Comptime Used | <Unassigned> | | | JA 11/16 16:01 |

2/28/2008 7:14:26 PM

Friday November 16, 2007
Page 5

| Post | Splt | Shft | Officer | Relieved Officer's New Status | Relieving Officer | Relieving Officer's Previous Status | Ret Shft | Changed By | | |
|---|---|---|---|---|---|---|---|---|---|---|
| SIS LT | | 3 | <Unassigned> | | Arries, J. | Comptime Used | Y | JA 11/16 16:02 | | |
| | | | | | Shift | Staff | | OT/CT | Start | End |
| | | | | | SIS LT | Arries, J. | | | 13:00 | 18:00 |
| | | | | | Comptime Used | Arries, J. | | | 18:00 | 21:00 |
| CONTROL #2 | | 6 | Long, D. | 10 SOUTH #2 5 | Pipkin, L | [SWAP] | | DL 11/16 17:25 | | |
| Assignment Swap officer long does not have sentry | | | | | | | | | | |
| CONTROL #2 | | 6 | Pipkin, L | [Time Change] | | | | DL 11/16 17:27 | | |
| | | | | | Shift | Staff | | OT/CT | Start | End |
| | | | | | CONTROL #2 | Pipkin, L | | | 14:30 | 22:30 |
| 10 SOUTH #2 | | 5 | Long, D. | [Time Change] | | | | DL 11/16 17:27 | | |
| | | | | | Shift | Staff | | OT/CT | Start | End |
| | | | | | 10 SOUTH #2 | Long, D. | | | 16:00 | 00:00 |
| SIS LT | | 3 | Arries, J. | [Time Change] | | | | JA 11/16 18:43 | | |
| | | | | | Shift | Staff | | OT/CT | Start | End |
| | | | | | SIS LT | Arries, J. | | | 13:00 | 19:00 |
| Comptime Used | | 0 | Arries, J. | [Time Change] | | | | JA 11/16 18:44 | | |
| | | | | | Shift | Staff | | OT/CT | Start | End |
| | | | | | Comptime Used | Arries, J. | | | 19:00 | 21:00 |
| SIS LT | | 3 | Arries, J. | [Time Change] | | | | JA 11/16 19:45 | | |
| | | | | | Shift | Staff | | OT/CT | Start | End |
| | | | | | SIS LT | Arries, J. | | | 13:00 | 21:00 |
| SIS LT | | 3 | Arries, J. | [Time Change] | | | | JA 11/16 19:46 | | |
| | | | | | Shift | Staff | | OT/CT | Start | End |
| | | | | | SIS LT | Arries, J. | | | 13:00 | 20:00 |
| Comptime Used | | 0 | Arries, J. | [Time Change] | | | | JA 11/16 19:46 | | |
| | | | | | Shift | Staff | | OT/CT | Start | End |
| | | | | | Comptime Used | Arries, J. | | | 20:00 | 21:00 |
| Day Off | | 0 | Alvarado, A | A.W.O.L. | | | | DL 11/17 10:41 | | |
| AW SHAKEDOWN | | 0 | Bogan, E | A.W.O.L. | | | | DL 11/17 10:41 | | |
| AW SHAKEDOWN | | 0 | Calderon, P | A.W.O.L. | | | | DL 11/17 10:41 | | |
| AW SHAKEDOWN | | 0 | Williams, V | A.W.O.L. | | | | DL 11/17 10:42 | | |
| A.W.O.L. | | 0 | Alvarado, A | Day Off | | | | DL 11/17 10:46 | | |
| A.W.O.L. | | | Jean, S. | L.W.O.P. | | | | JAB 11/19 12:56 | | |
| L.W.O.P. | | | Jean, S. | A.W.O.L. | | | | JAB 11/26 15:09 | | |

****Recapitulation****

| | |
|---|---|
| Morning Watch | 15 |
| AM Watch | 8 |
| Day Watch | 35 |
| PM Watch | 7 |
| Evening Watch | 20 |

**Back Page Categories**

| | |
|---|---|
| Day Off | 32 |
| Annual Leave | 2 |
| Sick Leave | 6 |
| C.O.P. | 1 |
| A.W.O.L. | 4 |
| L.W.O.P. | 6 |
| F.F.L.A. | 1 |
| E.A.L. | 2 |
| TRAVEL | 1 |
| LOAN | 1 |
| 3-SHAKEDOWN | 1 |

Total Correctional Svcs. Staff:  142

D000084

Friday November 16, 2007

Non Correctional Svcs. Staff:  1

Overtime Occurrences:  2
Comptime Occurrences:  0

Ops Lt. Evening Watch Signature:  _____

Captain's Signature:  _____

2/28/2008 7:14:26 PM



**U.S. Department of Justice**
Office of the Inspector General

**MEMORANDUM OF INVESTIGATION**

| Case Number: | Reporting Office: |
|---|---|
| 2006-003631 | New York Field Office |

Receipt of Documents from TSA

On Saturday, April 29, 2006, at approximately 5:00 p.m., DOJ Office of the Inspector General (OIG) Special Agents Eric J. Blachman and Guido Modano responded to LaGuardia Airport, Queens, New York, after being notified by Federal Bureau of Prisons, Metropolitan Correctional Center (MCC) New York, Special Investigative Agent Glenn A. Carrino that BOP Correctional Officer Roderick Jenkins boarded a commercial aircraft (Delta Flight 615) carrying a personal owned firearm while off-duty.

Transportation Security Administration (TSA) Assistant Federal Security Director John Marigliano also responded to LaGuardia Airport and assisted SAs Blachman and Modano.

Marigliano confirmed that Jenkins by-passed the security checkpoint (metal detectors) at LaGuardia Airport after he presented a valid BOP credential and signed the TSA Armed Law Enforcement Officer Entry Log. Marigliano also confirmed that 2 Federal Air Marshals that were on board Delta Flight 615 questioned Jenkins in flight; however, they did not arrest him.

Marigliano provided a copy of the TSA Armed Law Enforcement Officer Entry Log that Jenkins signed and a memorandum prepared by a Supervisory TSA Screener concerning her interaction with Jenkins.

The TSA Armed Law Enforcement Officer Entry Log and TSA Supervisory Screener Memorandum are affixed to this report.

Page 1 of 1

| Special Agent Name and Signature: | Eric J. Blachman | | Date: May 1, 2006 |
|---|---|---|---|

OIG Form 111-207/2 (10/23/96)   *This document contains neither recommendations nor conclusions of the IG. It is the property of the IG and is loaned to your agency; it and its contents are not to be distributed outside of your agency.*

D000086



**Transportation Security Administration**

To: _____

From: _Clarissa Boyd_____

Date: _4/29/06_____

Subject: _East End incident_____

AT APPROXIMATLY 1025 OFFICER JOHN INIQUEZ RADIOED ME, S.T.S.O CLARISSA BOYD REGARDING TWO OFFICERS PASSING THROUGH METAL DETECTORS BETWEEN LANE #4 AND LANE #5. WHEN I RESPONDED TO THE CALL ON EAST END I OBSERVED 2 OFFICERS ONE OF WHICH WAS A P.A.P.D OFFICER AND A PLAIN CLOTHES OFFICER. I IMMEDIATLY ASKED THE OFFICER IF HE WAS ARMED. HIS RESPONSE WAS "YES." I THEN ASKED TO SEE HIS ID AND PAPERWORK. HE PRESENTED HIS SHIELD (#623), BADGE, AND HIS LAW ENFORCEMENT PAPERS. I INFORMED HIM THAT NORMAL PROCEDURE IS TO CHECK IN AT MAIN CHECKPOINT. DURING MY CONVERSATION WITH THE OFFICER, P.A.P.D. INTERJECTED THAT HE WAS CLEARED AND THAT HE WAS WITH HIM. I ESCORTED THE OFFICER BACK TO THE MAIN CHECKPOINT SO THAT HE COULD LOG IN. WHILE THE OFFICER WAS LOGGING INTO THE LEO LOG BOOK, I RETRIEVED THE P.A.P.D ID # (#623). WHEN HE COMPLETED HIS ENTRY, HE HEADED TOWARD THE GATES.

APPROXIMATLY 5 MINUTES P.A.P.D OFFICER RETURNED TO CHECKPOINT I THEN APPROCHED HIM REGARDING THE MATTER ON THE EAST END. I BEGAN TO INFORM HIM THAT IT WAS NOT NORMAL PROTOCOL TO BRING ABOVE LEO VIA EAST END. HE THEN STATED TO ME THAT THAT HE KNEW AND HE APOLOGIZED BUT HE WAS ESCORTING PUFF DADDY AND THAT HE DID NOT WANT ANY ATTENTION BROUGHT TO HIM. HE ALSO STATED THAT THE OFFICER THAT WAS GUARDING HIM WAS NOT SUPPOSED TO LET HIM OUT OF HIS SIGHT. HE THEN WENT INTO DETAIL ABOUT HOW HE WAS SUPPOSED TO BE WATCHING PUFF DADDY WHILE HE WAS ON THE AIR CRAFT. ONCE HE WAS FINISHED HE EXITED THE CHECKPOINT AND APOLOGIZED ONCE AGAIN AND LEFT.

Print Name: _Clarissa Boyd_____     Signature: _C.~~~~_____

U.S. Department of Homeland Security • Transportation Security Administration • LaGuardia Airport
P.O. Box d41 • Flushing, NY 11371 • 718 630 1104

D000087

Transportation Security Administration

**LAW ENFORCEMENT OFFICER SIGN-IN**

AIRPORT: _LGA_   CODE: _20_   CHECKPOINT: _Delta/US_

| Date | Time | Name | Cred. No. Department | Address/Phone of Duty Station | Airline | Flight | Pax. Or Visitor | L.E.O. Initials |
|------|------|------|---------------------|------------------------------|---------|--------|-----------------|------------------|
| 1 | 4/29 | 0840 | Owen Choate | P10770A A 2Hrg | TSA/FFDO | Delta | 2037 | | |
| 2 | 4/29 | 1130 | Rod Tealer | 6 | Fortwork PD J | USAIR | | | |
| 3 | 4/29 | 11.50 | Thomas Loe | P00450 | TSA/FFDO | | | Pax | |
| 4 | 4/29/06 | 1121 | Bill Woody | P004705 | TSA/FFDO | | | | |
| 5 | 4/29/06 1500 | Paul Corbin | P10013 | TSA/FFDO | ATLD | — | | |
| 6 | | | | | | | | |
| 7 | | | | | | | | |
| 8 | | | | | | | | |
| 9 | | | | | | | | |
| 10 | | | | | | | | |
| 11 | | | | | | | | |
| 12 | | | | | | | | |
| 13 | | | | | | | | |
| 14 | | | | | | | | |
| 15 | | | | | | | | |
| 16 | | | | | | | | |
| 17 | | | | | | | | |
| 18 | | | | | | | | |
| 19 | | | | | | | | |
| 20 | | | | | | | | |

 

**U.S. Department of Justice**
Office of the Inspector General

**MEMORANDUM OF INVESTIGATION**

| Case Number: | Reporting Office: |
|---|---|
| 2006-003631 | New York Field Office |

Telephone Conversation with MCC Warden Marvin Morrison

On Saturday, April 29, 2006, at approximately 6:00p.m., DOJ Office of the Inspector General (OIG) Special Agents Eric J. Blachman spoke to federal Bureau of Prisons Metropolitan Correctional Center (MCC) New York Warden Marvin Morrison. After being advised that the purpose of the telephone call related to BOP Intelligence Research Specialist Roderick Jenkins, Morrison provided the following information:

He did not authorize Jenkins to fly armed, nor did he authorize Jenkins to work off-duty carrying a firearm.

He said that as far as he is concerned Jenkins violated BOP policy and the law by carrying his personally owned firearm.

Morrison agreed not to take any action until the completion of the OIG investigation.

Page 1 of 1

| Special Agent Name and Signature: | Eric J. Blachman | | Date: May 1, 2006 |
|---|---|---|---|

OIG Form III-207/2 (10/23/96)   *This document contains neither recommendations nor conclusions of the IG. It is the property of the IG and is loaned to your agency; it and its contents are not to be distributed outside of your agency.*



U.S. Department of Justice
Office of the Inspector General

**MEMORANDUM OF INVESTIGATION**

| Case Number: | Reporting Office: |
|---|---|
| 2006-003631 | New York Field Office |

Receipt of Documents from TSA

On Tuesday, August 1, 2006, at approximately 9:30 a.m., DOJ Office of the Inspector General (OIG) Special Agent Eric J. Blachman received a revised Transportation Security Administration (TSA) Supervisory Screener Memorandum relating to Federal Bureau of Prisons (BOP) Correctional Officer Roderick Jenkins.

The memorandum is affixed to this memorandum.

Page 1 of 1

| Special Agent Name and Signature: | Eric J. Blachman | | Date: August 1, 2006 |
|---|---|---|---|

OIG Form 111-207/2 (10/23/96)   *This document contains neither recommendations nor conclusions of the IG. It is the property of the IG and is loaned to your agency; it and its contents are not to be distributed outside of your agency.*

D000090

09/01/2006  09:32   395419          LGA TSA              PAGE  02

To: John Magliano

From: STSO Clarissa Boyd

Date: May 10, 2006

Subject: East End incident revision

To John Magliano,

    Upon review of my statement regarding the incident on the East end April 29,2006 I noticed that there were some mistakes in my statement.  I would like to submit a revised copy of my statement which is enclosed with this letter.  Please review it and feel free to contact me with any questions that you may have.  I apologize for any inconveniences that this may have caused you.

STSO Clarissa Boyd


To: John Magliano

From: STSO Clarissa Boyd

Date: May 10, 2006

Subject: East End incident revision


At approximately 1025, Officer John Iniguez radioed me STSO Clarissa Boyd regarding two officers passing through the metal detectors between lanes four and five. When I responded to the East end I observed two officers, one of which was a port authority officer (Shield # 628) and a plain-clothes officer. I immediately asked the officer if he was armed. His response to me was "yes." I then asked to see his ID and paper work. He presented his shield, badge and law enforcement paperwork. I informed him that normal procedure was to check in at the main checkpoint. During my conversation with the gentleman, the PAPD officer interjected that he was cleared and that he was with him. I escorted the plain clothes officer back to main checkpoint so that he could log in. While the officer was logging into the LEO book I retrieved the Port Authority Officer's Shield number (628). When he completed his entry into the logbook, he headed toward the gates.

Approximately five minutes later, I noticed the Port Authority Police Department Officer returning to the checkpoint. I then approached him regarding the matter on the East End. I began to inform him that it was not normal protocol to bring armed LEOS via the east end. He stated to me that he was aware of the regulations and that he apologized but he was escorting Puff Daddy and he did not want any attention brought to him. He

D000092


also said that the officer guarding him was not supposed to let him out of his sight. He then went into detail about how he was supposed to be watching Puff Daddy while he was on the aircraft. Once he finished ho exited the checkpoint and apologized once again.

TSO Boyd

D000093



**U.S. Department of Justice**
Office of the Inspector General

# MEMORANDUM OF INVESTIGATION

| Case Number: | Reporting Office: |
|---|---|
| 2006-003631 | New York Field Office |

Receipt of Documents from the Federal Air Marshals Service

On Wednesday, May 3, 2006, at approximately 2:30 p.m., DOJ Office of the Inspector General (OIG) Special Agents Eric J. Blachman received a copy of a Federal Air Marshals Service Activity Report that was prepared in regards to the incident involving Federal Bureau of Prisons (BOP) Correctional Officer Roderick Jenkins and Delta Airlines Flight 615 on April 29, 2006.

The activity report is affixed to this memorandum.

Page 1 of 1

| Special Agent Name and Signature: | Eric J. Blachman | | Date: May 3, 2006 |
|---|---|---|---|

OIG Form III-207/2 (10/23/96)   *This document contains neither recommendations nor conclusions of the IG. It is the property of the IG and is loaned to your agency; it and its contents are not to be distributed outside of your agency.*

D000094

05/03/2006  14:32      95419          LGA TSA                    PAGE  02

Page 1 of 6

| U.S. Department of<br>Homeland Security<br>Federal Air Marshal Service<br>FLD F7100 (12-05) | **ACTIVITY REPORT** |
|---|---|

| | |
|---|---|
| Submitted by: | Williams, Edward E |
| Date Report Filed: | April 29, 2006 |
| Incident Location: | Delta Flight 615    MOC Control #:  2006-119-003 |
| | *City, State* |
| Occurred On: | April 29, 2006, 12:30 PM |
| | *Date, Time* |
| Field Office: | Atlanta          ☐ CLASS 1   ☒ CLASS 2 |

**Class 1 Activities** are regulatory in nature and include, but are not limited to: irregularities involving screening and/or escort procedures, check-in procedures, assigned seating problems, boarding, aircrew conflicts, gate agent conflicts, flight crew briefings, searches, arrival procedures, and equipment retrieval/turn-in.

**Class 2 Activities** include, but are not limited to: arrests, medical situations requiring direct involvement of a FAM, interference with a flight crew by a subject, tampering with aircraft or aircraft equipment, verbal threats or threatening physical behavior by a subject, security breaches, suspicious activity that rises to a level requiring investigation and/or direct FAM involvement, third party information reported to a FAM, disruptive/disorderly personal behavior by a subject, suspect items or objects, field interview results, and other FAM law enforcement actions occurring prior to the opening and assignment of a formal investigation.

## INFORMATION

| **SUBJECT DETAILS** | **ADDITIONAL DATA** |
|---|---|
| Last Name:  Jenkins | Name(s) of additional FAM partner(s): |
| First Name:  Roderick | Williams, Edward |
| Middle Name: | Harold J. Lamberson |
| Date of Birth: ___ Age: ___ | Pilot/Crew I.D.: |
| Sex: ☒ Male  ☐ Female | Airline and Flight Number:  615 |
| Race:  Black | Type of Aircraft:  M-80 |
| Height:  6ft | Date of Flight:  04/29/06 |
| Weight:  210 | Origin & Destination Airports:  LGA/ATL |
| Hair Color:  Black  (Blonde, Brown, Black, Red, Gray, White) | |
| Eye Color:  Brown  (Blue, Brown, Black, Green, Gray, Violet) | |
| | |
| Passport Number: | ☐ Traveling alone   ☒ Traveling with others |
| Country of Citizenship: | *Explain:*  Working as private security for celebrity |
| Other Identification: | ☒ Carry On Items   ☐ Checked Baggage |
| Occupation:  Intelligence Officer | Any other LEOs involved: ☒ Yes  ☐ No |
| | Atlanta Police Department airport detail. |
| | Officer awaited planes arrival. Involved in |
| Address: | *Explain:*  questioning subject(s). |
| City & State:  New York, New York | |
| Phone Res:  ( ) - | |

Office of Field Operations                                                                 FAMS Form PLD F71 00 October 05

SENSITIVE SECURITY INFORMATION
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 C.F.R. PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW," AS DEFINED IN 49 C.F.R. PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 C.F.R. PARTS 15 AND 1520.

D000095

Case 1:11-cv-00268-NGG-CLP   Document 55-25   Filed 06/10/13   Page 96 of 139 PageID #: 1627

05/03/2006  14:32   '95419          LGA TSA                    PAGE  03

| U.S. Department of Homeland Security Federal Air Marshal Service FLD F7100 (12-05) | **ACTIVITY REPORT** |
|---|---|

## SUBJECT [2] DETAILS

Last Name:    Combs
First Name:   Sean
Middle Name:
Date of Birth:              Age:
Sex: ☒ Male  ☐ Female
Race:    Black
Weight:              Height:   6ft
Hair Color:          Eye
Passport Number:
Country of Citizenship:
Other Identification:
Occupation:          Entertainer
Address:    Unk
City & State:   Unk
Phone Res:   (Unk)     -
Phone Bus:   (      )    -

## ADDITIONAL DATA

☐ Traveling alone   ☒ Traveling with others
*Explain:*  Traveling as private passenger

☒ Carry On Items   ☐ Checked Baggage
Any other LEOs involved: ☒ Yes   ☐ No
*Explain:*  New York City Police provided escort

## SUBJECT [3] DETAILS

Last Name:
First Name:
Middle Name:
Date of Birth:              Age:
Sex: ☐ Male  ☐ Female
Race:
Weight:              Height:
Hair Color:          Eye
Passport Number:
Country of Citizenship:
Other Identification:
Occupation:
Address:
City & State:
Phone Res:   (      )    -
Phone Bus:   (      )    -

## ADDITIONAL DATA

☐ Traveling alone   ☐ Traveling with others
*Explain:*

☐ Carry On Items   ☐ Checked Baggage
Any other LEOs involved: ☐ Yes   ☐ No
*Explain:*

Office of Field Operations                                   FAMS Form FLD F71 00 October 05

SENSITIVE SECURITY INFORMATION
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 C.F.R. PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 C.F.R. PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 C.F.R. PARTS 15 AND 1520.

D000096

Case 1:11-cv-00268-NGG-CLP   Document 55-25   Filed 06/10/13   Page 97 of 139 PageID #: 1628

| U.S. Department of Homeland Security Federal Air Marshal Service FLD F7100 (10-05) | ACTIVITY REPORT |
|---|---|

**Describe action that took place:**

On April 29, 2006 at approximately 10:31a.m., I observed the following: A black male, whom I later identified as Roderick Jenkins, stepped slightly into the flight deck of Delta Airlines, Flight #615, aircraft equipment M80.  The subject made a brief introduction with the Captain and First Officer, shook their hands, and exited the flight deck.  I observed, however, that Mr. Jenkins did not present any sort of paperwork, or what could be deemed law enforcement credentials as is normally indicative of armed passengers boarding a civilian airline. Mr. Jenkins followed the entourage of individuals accompanying an American rap artist, formally known as "Diddy", later identified as Sean Combs.

Mr. Jenkins followed Mr. Sean Combs into the first class cabin. Mr. Combs took seat 2D. Mr. Jenkins, accompanying the entourage, stood idle momentarily, and then took the adjacent seat 2C.  Seat 2C, which Mr. Jenkins took was not his assigned seat.  Therefore, he approached the Lead Flight Attendant, identified as LaNetta, and prompted her to change his seat.  The lead flight attendant requested five individuals move- thereby accommodating Mr. Jenkins's request to occupy a seat adjacent to Mr. Combs.  Mr. Jenkins, now occupied seat 4B, and Mr. Combs occupied 4A.

At this point no one associated with the flight crew had notified my partner, Harold Lamberson, or myself, that an armed law enforcement officer was on board.  Due to Mr. Jenkins, entering the flight deck and speaking with the flight officers, I was prompted to inquire about Mr. Jenkins's status. Mr. Jenkins was clearly performing protective duties for Mr. Combs.  In my inquiry of the lead flight attendant, Lanetta, I asked her if Mr. Jenkins was armed. She answered: "Yes he is." When I asked her with what agency, she replied she didn't know.  But she said she would ask him. She came back with the reply that Mr. Jenkins stated, "He works for the Federal Department of Justice."  She subsequently scribbled the acronym FDOJ on a newspaper.

Upon learning this information, I asked the lead flight attendant to arrange a face-to-face meeting with myself and Mr. Jenkins in the front galley.  She complied.  Mr. Jenkins approached the front galley.  At this

Office of Field Operations                                      FAMS Form FLD F71 00 October 05

SENSITIVE SECURITY INFORMATION
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 C.F.R. PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW," AS DEFINED IN 49 C.F.R. PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 C.F.R. PARTS 15 AND 1520.

D000097

05/03/2006  14:32   71  35419          LGA TSA                    PAGE  05

Page 4 of 6

| U.S. Department of Homeland Security Federal Air Marshal Service FLD F7100 (10-05) | ACTIVITY REPORT |
| --- | --- |

**Describe action that took place:**

Point, I presented my credentials to Mr. Jenkins.  I asked him if he was a law enforcement officer.  To which he replied: "Yes".  I then asked if I might see his law enforcement credentials.  Initially, he was reluctant.  Demanding to know why I needed to see them.  He became noticeably nervous, hands shaking and voice faltering.  Yet, he did extend a set of credentials, which appeared government issued and official. The credentials indicated Mr. Jenkins was an employee of the Department of Justice, Federal Bureau of Prisons (BOP).  They listed the possessor's name as Roderick Jenkins, Intelligence Officer, MCC New York.

I asked Mr. Jenkins, if he was escorting Mr. Combs, or just accompanying him?  Mr. Jenkins replied: "He was escorting Mr. Combs."  I again asked Mr. Jenkins the same question.  And cautioned him to think about his response, before replying.  To this Mr. Jenkins said.  "I'm escorting Mr. Combs.  What is the problem?  I have done this 30 times or more.  I escort people all over the world.  Are you trying to tell me how to do my job?"  Mr. Jenkins was visibly upset and nervous at this point. His hands noticeably shaking.  His voice rising.

I did not respond to Mr. Jenkins's question.  I did, however, ask to reexamine his government issued credentials. The credentials had a small representative pin inserted into the inner lining.  The small metal pin contained the emblem "Federal Bureau of Prisons."  Thinking I may have missed Mr. Jenkins's specific job title, I rechecked his official duty designation.  The BOP credentials clearly indicated Mr. Jenkins's position as "Intelligence Officer, Federal Bureau of Prisons."  Yet, Mr. Jenkins, of his own volition stated he was in possession of a personal weapon and providing escort for Sean Combs.

Again, I asked Mr. Jenkins if he was armed with a weapon issued by his agency?  Mr. Jenkins replied:  "No. I have my personal weapon on me."  Again, I asked him to think carefully about his response before answering and asked him the question again.  Again, Mr. Jenkins, stated unequivocally:  "I have my personal weapon on me."  So I asked him if the Warden of MCC New York authorize him to carry the weapon on a flight and did the Warden direct him to escort Mr. Combs?  To which he

Office of Field Operations                                    FAMS Form FLD F7100 October 05

SENSITIVE SECURITY INFORMATION
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 C.F.R. PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW," AS DEFINED IN 49 C.F.R. PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 C.F.R. PARTS 15 AND 1520.

D000098

| U.S. Department of Homeland Security Federal Air Marshal Service FLD F7100 (10-05) | ACTIVITY REPORT |

**Describe action that took place:**

responded: "What is the problem? Are you trying to tell me how to do my job? What do you want? I do this all the time!" It was at this point that I asked Mr. Jenkins to return to his seat.

I then made telephonic contact with the Captain of Flight #615. I notified him of my findings and consulted with him regarding a course of action. The Captain notified me that he would have Delta Corporate Security and Atlanta Police Department (APD) awaiting the arrival of the flight. He did not order us to take the Subject into custody, nor did we do so at this point since a New York City Police Officer had escorted Mr. Jenkins onto the aircraft. Before, conducting any further actions, I wanted to ascertain from his Chief Executive Officer (the Warden at MCC New York) if in fact, Mr. Jenkins was in an official status or acting in a personal capacity.

Upon arriving at Hartsfield International Airport my partner and myself were met by Mr. Gary Booth, Lead Agent for Delta Airlines. An APD Officer accompanied Agent Booth. They conducted a brief inquiry of Mr. Jenkins, and allowed him to depart with Mr. Comb's entourage. I questioned the APD Officer about her findings. She indicated that it was out of her jurisdiction. Agent Booth replied that Delta had only regulatory authority in the affair and saw no further need for involvement. At this point I was still attempting telephonic contact with the Chief Executive Officer at MCC New York, or his representative.

On April 29, 2006, at about 14:35, I received a phone call from the Chief Correctional Officer (Captain) of MCC New York, Rufus Williams, phone number (646) 423-0079. Captain Williams provided the following statement: "Intelligence Officer, Roderick Jenkins, was not working in an official capacity. Nor was Roderick Jenkins presence or activities on the flight authorized by Warden Morris of MCC New York."

I asked Captain Williams if he was he speaking officially for the Warden of MCC New York. He replied: "Yes. Mr. Jenkins activities were being done on his own time and in no way associated with his duties and responsibilities at MCC New York."

Office of Field Operations                          FAMS Form FLD F71 00 October 06

SENSITIVE SECURITY INFORMATION
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 C.F.R. PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW," AS DEFINED IN 49 C.F.R. PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION 911 - THE SECRETARY OF TRANSPORTATION. UN-AUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 C.F.R. PARTS 15 AND 1520.

D000099

05/03/2006 14:32  75419 LGA TSA PAGE 07

Page 6 of 6

| U.S. Department of Homeland Security Federal Air Marshal Service FLD F7100 (10-05) | **ACTIVITY REPORT** |
| --- | --- |

Describe action that took place:

Mr. Jenkins had previously departed with Mr. Comb's entourage, and could not be questioned or detained further.

I then made contact with my immediate supervisors at the Federal Air Marshal Service notifying them of the status and findings of this report. This Activity Report shall serve to document events as recalled and witnessed on flight #615, for the date of April 29, 2006.

Office of Field Operations

FAMS Form FLD F71 00 October 05

SENSITIVE SECURITY INFORMATION
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 C.F.R. PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW," AS DEFINED IN 49 C.F.R. PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 C.F.R. PARTS 15 AND 1520.

# UNITED STATES DEPARTMENT OF JUSTICE

Office of the Inspector General

## WARNINGS AND ASSURANCES TO EMPLOYEE REQUIRED TO PROVIDE INFORMATION

**This is an administrative inquiry regarding allegations of misconduct or conduct that affects your capacity to carry out your official duties.** In accordance with the Privacy Act of 1974, you are advised that the authority to conduct this interview is contained in the Inspector General Act of 1978, as amended, and in Department of Justice Order 1393-90.

The purpose of this interview is to obtain information which will assist in the determination of whether administrative action is warranted.

You are going to be asked a number of specific questions regarding the performance of your official duties **and conduct that affects your capacity to carry out your official duties**.

You have a duty to reply to these questions and disciplinary action, including dismissal, may be undertaken if you refuse to answer or fail to reply fully and truthfully.

Neither your answers nor any information or evidence gained by reason of your answers can be used against you in any criminal proceeding, except that if you knowingly and willfully provide false statements or information in your answers, you may be criminally prosecuted for that action. The answers you furnish and any information or evidence resulting therefore may be used in the course of disciplinary proceedings which could result in disciplinary action, including dismissal.

## ACKNOWLEDGEMENT

I have read and understand my rights and obligations as set forth above.

_____
Office of the Inspector General
Special Agent Conducting Inquiry

_____
Witness

_____
Time _12:40 AM_

_____
Employee's Signature

_____
Date _1/25/07_

_____
Place _SDNY_

**OIG Form III-226/3** *(7/31/96)*

D000101

OCT-06-2009 TUE 12:43 PM                                    FAX NO.                                    P. 02

**U.S. Department of Justice**
Office of the Inspector General                        **MEMORANDUM OF INVESTIGATIO**



| Case Number: | Reporting Office: |
|---|---|
| 2006-003631 | New York Field Office |

2nd Interview of Roderick Jenkins

On Thursday, February 22, 2007, at approximately 1:30 p.m., DOJ Office of the Inspector General (OIG) Special Agents Eric J. Blachman and Kenneth Connaughton re-interviewed federal Bureau of Prisons (BOP) Intelligence Research Specialist Roderick Jenkins at the U.S. Attorney's Office, Southern District of New York, Sub-Office, at 500 Pearl Street, New York, New York. Also present was Jenkins' attorney, Robert J. Valli, Jr. from Valli & Kane LLP.

Jenkins was informed that the purpose of the interview was to review his previous statement to the OIG and obtain a signed sworn statement.

SA Blachman started the interview by reviewing Jenkins' previous oral statements to OIG investigators from January 25, 2007. Jenkins did not object to how his previous statements were reported and advised that he would adopt his draft statement he provided to the OIG on February 6, 2007, as his final original version.

Prior to obtaining Jenkins' signature for his statement, SA Blachman confronted him about his previous statements, including, but not limited to a news article that indicated Jenkins as a member of Combs' security detail.

Jenkins again denied working security for Combs and said that he has no control over how he is identified. Jenkins said that he was possibly identified as "security personnel" so he could receive an all access pass to the event that he was working.

After confirming he had no new information to report, Jenkins was placed under oath and signed his affidavit. His affidavit is attached to this report.

Jenkins also submitted a new letter he said he received from Combs' Chief of Staff Dia Bank. The letter stated that his company (True Familia Entertainment) provided outside consulting services on a host of special events and his expertise in law enforcement served them well, however, Jenkins does not provide security for Sean Comb's Executive Offices. The letter is attached to the report.

Page 1 of 1

| Special Agent Name and Signature: | Eric J. Blachman | | Date: February 28, 2007 |
|---|---|---|---|

OIG Form III-207/2 (10-23-96)   *This document contains neither recommendations nor conclusions of the IG. It is the property of the IG and is loaned to your agency; it and its contents are not to be distributed outside of your agency.*

D000102

OCT-06-2009 TUE 12:43 PM                                    FAX NO.                        P. 03

U.S. Department of Justice
Office of the Inspector General                                                        AFFIDAVIT

| 1. Place *(City, State)* | 2. Date | 3. Time | 4. Case Number |
|---|---|---|---|
| New York, New York | 2/22/2007 | 145pm | 200600363 1 |

**Person Making Statement**

| 5. Name | 6. Home Address | 7. Home Tel. |
|---|---|---|
| Roderick Jenkins | MCC NY 150 Park Row | |

| 8. Title | 9. Grade | 10. Component | 11. Length of Employ | 12. Office Tel. |
|---|---|---|---|---|
| Intelligence Research Specialist | 9/10 | BOP | 18 years | |

| 13. Employer | 14. Office Address |
|---|---|
| Bureau of Prison | MCC NY 150 Park Row |

**Others Present When Statement is Given**

| 15. Name | 16. Title |
|---|---|
| Eric J. Blachman | Special Agent |

| 17. Name | 18. Title |
|---|---|
| Kenneth Connaughton | Special Agent |

**19. Statement of Affiant:**

I, Roderick Jenkins solemnly (swear)(affirm) that the statement which I am about to make shall be the truth and nothing but the truth.

See two page typed statement affixed to this report Note: Originally this statement was my draft but after consulting with my Attorney. I have adopted it as my final/original version.

*Roderick Jenkins*

Page. 1 of 4

D000103

OCT-06-2009 TUE 12:43 PM                    FAX NO.                           P. 04
02/05/2007 14:34 FAX 51   84690          VALLI & KANE                         ☒003



~~DRAFT~~ STATEMENT



I incorporated True Familia Entertainment in December 2006.  It is a management and consulting company.  I currently manage and work with various artists and producers.  My consulting portion of True Familiar Entertainment consists of professional advice which is derived from my knowledge, training and experience.

Someone approached me from Sean Combs office regarding providing consulting work for Sean Combs.  The job entails giving advice for special events and functions.  The chief of staff would contact me by phone to inquire if I was available for a specific function or events.  All expenses would be paid by Mr. Combs.

The consulting is only for specific events.  It consists of going over his daily itinerary, talking with event planners, informing the hosting entity, security, drivers and or liaison what his daily activities will consist of.

True Familia Entertainment does not provide security for Sean Combs.  However, I do advise his security where his staging, vehicles, entrances and exits are located.

My weapon is a Glock 26, which was purchased at Woodhaven Rifle & Pistol Range Inc., June 23, 2005.

I was advised by personnel Shirley Robinson that outside employment requirements where changed per a memorandum from Yvonne Hinson, Associate General Counsel/Ethics Officer on March 25, 2004.

On Saturday, April 29, 2006, I took a flight to Atlanta Georgia.  My cousin drove me to LaGuardia Airport.  Upon arriving at the airport I was greeted by the airport greeter (Mike).  Shortly after meeting Mike, Mr. Combs arrived with a driver and security at LaGuardia Airport.  The greeter then took Mr. Combs identification (passport) and my driver's license.  We then proceeded to the VIP ticket desk for Delta Airlines.  I then advised the greeter that I needed to declare my weapon.  The greeter, Sean Combs and myself then proceeded to the ticket agent to get our seating assignment.

I then advised the ticket agent that I needed to declare my weapon.  She asked for my LEO Identification and she provided me with the declare weapon paperwork to fill out.  I then filled out the paperwork, which has a spot to inform them whether I was transporting a prisoner or I was on non-official travel.  I indicated on the paperwork that I was not on official travel and gave it back to the ticket agent.  She then proceeded to notify Port Authority police to come to the ticket terminal to verify identification and weapon.  Port Authority police then arrived at the ticket terminal and checked the weapon and ammo.  The weapon was stored in a secure lockbox with a trigger lock.  The ammo was in a separate lockbox which was in my bag.  Mr. Combs and I had no baggage to check.

Mr. Combs, the greeter, Port Authority police and I proceeded to the screening area.  I was then advised by a T.S.A screener to bypass the screening area and to sign into the L.E.O logbook.  We then proceeded to the VIP lounge prior to boarding.  Mr. Combs, the Port Authority police and I proceeded to the gate.  The tickets and the paperwork were then handed to the gate agent, who then notified the stewardess that an LEO was boarding the aircraft, the stewardess then notified the captain.  We proceeded to board the aircraft, we were the last passengers to board.

OCT-06-2009 TUE 12:43 PM    FAX NO.    P. 05
02/08/2007 14:34 FAX 51  84680    VALLI & KANE     @004

I was advised by the stewardess the captain wanted to meet with me. I then proceeded to the door area of the cockpit and was told by the captain "nice to have you on board, Mr. Jenkins." He then advised me that there were 2 LEO Air Marshals and he told me their assigned seats.

Mr. Combs and I proceeded to our seats in 1st class. Mr. Combs was seated closest to the window and I was seated in an aisle seat. I proceeded to put my secured weapon that was in my bag, underneath my seat with the key and combination in my possession. One African American Air Marshall was seated in front of me; the other Air Marshall (white) was seated on the right aisle seat right across from me. The flight was approximately two hours. While descending I noticed the stewardess kneeling down talking to the marshal in front of me, she then proceeded toward me to tell me that the marshal would like to talk with me in the front cabin. I then got up and headed towards the front cabin to talk with the marshal. My weapon was secured in my bag underneath my seat where the second air marshal was seated across from me. Upon arriving at the front cabin the air marshal identified himself and I then identified myself. The air marshal then asked me if I was escorting Mr. Combs. I replied by saying no I am traveling with him. He then replied that I was out of my code of conduct. I replied, excuse me is there a problem? He then stated sarcastically that he didn't know yet.

I went back to my seat, I reached over and woke up Mr. Combs to advise him that I had to take care of an issue concerning law enforcement when we land and that he needs to leave without me. Mr. Combs asked what was the matter and again I stated a law enforcement issue, Mr. Combs then said "ok", and went back to sleep. I asked the Caucasian air marshal, what's the problem and was the African American marshal the supervisor of the flight? He replied, "yes he is the supervisor and he thought that he wanted to check if my paperwork was done." I knew this did not make sense because had the paperwork been incorrect I would not have been permitted on the flight.

The African American air marshal proceeded back to his seat. I then tapped him and asked is this an issue that we will take care of when we land? I believe he stated sarcastically, that he did not know. Once the plane landed Mr. Combs and I proceeded to exit the aircraft, where we were greeted by an airline greeter and security for Mr. Combs, 2 Atlanta police officers (1 male plain-clothes sergeant, 1 female uniform officer). The 2 Air marshals did not say anything exiting the aircraft, so Mr. Combs and I proceeded to follow the police officers thru the staff exit, which leads to the tar mat of the aircraft where 1 SUV was arranged to take us to our destination with police escort. I was then advised by the female police officer to come back up to the gate front entrance ticket booth where I was greeted by the escorting female police officer. So Mr. Combs and I proceeded back upstairs. Upon arriving there she was in discussions with the two Air marshals. She then asked me for my paper work, I replied that the captain has a copy of it but she asked me for mine. I handed it over to her and she proceeded to walk inside of the aircraft to meet with the captain. Then the Air marshal (Black) ask Mr. Combs can he talk with him. I replied to the marshal "no this doesn't have anything to do with him this is my personal affair." The female police officer then returned from the aircraft, and stated to me and the Air marshals that the captain and Delta Airlines doesn't have a problem with my paper work, everything is in order. She also stated that she contacted Homeland security and New York to verify the paper work and that New York and Homeland security didn't have a problem either. She then advised the Marshal that there is nothing she can do and that if he had a problem to take it up with his agency and to have his agency notify my agency. The Air marshal then asked me who my warden/Supervisor was and I replied warden Marvin Morrison and the telephone number is 646-836-6300. I then exited the ticket area and proceeded to walk down the staff stairs with the escorting police officer and Mr. Combs. The female officer then stated to me that he was and #%@ hole. We then exited the airport.



D000105

OCT-08-2009 TUE 12:43 PM

*I have read this statement consisting of 4 page(s), and it is true and complete to the best of my knowledge and belief.*

Subscribed and (sworn to) (~~affirmed~~)

before me at 225pm

on this _____ 22 _____ day of

Feb ruary 2007
_____ , 19 _____

(Affiant's Signature)

(Investigator's Signature)   02/22/2007

one not 4



To whom it may concern:

Please be advised that True Famalia Entertainment (Roderick Jenkins) provides outside services for Sean Combs' Executive Offices. His company has provided outside consulting services for us on a host of special events and his expertise in Law Enforcement has served us well. Please note that True Famila Entertainment (Roderick Jenkins) does not provide security for Sean Combs' Executive Offices. Please do not hesitate to contact me for any questions or clarification.

Sincerely,

Dia Banks
Chief of Staff
Sean Combs Executive Office
T. 212.381.2001
F. 212.381.2010
dbanks@seanjohn.com

D000107

U.S. Department of Justice
Office of the Inspector General

**MEMORANDUM OF INVESTIGATION**

| Case Number: | Reporting Office: |
|---|---|
| 2006-003631 | New York Field Office |

Interview of Roderick Jenkins

## Introduction

On Thursday, January 25, 2007, at approximately 12:30 p.m., DOJ Office of the Inspector General (OIG) Special Agents Eric J. Blachman and Laura Riley interviewed Federal Bureau of Prisons (BOP) Intelligence Research Specialist Roderick Jenkins at the U.S. Attorney's Office, Southern District of New York, Sub-Office, at 500 Pearl Street, New York, New York. Also present was Jenkins attorney, Robert J. Valli, Jr. from Valli & Kane LLP.

Jenkins was informed that the purpose of the interview was to obtain information about allegations that he carried a firearm on board a commercial aircraft and violated workman compensation rules. After being provided OIG Form III-262/3 Warning and Assurances to Employees Required to Provide Information, Jenkins signed the form and provided the following information:

## Background

On Saturday, April 29, 2006, OIG received information that while on leave from the BOP Jenkins carried a personally owned weapon onto a civilian aircraft while he was escorting a celebrity musician, Sean Combs (a.k.a. P. Diddy, a.k.a. Puffy).

## Relationship with Sean Combs

His relationship with Combs is purely a business/professional relationship.

Around December 2005, he (Jenkins) created a company named True Familia Entertainment to provide management and consulting services to Combs. Jenkins said he does not act as a security guard to Combs, but does provide advice on security and other issues to Combs and any other company or entity responsible for an event that Combs participates in or attends.

He also coordinates Combs' movement and is responsible for maintaining liaison with members of Combs' security detail and law enforcement agencies when Combs travels. According to Jenkins, Combs always has a security escort for his protection.

## True Familia Entertainment

He is the sole owner of True Familia Entertainment and is the only employee of the company. He claims the company is incorporated and is managed from his residence, although he receives mail for the company through a Post Office Box located in North Bergen, New Jersey. He could not recall the actual address to the PO Box.

Page 1 of 5

| Special Agent Name and Signature: | Eric J. Blachman | *[signature]* | Date: January 26, 2007 |
|---|---|---|---|

OIG Form III-207/1 (10/23/96)   *This document contains neither recommendations nor conclusions of the IG. It is the property of the IG and is loaned to your agency; it and its contents are not to be distributed outside of your agency.*

D000108

He receives payment for the services he provides to Combs. He is paid by each event he works, but is never paid cash. He is paid by check which is usually made payable to True Familia Entertainment. The check is not a personal check, but rather a check from a company affiliated or owned by Combs. Combs or one of his companies usually pay all expenses such as airfare and accommodations related to the trip or event.

He is assigned work by Combs' Chief of Staff Dia Banks. According to Jenkins, Banks would request his services due to an event Combs is participating in or attending. Bank usually contacted him by telephone or e-mail and assuming he was available, he (Jenkins) would accept the job assignment.

### Saturday April 29, 2006

A few days prior to Saturday, April 29, 2006, Jenkins received a request from Banks to accompany Combs on a trip to Atlanta, Georgia to see his children. Jenkins could not recall how many days the trip was scheduled for, but ultimately agreed to work the trip because he had family in Atlanta.

He was paid for his services on April 29, 2006.

On the morning of Saturday, April 29, 2006, he met Combs at LaGuardia Airport located in Queens, New York. He believed he arrived prior to Combs and met Combs when his security detail dropped him (Combs) at the airport.

*Firearm*

He confirmed that he was carrying a firearm (Glock 26) in a locked box with a trigger guard inside his carry-on bag when he met Combs. According to Jenkins, the firearm was not loaded and the ammunition was locked in a separate locked box. He said he did not have a permit for the firearm weapon and used his credentials and driver license to purchase the firearm from a federal firearms dealer doing at the Woodhaven Rifle and Pistol Range Incorporated.

He said he carried his firearm for his own protection because he is authorized to do so under HR 218. Jenkins admitted that he still owns the firearm and still does not have a permit to carry the weapon.

*Delta Airlines Ticket Counter*

According to Jenkins, arrangements were made by Combs' company through the airport to have a "greeter" meet him and Combs prior to check-in. Soon after Combs arrived, the "greeter" met them and escorted them to the Delta Airlines Ticket Counter. He said he informed the "greeter" and the Delta Ticketing Agent that he wanted to declare his firearm because he had it in a locked box and was off duty.

He said he completed several forms and displayed his BOP credentials to the Delta Ticketing Agent. After several minutes, he was issued a law enforcement gate pass, Combs' airline boarding pass and was met by a New York/New Jersey Port Authority Police Officer.

Page 2 of 5

---

Memorandum of Investigation

Date: January 26, 2007

Case Number: 2006-003631

Item Number:

Page 2

D000109

Neither Jenkins, nor Combs' checked any luggage.

*NY/NJ Port Authority Police Officer*

When the Port Authority Police Officer arrived at the ticket counter, Jenkins displayed his BOP credential's to the police officer and said that the police officer approved his paperwork and escorted him passed the metal detectors. Combs was not armed and went through the normal TSA screening process at the metal detectors.

*TSA Screening Process*

He denied displaying his BOP credentials or a badge to any employee of the U.S. Department of Homeland Security, Transportation Security Administration (TSA), but said he stopped to sign the TSA Armed Law Enforcement Officer's Log. After signing the TSA Log, Jenkins and Combs were escorted to the VIP Lounge. They remained inside the VIP lounge until they boarded Delta Airlines Flight 615 to Atlanta, Georgia just prior to departure.

Jenkins reviewed the TSA Log and confirmed that he signed the TSA Log and listed the address of the BOP's Metropolitan Correctional Center (MCC) New York as his home duty station, even though he was off duty and not traveling for official business

*Delta Flight 615*

When he boarded Delta Airlines Flight 615 with Combs, he (Jenkins) stopped at the cockpit and introduced himself to the Captain. He claimed he provided the Captain a copy of his armed boarding card, other documents and then took his seat next to Combs.

He confirmed that he placed his bag containing his firearm underneath his seat. According to Jenkins his firearm and ammunition remained in their locked boxes.

At some point during the flight, the flight attendant asked him to meet one the Federal Air Marshals (FAM). He said he complied with the flight attendant's request and met only 1 FAM in the galley of the plane. He said the FAM identified himself and asked him for his identification. Jenkins said he complied and displayed his BOP credentials. He said the FAM then asked whether he was escorting Combs. Jenkins said he told the FAM that he was traveling with him and asked whether or not there was a problem.

According to Jenkins, the FAM answered him with an attitude and said that he (Jenkins) may be "out of the code of conduct." Jenkins said after a few minutes he subsequently returned to his seat.

Jenkins admitted that while he spoke to the FAM, his bag containing his firearm and ammunition remained underneath his seat, although he said they were still in their locked boxes.

Page 3 of 5

| Memorandum of Investigation | | |
|---|---|---|
| Date: | January 26, 2007 | |
| Case Number: | 2006-003631 | Page 3 |
| Item Number: | | |

He denied he was providing physical armed security for Combs on board Delta Airlines Flight 615, however, he did admit that he was working for Combs as a consultant during the trip to Atlanta, Georgia.

He said once the plane landed he immediately escorted Combs from the plane to a waiting vehicle because he was nervous that the other passenger would rush Combs seeking his autograph. After Combs was in the vehicle he returned and spoke to an Atlanta Police Officer. After several minutes, the Atlanta Police Officer allowed Jenkins to leave because he said the Captain, the U.S. Department of Homeland Security at LaGuardia Airport and Delta was aware that he (Jenkins) had a firearm on board the aircraft and did not have a problem with that.

### Violation of TSA Guidelines

Jenkins admitted that when he carried his personally owned firearm on board Delta Airlines Flight 615 he was off duty, not authorized by the BOP to travel armed on board a civilian aircraft, and did not meet any of the TSA requirements to fly armed. (i.e. *Prisoner Escort, Hazardous Surveillance, Law Enforcement Officer on Official Travel Required to Report to Another location Armed and prepared for Duty*).

### BOP Policy

Jenkins admitted that he received training from the BOP regarding the Federal Aviation Administration (FAA) rules for Law Enforcement Officers Flying Armed, but claimed he was unaware of BOP policy 5500.12 Correctional Services Manual, Chapter 7, Page 7 and 8, Section 703, that required BOP employees to place weapons (firearms) in checked baggage when he carried his firearm on board Delta Airlines 615.

### Other Issues

- Jenkins agreed to prepare a written statement, but requested that he have an opportunity to speak to his attorney prior to preparing a statement. SA Blachman agreed and a second interview will be scheduled to allow Jenkins an opportunity to consult with his attorney.

- Jenkins claimed that when he carried his firearm onto Delta Airlines Flight 615 on Saturday, April 29, 2006, it was the first time that he ever carried a weapon on board a commercial aircraft off duty.

- Jenkins admitted that he did not have permission to work off duty from the BOP, but claimed that he did not have to file any paperwork to work as a management consultant for Combs.

- Jenkins admitted that between June 2006 and present he has worked for Combs numerous times, but notified OWCP each time.

Page 4 of 5

---

Memorandum of Investigation

| | | |
|---|---|---|
| **Date:** | January 26, 2007 | |
| **Case Number:** | 2006-003631 | **Page 4** |
| **Item Number:** | | |

- Jenkins admitted that he received and reviewed the Law Enforcement Officers Safety Act of 2004 on or about April 11, 2006.

- The last time Jenkins traveled with Combs was about 3 months ago.

- Jenkins stores his Glock 26 at his home residence inside a safe.

- Jenkins provided a copy of a letter Combs's Chief of Staff allegedly prepared detailing Jenkins responsibilities when he worked for Combs. The letter is attached to this report.

## Attachments

- OIG Form III-226/3 Warnings and Assurances to Employees Required to Provide Information

- Acknowledgment of Receipt of guidance Materials Regarding the Law Enforcement Officers Safety Act of 2004

- TSA Armed Law Enforcement Officers Entry log

- Officer Letter from Dia Banks, Chief of Staff for Sean Combs Executive Office

Page 5 of 5

| | | |
|---|---|---|
| **Memorandum of Investigation** | | |
| **Date:** | January 26, 2007 | |
| **Case Number:** | 2006-00363 1 | **Page 5** |
| **Item Number:** | | |

D000112



**U.S. Department of Justice**
Office of the Inspector General

**MEMORANDUM OF INVESTIGATION**

| Case Number: | Reporting Office: |
|---|---|
| 2006003631 | New York Field Office |

Receipt of Documents from Port Authority Police Department

On Thursday, May 10, 2007, DOJ Office of the Inspector General (OIG) Special Agent Eric J. Blachman received the document listed below via facsimile from New York/New Jersey Port Authority Police Department (PAPD), Internal Affairs Division Sergeant George Santiago.

The document relates to an interview Sergeant Santiago conducted of PAPD Police Officer Lawrence Rand. Rand was the NY/NJ PAPD Police Officer who escorted Federal Bureau of Prisons (BOP) Intelligence Research Specialist Roderick Jenkins passed the security checkpoint at LaGuardia Airport on Saturday, April 29, 2006.

**Attachments**

1. NY/NJ Port Authority Police Internal Affairs Division Investigative Action Report

Page 1 of 1

| Special Agent Name and Signature: | Eric J. Blachman | | Date: May 10, 2007 |
|---|---|---|---|

OIG Form 111-207/2 (10/23/96)   *This document contains neither recommendations nor conclusions of the IG. It is the property of the IG and is loaned to your agency; It and its contents are not to be distributed outside of your agency.*

D000113

# IAD INVESTIGATIVE ACTION REPORT

**I.A.D. Inquiry # 07-016**

**DATE:** May 8, 2007

**TIME:** 1400 Hours

**I.O. NAME: Sergeant J. Santiago #294**

On April 25, 2007 at approximately 1400 hours Sergeant George Santiago and Sergeant Jose Alba of the Internal Affairs Division (IAD) interviewed Police Officer Lawrence Rand (employee # 31808) at the Port Authority Technical Center (PATC) located at 241 . Erie Street, Jersey City, N.J. in room 309. Present at this interview were Police Officer Lawrence Rand, Sergeant Jose Alba and Sergeant George Santiago representing the Internal Affairs Division.

Officer Rand was advised that this was an official department investigation and that he was a witness in this investigation. There were no allegations against him. However he was reminded that he must cooperate in the investigation and answer our questions both honestly and accurately.

Officer Rand was asked to explain the events that transpired on April 29, 2006 at LaGuardia Airport (LGA) at approximately 1030 hours. Officer Rand briefly referred to his memo-book entry on the date in question and indicated that he was dispatched to the Delta Airlines ticket counter for an 8-52 (Identification Check). Upon his arrival, Officer Rand observed a male black standing next to the ticket counter. Officer Rand further indicated that he asked the gentleman for his identification and what department he worked for. Officer Rand stated that the gentleman replied that he worked for the Federal Bureau of Investigations Task Force. Officer Rand Further stated that he asked the gentleman a second time what department did he work for. The gentleman replied that he worked for the Department of Justice. Officer Rand indicated that he asked the gentleman a third time what department did he work for. The gentleman then handed Officer Rand his credentials, which indicated that he was employed by the Bureau of Prisoners as a Correction Officer. Sergeant Santiago asked Officer Rand if he recalled a badge number on the Officers' identification. Officer Rand indicated that he observed a control number 62418. (It should be noted that Officer Rand made the following entry into his memo-book; Roderick Jenkins, BOP, 62418, DL615) A copy has been placed in this case folder. Officer Rand further indicated that the credentials appeared to be authentic.

Officer Rand indicated that the name on the identification was Roderick Jenkins. Officer Rand further indicated that Officer Jenkins escorted Sean Combs (A.K.A. P-Diddy) and was flying on official business. Officer Rand further indicated that Officer Jenkins had filed the necessary paperwork with Delta Airlines. Officer Rand indicated that he escorted Officer Jenkins to the screening point at which point a TSA Agent reviewed the subject

# IAD INVESTIGATIVE ACTION REPORT

paperwork and then authorized Officer Jenkins entry into the sterile area. Officer Rand further indicated his belief that Officer Jenkins carried a weapon on his person, thus the necessity for the identification check. The interview was concluded at 1410 hours.

Therefore based on the above-mentioned information the undersigned investigator recommends that this **INQUIRY** be **CLOSED** and further action warranted

_Sgt. George J. Santiago #294_
I.O. Signature

_Timothy McGovern_
Supervisor Signature

2

## Acknowledgment of Receipt of Guidance Materials
### Regarding the Law Enforcement Officers Safety Act of 2004

I have received a copy of the Law Enforcement Officers Safety Act (P.L. 108-277); the Bureau of Prisons February 27, 2006, memorandum titled "Guidance Regarding the Law Enforcement Officers Safety Act (LEOSA);" the Department of Justice's January 31, 2005, memorandum titled "Guidance on the Application of the Law Enforcement Officers Safety Act of 2004 to Current and Retired Department of Justice Law Enforcement Officers," title 18 U.S.C. § 3050; 28 C.F.R. §§ 511.10-511.16, and the Department of Justice Policy Statement on the Use of Deadly Force.

_JENKINS, Roderick_  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
Staff Member/Printed Name

_[signature]_
Staff Member Signature

_4/11/06_
Date Signed

Place this form on the left side of the employee's Official Personnel Folder

D000116

Department of Justice (Department) issued guidance to all components regarding application of LEOSA to current and retired Department law enforcement officers (a copy of the Department's guidance is included with this memorandum as an attachment).[3] Most BOP staff who have primary or secondary law enforcement status are "law enforcement" officers as defined in LEOSA, because most of these staff are "authorized by the agency to carry a firearm," as required by the law (see 18 U.S.C. § 926B (c)(2)). But, certain staff who qualify as "law enforcement officers" for retirement purposes are NOT "authorized by the agency to carry a firearm," (for example, Chaplains, as discussed below). A staff member's retirement system status (i.e., law enforcement status) is a necessary condition but not a sufficient condition to determine eligibility under LEOSA.[4]

This memorandum should not be construed as the Bureau of Prisons encouraging any staff member to take any particular action with regard to LEOSA. Staff must continue to abide by Bureau policies and/or procedures regarding personal firearms that:

(1)   prohibit staff from carrying or using a personal firearm while on duty;

(2)   prohibit personal firearms from being brought into an institution or on the grounds of any Federal prison (except for personal firearms to be used on an institution firing range as authorized by the Warden, where constant possession and control of the firearm is maintained);

---

[3] LEOSA defines a qualified current law enforcement officer as an employee who (1) is authorized by law to engage in or supervise the prevention, detection, investigation, or prosecution of, or the incarceration of any person for, any violation of law, and has statutory powers of arrest; (2) is authorized by the agency to carry a firearm; (3) is not the subject of any disciplinary action by the agency; (4) meets standards, if any, established by the agency which require the employee to regularly qualify in the use of a firearm; (5) is not under the influence of alcohol or another intoxicating or hallucinatory drug or substance; and (6) is not prohibited by Federal law from receiving a firearm.

[4] The Department's guidance makes clear that individuals who meet the definition of a qualified law enforcement officer under LEOSA may or may not meet the definition of a law enforcement officer under the Civil Service Retirement System or the Federal Employees Employee Retirement System. (Emphasis added.)

- 2 -

D000117

<u>Use of Bureau of Prisons Identification for LEOSA Purposes</u>
Following Union negotiations, the Bureau has decided to approve
staff use of Bureau identification cards or credentials for LEOSA
purposes. Consequently, the Bureau will no longer issue specific
LEOSA identification cards. Staff who received a LEOSA
identification card pursuant to the March 14, 2005, guidance must
return it to the Employee Services Department within two weeks of
the date of this memorandum.

Bureau identification cards or credentials may always be used by
staff to verify Bureau employment to any entity. This includes,
but is not limited to, presenting your Bureau identification card
or credentials, when necessary, to another Federal, State, or
local law enforcement officer for purposes of explaining your
eligibility to carry a concealed personal firearm in public under
LEOSA. This situation could arise during a routine traffic stop,
while shopping in public, or in other situations.

In these type situations, it is important that off-duty staff not
misrepresent that they are acting in furtherance of their
official Bureau duties. There should never be a time when off-
duty staff claim to be carrying a concealed personal firearm **as
part of** their Bureau employment or **in furtherance of** their
official Bureau duties.

LEOSA does not alter the Bureau's policy which allows the use of
Bureau credentials to obtain permissible discounts offered to a
broad class of Government employees (see Bureau Program Statement
No. 3420.09, <u>Standards of Employee Conduct</u>, Section 17.c).
Neither does LEOSA change the Bureau's policy regarding badges.
Official Bureau identification badges will be issued to staff
only when they are assigned to duties that require the carrying
of a firearm (see Bureau Program Statement No. 5500.12,
<u>Correctional Services Procedures Manual</u>, Section 705).

<u>Outside Employment</u>
The Bureau rescinds its categorical prohibition on outside
employment which requires the use of a firearm (see Bureau
Program Statement No. 3420.09, <u>Standards of Employee Conduct</u>,
Section 18). The Program Statement will be amended to reflect
this change.

Employees are reminded that pursuant to 5 C.F.R. § 3801.106(b)(ii)
they are still prohibited from engaging in outside employment
that involves criminal matters. "Criminal matters," for this
purpose, includes involvement with a Federal, State, or local law
enforcement agency, or with inmates as defined in the Standards
of Conduct, or with State and local inmates. In addition, the

- 4 -

D000118

prohibition covers outside employment that requires being
deputized, granted police powers or arrest authority, or
involvement with the courts. All requests for outside employment
that require the carrying of a firearm must be reviewed and
approved by the staff member's immediate supervisor, CEO, and the
Ethics Office prior to beginning the outside employment.

Specific examples of prohibited outside employment may include,
but are not limited to: auxiliary, reserve, or regular police
officers; sheriffs or deputy sheriffs; and other positions that
provide police or arrest powers to enforce criminal laws.

Specific examples of permissible outside employment may include,
but are not limited to: a property repossessor charged with
recovering property on behalf of a financial institution, a store
security guard, positions involving search and rescue operations,
and other positions that do not require the use of police powers
or arrest authority, but may allow the carrying of a firearm.

Disciplinary Action
To be a qualified law enforcement officer for purposes of LEOSA,
an employee must not be "the subject of any disciplinary action
by the agency."[6]  For this purpose, the Bureau considers an
employee to be the subject of "any disciplinary action" when the
decision letter is issued to the employee (meaning, disciplinary
action begins).  Disciplinary action ends when all sanctions that
were issued are completed.  "Disciplinary action" includes both
disciplinary and adverse actions as stated in the Master
Agreement and Title 5 C.F.R. Part 3801.  For demotion actions and
letters of reprimand, the sanction is deemed completed on the
date the letter rendering the demotion action or the letter of
reprimand is issued.

Public Health Service Officers
Public Health Service (PHS) officers detailed to the Bureau do
not have the statutory powers of arrest conferred upon Bureau
staff by 18 U.S.C. § 3050 (see 28 C.F.R. § 511.10(b)).
Consequently, these PHS officers do not meet one of the necessary
criteria in the LEOSA definition of a "qualified law enforcement
officer," and do not qualify to carry a concealed personal
firearm pursuant to LEOSA.

---

[6] See Bureau Program Statement No. 3420.09, Standards of Employee
Conduct, for a review of what is considered to be disciplinary action by the
Bureau.

D000119



Chaplains

Bureau Program Statement No. 3939.07, Chaplains' Employment, Responsibilities, and Endorsements, expressly prohibits chaplains from participating in firearms training, which likewise prohibits them from being issued firearms to perform official Bureau duties.  Consequently, because chaplains are not "authorized by the agency to carry a firearm," they do not meet one of the necessary criteria to be a "qualified law enforcement officer" for LEOSA purposes, and do not qualify to carry a concealed personal firearm pursuant to LEOSA.

Employees For Whom Firearms Qualification is Optional

Employees in non-institution, primary or secondary law enforcement status (e.g., Central Office and Regional staff), may choose to complete the Bureau's firearms qualification program in order to remain authorized to be issued a firearm as part of official Bureau duties.  Such staff should consult with their Employee Services Department to determine the most appropriate method for qualifying.  Most likely, the Employee Services Department will have to coordinate with a Bureau facility that provides firearms qualification to determine a suitable time for non-institution staff.

Retired Law Enforcement Officers

Some Bureau retirees who were law enforcement officers will wish to take advantage of this law.  The guidance from the Department requires that a retiree's identification include the name of the individual, the individual's photograph, an identification number traceable to the bearer, the date the employee retired in good standing, and the phrase "Retired Law Enforcement Officer."  Guidance regarding the issuing of the required identification cards to retirees is contained in a March 30, 2005, memorandum from W. Elaine Chapman, Acting Assistant Director, Human Resource Management Division, to Employee Services Administrators and Managers titled "Additional Guidance and Procedures for Bureau Retirees to Obtain a Law Enforcement Officers Safety Act Identification Card."

The Bureau will not be responsible for training or qualifying retirees to carry a concealed personal firearm under LEOSA.  In order to be authorized under LEOSA to carry a firearm, a Bureau retiree must qualify in accordance with State standards for active law enforcement officers, as provided in LEOSA (18 U.S.C. § 926C(d)(2)(B)), and the guidance from the Department.

Copies of LEOSA to Employees

All Bureau employees will be provided a copy of this guidance memorandum and its attachments and are required to sign to acknowledge receipt of these documents.

Attachments





# Office of the Attorney General

## Washington, D.C. 20530

January 31, 2005

MEMORANDUM FOR THE DIRECTOR, BUREAU OF ALCOHOL, TOBACCO,
                FIREARMS, AND EXPLOSIVES
             THE ADMINISTRATOR, DRUG ENFORCEMENT
                ADMINISTRATION
             THE DIRECTOR, FEDERAL BUREAU OF INVESTIGATION
             THE DIRECTOR, FEDERAL BUREAU OF PRISONS
             THE INSPECTOR GENERAL
             THE DIRECTOR, UNITED STATES MARSHALS SERVICE

FROM:         THE ATTORNEY GENERAL

SUBJECT:      GUIDANCE ON THE APPLICATION OF THE
              LAW ENFORCEMENT OFFICERS SAFETY ACT OF 2004
              TO CURRENT AND RETIRED DEPARTMENT OF
              JUSTICE LAW ENFORCEMENT OFFICERS

        On July 22, 2004, Congress passed and the President signed the Law Enforcement
Officers Safety Act of 2004 (the "Act"), Pub. L. No. 108-277, 118 Stat. 865 (2004),
codified at 18 U.S.C. §§ 926B and 926C. With certain limitations and conditions, the Act
exempts active and retired "qualified law enforcement officers" ("qualified LEOs") from
state laws and local ordinances prohibiting the carrying of concealed weapons. The Act
does not purport to affect any state or local laws and ordinances that permit restrictions of
concealed firearms on private property or any such laws that restrict the possession of
firearms on any State or local government property, installation, building, base, or park.

        This memorandum outlines the Act's application to current and retired
Department of Justice LEOs. The Department recognizes that individuals who meet the
definition of a qualified LEO under the Act may or may not meet the definition of an
LEO under the Civil Service Retirement System or the Federal Employee Retirement
System. The guidance set forth below is not intended to and does not create any rights,
privileges, or benefits, substantive or procedural, enforceable by any party against the
United States, its departments, agencies, or other entities, its officers or employees, or
any other person. Nothing in the Act or this memorandum impairs or otherwise affects
the right of an individual to keep and bear arms under the Second Amendment to the
Constitution of the United States.

JUL-05-2006 WED 02:09 PM DO' OIG NYFO          FAX NO.                        P. 18




Memorandum for Directors for ATF, BOP, FBI, USMS;                    Page 2
         Administrator of DEA; Inspector General
Subject:  Guidance on the Application of the Law Enforcement Officers
         Safety Act of 2004 to Current and Retired Department of Justice
         Law Enforcement Officers

I.    **The Act's Application to Current Department Law Enforcement Officers**

    With respect to current law enforcement officers, the Act provides as follows:

    "(a)    Notwithstanding any other provision of the law of any State or any
         political subdivision thereof, an individual who is a qualified law
         enforcement officer and who is carrying the identification required by
         subsection (d) may carry a concealed firearm that has been shipped or
         transported in interstate or foreign commerce, subject to subsection (b).

    (b)    This section shall not be construed to supersede or limit the laws of any
         State that--
         (1)    permit private persons or entities to prohibit or restrict the
                 possession of concealed firearms on their property; or
         (2)    prohibit or restrict the possession of firearms on any State or local
                 government property, installation, building, base, or park.

    (c)    As used in this section, the term 'qualified law enforcement officer' means
         an employee of a governmental agency who--
         (1)    is authorized by law to engage in or supervise the prevention,
                 detection, investigation, or prosecution of, or the incarceration of
                 any person for, any violation of law, and has statutory powers of
                 arrest;
         (2)    is authorized by the agency to carry a firearm;
         (3)    is not the subject of any disciplinary action by the agency;
         (4)    meets standards, if any, established by the agency which require
                 the employee to regularly qualify in the use of a firearm;
         (5)    is not under the influence of alcohol or another intoxicating or
                 hallucinatory drug or substance; and
         (6)    is not prohibited by Federal law from receiving a firearm.

    (d)    The identification required by this subsection is the photographic
         identification issued by the governmental agency for which the individual is
         employed as a law enforcement officer."

118 Stat. at 865-66.

    As these provisions make clear, an active qualified LEO under the Act is a current
government agency employee who (1) is authorized to perform the specified law
enforcement functions *and* holds a position for which powers of arrest are granted by
statute; (2) is authorized to carry a firearm by the agency for which he or she works; (3) is
not the subject of disciplinary action; (4) meets any standards set by the employing



JUL-05-2006 WED 02:09 PM DO' OIG NYFO                                    P. 19

Memorandum for Directors for ATF, BOP, FBI, USMS;                    Page 3
      Administrator of DEA; Inspector General
Subject:  Guidance on the Application of the Law Enforcement Officers
      Safety Act of 2004 to Current and Retired Department of Justice
      Law Enforcement Officers



agency that require the employee to regularly qualify in the use of a firearm; (5) is not under the influence of alcohol or another intoxicating or hallucinatory drug or substance; (6) is not prohibited by Federal law from receiving a firearm; and (7) carries a photo identification issued by the agency. For purposes of the last factor, the Department considers a current, valid "U.S. Government Employee" photographic identification card or a Department-issued credential to constitute "the photographic identification issued by the governmental agency for which the individual is employed as a law enforcement officer." Should any questions arise concerning the application of these qualification provisions, the determination made by the head of the relevant Department component or his designee shall be subject to review by the Deputy Attorney General.

The Act has no effect on the requirement of any Department law enforcement components that agents or officers carry a firearm at all times. Similarly, any component's regulations or procedures with respect to on-duty agents or officers will continue to be in effect. Those requirements, regulations, and procedures separately remain in effect, notwithstanding any provision of the Act.

It is important to note that the Act does not supersede existing agency regulations or policies limiting, restricting, conditioning, or otherwise affecting the carrying of concealed firearms. The Act does preempt and supersede inconsistent state laws and local ordinances, whether criminal or civil. It does not prohibit any component from taking any appropriate disciplinary action for any violation of its existing regulations or policies.

The Department considers the following components to be agencies whose current employees may qualify as LEOs for purposes of the Act: the Bureau of Alcohol, Tobacco, Firearms, and Explosives; the Drug Enforcement Administration; the Federal Bureau of Investigation; the Federal Bureau of Prisons; the Office of the Inspector General; and the United States Marshals Service. Of course, any particular employee of one of these components independently must meet each of the specified statutory qualifications to qualify as an LEO under the Act.

**II.   The Act's Application to Retired Department Law Enforcement Officers**

With respect to retired law enforcement officers, the Act provides as follows:

"(a)   Notwithstanding any other provision of the law of any State or any political subdivision thereof, an individual who is a qualified retired law enforcement officer and who is carrying the identification required by subsection (d) may carry a concealed firearm that has been shipped or transported in interstate or foreign commerce, subject to subsection (b).





Memorandum for Directors for ATF, BOP, FBI, USMS;                    Page 4
            Administrator of DEA; Inspector General
Subject:  Guidance on the Application of the Law Enforcement Officers
            Safety Act of 2004 to Current and Retired Department of Justice
            Law Enforcement Officers



(b)   This section shall not be construed to supersede or limit the laws of any
      State that—
      (1)   permit private persons or entities to prohibit or restrict the
            possession of concealed firearms on their property; or
      (2)   prohibit or restrict the possession of firearms on any State or local
            government property, installation, building, base, or park.

(c)   As used in this section, the term 'qualified retired law enforcement officer'
      means an individual who—
      (1)   retired in good standing from service with a public agency as a law
            enforcement officer, other than for reasons of mental instability;
      (2)   before such retirement, was authorized by law to engage in or
            supervise the prevention, detection, investigation, or prosecution
            of, or the incarceration of any person for, any violation of law, and
            had statutory powers of arrest;
      (3)   (A)   before such retirement, was regularly employed as a law
                  enforcement officer for an aggregate of 15 years or more;
                  or
            (B)   retired from service with such agency, after completing any
                  applicable probationary period of such service, due to a
                  service-connected disability, as determined by such agency;
      (4)   has a nonforfeitable right to benefits under the retirement plan of
            the agency;
      (5)   during the most recent 12-month period, has met, at the expense of
            the individual, the State's standards for training and qualification
            for active law enforcement officers to carry firearms;
      (6)   is not under the influence of alcohol or another intoxicating or
            hallucinatory drug or substance; and
      (7)   is not prohibited by Federal law from receiving a firearm.

(d)   The identification required by this subsection is—
      (1)   a photographic identification issued by the agency from which the
            individual retired from service as a law enforcement officer that
            indicates that the individual has, not less recently than one year
            before the date the individual is carrying the concealed firearm,
            been tested or otherwise found by the agency to meet the standards
            established by the agency for training and qualification for active
            law enforcement officers to carry a firearm of the same type as the
            concealed firearm; or
      (2)   (A)   a photographic identification issued by the agency from
                  which the individual retired from service as a law
                  enforcement officer; and



Memorandum for Directors for ATF, BOP, FBI, USMS;                    Page 6
                Administrator of DEA; Inspector General
Subject:  Guidance on the Application of the Law Enforcement Officers
          Safety Act of 2004 to Current and Retired Department of Justice
          Law Enforcement Officers

minimum, include the name of the individual, the individual's photograph, an identification number traceable to the bearer, the date the employee retired in good standing from service with the issuing agency, and the phrase "Retired Law Enforcement Officer."

     Individual components shall not themselves train or qualify retired employees to carry a firearm, as authorized under the law. In order to be authorized under the Act to carry a firearm, a retired qualified LEO from a DOJ component must qualify pursuant to 18 U.S.C. § 926C(d)(2)(B), and in accordance with state standards for active LEOs.

     It shall be within the discretion of the employing agency to issue the retired LEO credential called for under the Act. Should the agency (1) make a finding that the subject is not qualified, or (2) enter into an agreement in which the subject agrees that he or she is not qualified, the subject shall not be issued the retired LEO credential described above.

     With respect to the Act's limitation that a qualified retired LEO "is not under the influence of alcohol or another intoxicating or hallucinatory drug or substance," each former Department employee seeking such qualification annually must meet state standards, if any, regarding alcohol or drug use by law enforcement officers authorized to carry a firearm.



D000125

## LEOSA

To understand the agency's case against the appellant, one must be familiar with LEOSA. As noted above, LEOSA applies to both active and retired law enforcement officers; 18 U.S.C. § 926B concerns active law enforcement officers and 18 U.S.C. § 926C concerns retired law enforcement officers. It is, of course, § 926B that is germane to the appellant. That section states:

(a) Notwithstanding any other provision of the law of any State or any political subdivision thereof, an individual who is a qualified law enforcement officer and who is carrying the identification required by subsection (d) may carry a concealed firearm that has been shipped or transported in interstate or foreign commerce, subject to subsection (b).

(b) This section shall not be construed to supersede or limit the laws of any State that—

(1) permit private persons or entities to prohibit or restrict the possession of concealed firearms on their property; or

(2) prohibit or restrict the possession of firearms on any State or local government property, installation, building, base or park.

11-05-2008 05:13   USSID

PAGE:4

D000126

5

On March 14, 2005, Harley G. Lappin, the director of BOP, issued a memorandum relating to the "implementation" of LEOSA. Mr. Lappin stated that the memorandum should not be construed as encouraging any employee to take any particular action with regard to LEOSA. Mr. Lappin also stated that the employees would have to continue to abide by BOP policies regarding personal weapons—policies such as those prohibiting employees from carrying a personal firearm while on duty and from storing personal firearms in BOP facilities. He further stated that, upon request, BOP would issue LEOSA identification cards to eligible employees, but a LEOSA identification card would not serve as a replacement for an employee's regular work identification. *See* IAF, Tab 6, Subtab 4m.

On February 27, 2006, Mr. Lappin issued a memorandum with updated guidance as to the implementation of LEOSA. He reiterated his previous statement that the employees must continue to abide by BOP policies regarding personal firearms. He noted that BOP employees are not required as a condition of employment to carry firearms when they are off duty and that the carrying of personal firearms pursuant to LEOSA is not an extension of their official BOP duties. In a section labeled "Use of Bureau of Prisons Identification for LEOSA Purposes," he stated in pertinent part:

> Following Union negotiations, the Bureau has decided to approve staff use of Bureau identification cards or credentials for LEOSA purposes. Consequently, the Bureau will no longer issue specific LEOSA identification cards. Staff who received a LEOSA identification card pursuant to the March 14, 2005 guidance must return it to the Employee Services Department within two weeks of the date of this memorandum.

> Bureau identification cards or credentials may always be used by staff to verify Bureau employment to any entity. This includes, but is not limited to, presenting your Bureau identification card or credentials, when necessary, to another Federal, State, or local law enforcement officer for purposes of explaining your eligibility to carry a concealed personal firearm in public under LEOSA. This situation could arise during a routine traffic stop, while shopping in public, or in other situations.

D000127

03-04-2009 10:36   VASID

PAGE6

6

In these type (sic) situations, it is important that off-duty staff not misrepresent that they are acting in furtherance of their official Bureau duties. There should never be a time when off-duty staff claim to be carrying a concealed personal firearm as part of their Bureau employment or in furtherance of their official Bureau duties.

*See* IAF, Tab 6, Subtab 4l (Bold lettering in original).

In a section labeled "Outside Employment," Mr. Lappin stated:

The Bureau rescinds its categorical prohibition on outside employment which requires the use of a firearm (see Bureau Program Statement No. 3420.09, Standards of Employee Conduct, Section 18). The Program Statement will be amended to reflect this change.

Employees are reminded that pursuant to 5 C.F.R. § 3801.106(b)(ii) they are still prohibited from engaging in outside employment that involves criminal matters. "Criminal matters," for this purpose, includes involvement with a Federal, State, or local law enforcement agency, or with inmates as defined in the Standards of Conduct, or with State and local inmates. In addition, the prohibition covers outside employment that requires being deputized, granted police powers or arrest authority, or involvement with the courts. All requests for outside employment that require the carrying of a firearm must be reviewed and approved by the staff member's immediate supervisor, CEO, and the Ethics Officer prior to beginning the outside employment.

Specific examples of prohibited outside employment may include, but are not limited to: auxiliary, reserve, or regular police officers; sheriffs or deputy sheriffs; and other positions that provide police or arrest powers to enforce criminal laws.

Specific examples of permissible outside employment may include, but are not limited to: a property repossessor charged with recovering property on behalf of a financial institution, a store security guard, positions involving search and rescue operations, and other positions that do not require the use of police powers or arrest authority, but may allow the carrying of a firearm.

*Id.* (Underlining in original).



To whom it may concern:

Please be advised that True Famalia Entertainment (Roderick Jenkins) provides outside services for Sean Combs' Executive Offices. His company has provided outside consulting services for us on a host of special events and his expertise in Law Enforcement has served us well. Please note that True Famila Entertainment (Roderick Jenkins) does not provide security for Sean Combs' Executive Offices. Please do not hesitate to contact me for any questions or clarification.

Sincerely,

Dia Banks
Chief of Staff
Sean Combs Executive Office
T. 212.381.2001
F. 212.381.2010
dbanks@seanjohn.com

D000129

Sent By: MIDDLETON LAW GROUP, INC.;

N. Y. S. DEPARTMENT OF STATE
DIVISION OF CORPORATIONS AND STATE RECORDS          ALBANY, NY 12231-0001

FILING RECEIPT

========================================================================

ENTITY NAME: TRUE FAMILIA ENTERTAINMENT, INC.

DOCUMENT TYPE: INCORPORATION (DOM. BUSINESS)          COUNTY: NASS

SERVICE COMPANY: NATIONAL CORPORATE SERVICES, INC.          SERVICE CODE: C4 *

========================================================================

FILED:01/17/2006 DURATION:PERPETUAL   CASH#:060117000841 FILM #:0601170007B2

ADDRESS FOR PROCESS                                   EXIST DATE
- - - - - - - - - - - - - - - - - - - -               - - - - - - - - -
THE CORPORATION                                       01/17/2006
21A MARTIN LUTHER KING DRIVE
HEMPSTEAD, NY 11550

REGISTERED AGENT
- - - - - - - - - - - - - - - - -

STOCK:          200 NPV




**Transportation Security Administration**

# Traveling with Special Items

*Firearms & Ammunition*

You may only transport firearms, ammunition and firearm parts in your checked baggage. Firearms, ammunition and firearm parts are prohibited from carry-on baggage.

There are certain limited exceptions for law enforcement officers who may fly armed by meeting the requirements of Title 49 CFR § 1544.219. Law enforcement officers should read our policies on traveling with guns.

The key regulatory requirements to transporting firearms, firearm parts or ammunition in checked baggage are:



Photo of a firearm improperly packaged.

- You must declare all firearms to the airline during the ticket counter check-in process.
- The firearm must be unloaded.
- The firearm must be in a hard-sided container.
- The container must be locked. A locked container is defined as one that completely secures the firearm from access by anyone other than you. Cases that can be pulled open with little effort do not meet this criterion. The pictures provided here illustrate the difference between a properly packaged and an improperly packaged firearm.
- We recommend that you provide the key or combination to the security officer if he or she needs to open the container. You should remain present during screening to take the key back after the container is cleared. If you are not present and the security officer must open the container, we or the airline will make a reasonable attempt to contact you. If we can't contact you, the container will not be placed on the plane. Federal regulations prohibit unlocked gun cases (or cases with broken locks) on aircraft. TSA locks are not approved for securing firearms.
- You must securely pack any ammunition in fiber (such as cardboard), wood or metal boxes or other packaging that is specifically designed to carry small amounts of ammunition.
- You can't use firearm magazines/clips for packing ammunition unless they completely and securely enclose the ammunition (e.g., by securely covering the exposed portions of the magazine or by securely placing the magazine in a pouch, holder, holster or lanyard).
- You may carry the ammunition in the same hard-sided case as the firearm, as long as you pack it as described above.
- You can't bring black powder or percussion caps used with black-powder type firearms in either your carry-on or checked baggage.



We and other authorities strictly enforce these regulations. Violations can result in criminal prosecution and civil penalties of up to $10,000 per violation.

Airlines may have their own additional requirements on the carriage of firearms and the amount of ammunition that you may have in your checked baggage. Therefore, travelers should also contact the airline regarding its firearm and ammunition carriage policies.

Also, please note that many other countries have different laws that address transportation and possession of firearms. If you

TSA: Traveling with Special s

Photo of a firearm properly packaged.

are traveling internationally, please check with the authorities at your destination about their requirements.

Transportation Security Administration | U.S. Department of Homeland Security

D000132

 **Transportation Security Administration**

# Law Enforcement Officers Flying Armed

*Office of Law Enforcement/Federal Air Marshal Service*

The Office of Law Enforcement/Federal Air Marshal Service maintains oversight of the Law Enforcement Officers Flying Armed training program. This training program is **mandatory** for all Law Enforcement Officers flying armed under Code of Federal Regulation CFR 1544.219 Carriage of Accessible Weapons.



The training material for this program is comprised of a structured lesson plan, slide presentation, FAQ's, and applicable codes of federal regulation. This material is provided to other federal, state, and local law enforcement agencies and departments to properly instruct their officers on the subject of flying on board commercial aircraft while armed. The material covered includes protocols in the handling of prohibited items, prisoner transport and dealing with an act of criminal violence aboard an aircraft.

The program training material may be obtained by emailing the Office of Law Enforcement/Federal Air Marshal Service, Office of Training and Workforce Programs, Training Policy and Development Division, Operations Branch at LEOFA@dhs.gov with the following information:

- Full Name
- Agency Name
- Agency Address & Number
- Supervisor Name & Number

For time sensitive requests please call 1-703-487-3100 between the core business hours of 9:00am to 5:00 pm Eastern. To ensure uniform and consistent instruction of the program, the training material will only be disseminated to the training division of the requesting agency.

On July 15, 2009 the Transportation Security Administration (TSA) will no longer accept the original letter of authority for the purpose of flying while armed. State, Local, and Territorial LEOs flying armed must submit a National Law Enforcement Telecommunications System (NLETS) message prior to travel. The NLETS message sent by the employing agency will replace the current original letter of authority, signed by the chief or agency head, required under 49 CFR 1544.219. Once the NLETS message is received by TSA, a return NLETS message will be sent to the employing agency with an eight character Unique Alphanumeric Identifier for verification at the airport on the day of travel. This change is being implemented to provide a more secure means of confirming the identity of LEOs, since the Original Letter of Authority can be counterfeited. The current procedures for federal LEOs flying armed remains unchanged.

Failure to use the NLETS message in lieu of the Original Letter of Authority (Commonly referred to as the "Chief's Letter") will result in denial to the sterile area for failure to comply with the "Letter of Authority" requirement delineated in 49 CFR 1544.219.

A general overview of the program can also be found on the FBI's Law Enforcement Online system which is only available to

D000133

persons duly employed by a law enforcement, criminal justice, or public safety agency. To request access to the FBI's Law Enforcement Online system, please contact their program office at (888) 334-4536 or e-mail membership@leo.gov.

For general questions or guidance related to Law Enforcement Officers flying armed, please contact the Office of Law Enforcement/Federal Air Marshal Service, Liaison Division. Their e-mail address is: LEOFA@dhs.gov.

The links on this web page should only be used by federal, state, and local law enforcement agencies and departments who are seeking information on the subject of flying on board commercial aircraft while armed. **Please do not submit inquiries about employment opportunities to the above e-mail addresses.**

### Prohibited Items

We would like to remind federal officers and agents, whether on official or non-official travel, and state and local officers and agents on official travel not to transport prohibited items, which are not necessary for the performance of their official duties, through security checkpoints or onboard aircraft while traveling armed. Regulations surrounding prohibited carry-on items and associated security checkpoint procedures are covered in the training material. Particular attention should be given to the prohibition against carrying hazardous materials, such as pepper spray or mace, in carry-on bags. For more information read our prohibited items section.

Transportation Security Administration | U.S. Department of Homeland Security

D000134



**Transportation Security Administration**

# Prohibited Items

*For Travelers*

- Sharp Objects
- Sporting Goods
- Guns & Firearms
- Tools
- Martial Arts & Self Defense Items
- Explosive & Flammable Materials, Disabling Chemicals & Other Dangerous Items
- Other Items

Notify me when there are updates to this page!



Downloadable Brochures



**Updated!**
Click here to download the Prohibited Items brochure. (957kb, pdf)

## Sharp Objects

| Item | Carry-on | Checked |
|---|---|---|
| Box Cutters | No | Yes |
| Ice Axes/Ice Picks | No | Yes |
| Knives - except for plastic or round bladed butter knives | No | Yes |
| Meat Cleavers | No | Yes |
| Razor-Type Blades - such as box cutters, utility knives, razor blades not in a cartridge, but excluding safety razors. | No | Yes |
| Sabers | No | Yes |
| Scissors - metal with pointed tips and blades shorter than four inches | Yes | Yes |
| Swords | No | Yes |

**NOTE:** Any sharp objects in checked baggage should be sheathed or securely wrapped to prevent injury to baggage handlers and inspectors.

Back To Top

## Sporting Goods

| Item | Carry-on | Checked |
|---|---|---|
| Baseball Bats | No | Yes |
| Bows and Arrows | No | Yes |
| Cricket Bats | No | Yes |
| Golf Clubs | No | Yes |
| Hockey Sticks | No | Yes |
| Lacrosse Sticks | No | Yes |

D000135

| | Carry-on | Checked |
|---|---|---|
| Pool Cues | No | Yes |
| Ski Poles | No | Yes |
| Spear Guns | No | Yes |

For more information, please read our Traveling with Special Items section.

Back To Top

### Guns & Firearms

| Item | Carry-on | Checked |
|---|---|---|
| Ammunition - Check with your airline or travel agent to see if ammunition is permitted in checked baggage on the airline you are flying. If ammunition is permitted, it must be declared to the airline at check-in. Small arms ammunitions for personal use must be securely packed in fiber, wood or metal boxes or other packaging specifically designed to carry small amounts of ammunition. Ask about limitations or fees, if any, that apply. Read our Firearms & Ammunition section. | No | Yes |
| BB guns | No | Yes |
| Compressed Air Guns (to include paintball markers) - Carried in checked luggage without compressed air cylinder attached. | No | Yes |
| Firearms - firearms carried as checked baggage MUST be unloaded, packed in a locked hard-sided container, and declared to the airline at check-in. Read our Firearms & Ammunition section. | No | Yes |
| Flare Guns - May be carried as checked baggage MUST be unloaded, packed in a locked hard-sided container, and declared to the airline at check-in. Read our section on Camping. | No | Yes |
| Flares | No | No |
| Gun Lighters | No | Yes |
| Gun Powder including black powder and percussion caps | No | No |
| Parts of Guns and Firearms | No | Yes |
| Pellet Guns | No | Yes |
| Realistic Replicas of Firearms | No | Yes |
| Starter Pistols | No | Yes |

**NOTE:** Check with your airline or travel agent to see if firearms are permitted in checked baggage on the airline you are flying. Ask about limitations or fees, if any, that apply.

Back To Top

### Tools

| Item | Carry-on | Checked |
|---|---|---|
| Axes and Hatchets | No | Yes |
| Cattle Prods | No | Yes |
| Crowbars | No | Yes |
| Hammers | No | Yes |
| Drills and drill bits (including cordless portable power drills) | No | Yes |
| Saws (including cordless portable power saws) | No | Yes |
| Tools (greater than seven inches in length) | No | Yes |
| Tools (seven inches or less in length) | Yes | Yes |

D000136



| | Carry-on | Checked |
|---|---|---|
| Screwdrivers (seven inches or less in length) | Yes | Yes |
| Wrenches and Pliers (seven inches or less in length) | Yes | Yes |

**NOTE:** Any sharp objects in checked baggage should be sheathed or securely wrapped to prevent injury to baggage handlers and Security Officers.

Back To Top

---

**Martial Arts & Self Defense Items**

| Item | Carry-on | Checked |
|---|---|---|
| Billy Clubs | No | Yes |
| Black Jacks | No | Yes |
| Brass Knuckles | No | Yes |
| Kubatons | No | Yes |
| Mace/Pepper Spray - One 118 ml or 4 Fl. oz. container of mace or pepper spray is permitted in checked baggage provided it is equipped with a safety mechanism to prevent accidental discharge. For more information visit www.faa.gov., click on Passengers, then Preparing to Fly. | No | Yes |
| Martial Arts Weapons | No | Yes |
| Night Sticks | No | Yes |
| Nunchakus | No | Yes |
| Stun Guns/Shocking Devices | No | Yes |
| Throwing Stars | No | Yes |

**NOTE:** Any sharp objects in checked baggage should be sheathed or securely wrapped to prevent injury to baggage handlers and Security Officers.

Back To Top

---

**Explosive & Flammable Materials, Disabling Chemicals & Other Dangerous Items**

| Explosive Materials | Carry-on | Checked |
|---|---|---|
| Blasting Caps | No | No |
| Dynamite | No | No |
| Fireworks | No | No |
| Flares (in any form) | No | No |
| Hand Grenades | No | No |
| Plastic Explosives | No | No |
| Realistic Replicas of Explosives | No | No |

| Flammable Items | Carry-on | Checked |
|---|---|---|
| Aerosol (any except for personal care or toiletries in limited quantities) | No | No |
| Fuels (including cooking fuels and any flammable liquid fuel) | No | No |
| Gasoline | No | No |
| Gas Torches | No | No |
| Lighter Fluid | No | No |
| Common Lighters - Lighters without fuel are permitted in checked baggage. Lighters with fuel are prohibited in checked baggage, unless they adhere to the Department of Transportation (DOT) exemption, which allows up to two fueled lighters if properly enclosed in a DOT approved | Yes | No |

D000137



case, if you are uncertain as to whether your lighter is prohibited, please leave it at home.

| | Carry-on | Checked |
|---|---|---|
| Torch Lighters - Torch lighters create a thin, needle-like flame that is hotter (reaching 2,500 degrees Fahrenheit) and more intense than those from common lighters. Torch lighters are often used for pipes and cigars, and maintain a consistent stream of air-propelled fire regardless of the angle at which it is held. Torch lighters continue to be banned. | No | No |
| Strike-anywhere Matches - One book of safety (non-strike anywhere) matches are permitted as carry-on items, but all matches are prohibited in checked baggage. | No | No |
| Flammable Paints (See Other Items below for non-flammable paints) | No | No |
| Turpentine and Paint Thinner | No | No |
| Realistic Replicas of Incendiaries | No | No |

NOTE: There are other hazardous materials that are regulated by the FAA. This information is summarized at www.faa.gov, click on Passengers, then Preparing to Fly.

| Disabling Chemicals & Other Dangerous Items | Carry-on | Checked |
|---|---|---|
| Chlorine for Pools and Spas | No | No |
| Small compressed gas cartridges (Up to 2 in life vests and 2 spares. The spares must accompany the life vests and presented as one unit) | Yes | Yes |
| Fire extinguishers and other compressed gas cylinders | No | No |
| Liquid Bleach | No | No |
| Spillable Batteries - except those in wheelchairs | No | No |
| Spray Paint | No | No |
| Tear Gas | No | No |

NOTE: There are other hazardous materials that are regulated by the FAA. This information is summerized at www.faa.gov.

Back To Top

Other Items

| Item | Carry-on | Checked |
|---|---|---|
| Gel-type candles | No | Yes |
| Gel shoe inserts - Gel shoe inserts are not permitted, but shoes constructed with gel heels are allowed and must be removed and screened. | No | Yes |
| Non-flammable liquid, gel, or aerosol paint | Yes - 3 oz. or smaller container | Yes |
| Flammable liquid, gel, or aerosol paint | No | No |
| Snow globes and like decorations regardless of size or amount of liquid inside, even with documentation. | No | Yes |

Back To Top

Download Plug-in
Some of the links on this page require a plug-in to view them, which are available below.

Adobe Acrobat (PDF)

Windows Media Player

Transportation Security Administration | U.S. Department of Homeland Security

http://www.tsa.dhs.gov/travelers/airtravel/prohibited/permitted-prohibited-items.shtm        8/21/2009

D000138

D000139