UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

RODERICK JENKINS,

                     Plaintiff,

    -against-

ERIC H. HOLDER, Attorney General,

                    Defendant.

-------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**11-CV-0268 (NGG) (CLP)**

NICHOLAS G. GARAUFIS, United States District Judge.

      Plaintiff Roderick Jenkins brought this action against Defendant Eric H. Holder, Attorney

General of the United States of America, alleging pursuant to Title VII of the Civil Rights Act of

1964, 42 U.S.C. §§ 2000e-16, et seq. ("Title VII"), that he was subjected to discriminatory

treatment due to his race when he was terminated from his job at the Bureau of Prisons ("BOP").

Plaintiff further claims that his termination was discriminatory on the basis of his disability in

violation of the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791, et seq.

("Rehabilitation Act"). Finally, Plaintiff also alleges that his termination was in retaliation for

protected activity in violation of both Title VII and the Rehabilitation Act. Defendant seeks

summary judgment on all claims. For the reasons set forth below, the motion is GRANTED.

## I.    BACKGROUND

###     A.    Statement of Facts

      Each party submitted a statement of facts and also responded to the opposing side's initial

submissions, pursuant to Local Rule 56.1. (See Def. 56.1 St. (Dkt. 51); Pl. 56.1 St. (Dkt. 54).)

Where a party failed to controvert a fact in the other side's 56.1 statement, which is supported by

specific reference to admissible record evidence, that fact is deemed admitted. See Local Civ. R.

56.1(c); T.Y. v. N.Y. City Dep't of Educ., 584 F.3d 412, 417-18 (2d Cir. 2009); Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73 (2d Cir. 2001) (noting that Local Rule 56.1 should be interpreted to provide that "where there are [no] citations or where the cited materials do not support the factual assertions in the Statements, the Court is free to disregard the assertion") (quotation marks and citations omitted). Except as otherwise noted, the court refers to the undisputed portions of the parties' Local Rule 56.1 statements of fact and will otherwise refer to undisputed evidentiary sources from the record.

### 1. Plaintiff's Disability

Plaintiff, a black male, is a former employee of the BOP who worked as an Intelligence Officer at the Metropolitan Corrections Center ("MCC") since January 1, 1999. (Def. 56.1 St. ¶¶ 1-3; Pl. 56.1 St. ¶¶ 1-2.) On April 13, 2006, Plaintiff suffered a work-related injury when he twisted his ankle. (Pl. 56.1 St. ¶ 6.) Plaintiff was off from work from April 2006 to November 2007. (Decl. of Robert J. Valli ("Valli Decl.") (Dkt. 55), Ex. 26.)

### 2. Plaintiff's Incident on April 29, 2006

On April 29, 2006, Plaintiff used his BOP credentials to carry his personal firearm onto a commercial flight out of LaGuardia Airport, while he was off-duty and traveling with celebrity musician Sean Combs. (See Def. 56.1 St. ¶¶ 5-8.)

During the flight, a Federal Air Marshal noticed that Plaintiff was "clearly performing protective duties for Mr. Combs." (Id. ¶ 10.) The Federal Air Marshal learned that Plaintiff was flying armed, confronted Plaintiff, and called the Warden at the MCC to inquire whether the Warden knew that Plaintiff was flying armed. (Id. ¶¶ 11-12, 16.) A Captain at the MCC notified the Federal Air Marshal that Plaintiff was not on-duty and that his actions were not authorized by the Warden. (Id. ¶ 17.)

3. The Investigative Phase: Department of Justice Office of Inspector General Investigation

Following the incident on the flight, the Department of Justice Office of Inspector General ("OIG") commenced an investigation of Plaintiff's conduct. (See Def. 56.1 St. ¶ 18.) During the course of the investigation, OIG Special Agent Eric J. Blachman interviewed several witnesses and collected statements and documents from numerous law enforcement agents, including the Federal Air Marshal, representatives from the Department of Homeland Security, representatives from the BOP, and a Port Authority Police Officer. (Id. ¶ 19.) Special Agent Blachman also interviewed Plaintiff on at least two different occasions. (Id. ¶ 21.)

OIG concluded its investigation on or about October 12, 2007. (Id. ¶ 22.) The investigation found that Plaintiff violated two different BOP Standards for Employee Conduct and a separate BOP Program Statement when he boarded a flight armed and provided armed security to Combs on April 29, 2006. (Id. ¶ 25.) Upon completion of its investigation, on November 1, 2007, OIG referred its report to the BOP for appropriate administrative action. (Id. ¶ 30.)

4. The Investigative Phase: The BOP Office of Internal Affairs Investigation

After OIG referred the case for administrative action, the BOP Office of Internal Affairs Investigation ("OIA") reviewed OIG's findings and, on June 10, 2008, referred the matter to the MCC's Special Investigative Agent for a local investigation. (Id. ¶ 31.)

Special Investigative Agent Mary Wade-Jones conducted the local investigation. (Id. ¶ 31.) Agent Wade-Jones interviewed Plaintiff, among others, during the course of the investigation. (Pl. 56.1 St. ¶ 35.) Prior to the interview of Plaintiff on March 4, 2009, Agent Wade-Jones advised him that he was being interviewed in connection with the following charges

alleged against him: (1) misuse of official position/badge, (2) failure to follow policy, and (3) failure to obtain outside employment approval. (Id. ¶¶ 34-35.)[1]

Agent Wade-Jones sustained these three charges at the conclusion of her investigation. (Def. 56.1 St. ¶¶ 35, 68.) On April 24, 2009, a supervisor at OIA approved the Agent's investigative packet and instructed her to forward the report and supporting documentation to the MCC's Warden for appropriate disposition. (Id. ¶ 38.)

### 5. Plaintiff's Equal Employment Office ("EEO") Complaints

On December 27, 2007—soon after he returned to work and while the investigation into the incident on the flight was still ongoing—Plaintiff filed a complaint of race and disability discrimination with the BOP's EEO because the MCC had allegedly forced him back to work after his absence and then marked him AWOL for some work that he had missed. (See Am. Compl. ¶ 32; Pl. 56.1 St. ¶ 10.)

On March 3, 2009—while the local investigation into the incident on the flight was still continuing—Plaintiff filed another EEO complaint of race, color, and disability discrimination and retaliation based on the MCC's alleged refusal to provide Plaintiff with a reasonable accommodation in the aftermath of his ankle injury. (See Am. Compl. ¶ 50; Pl. 56.1 St. ¶ 11.)

Settlement discussions pertaining to these two EEO complaints began while Plaintiff was employed at the MCC. (Pl. 56.1 St. ¶ 10.) Both of these complaints were later settled at the administrative level. (See Def. 56.1 St. ¶ 183; Pl. 56.1 St. ¶ 13-14.)

---

[1] Plaintiff was also advised of three unrelated charges, which were not sustained and are beyond the scope of this civil action. In addition, the Special Investigative Agent investigated a charge against Plaintiff relating to the loss of his keys at the MCC, which the Agent sustained. (Def. 56.1 St. ¶¶ 39-40.) This charge was ultimately consolidated with the other sustained charges against Plaintiff, which arose from the incident on the flight on April 29, 2006. (Id. ¶ 42.)

6.    BOP Disciplinary Procedures

Within the BOP, the Human Resources ("HR") Department is responsible for the discipline phase that follows an investigation of charges against employees. (Def. 56.1 St. ¶ 43.) It is customary for the local institution's HR staff to draft the proposals for discipline ("proposal letters"), after which these are reviewed by the HR staff at the regional office. (Id. ¶¶ 66, 53.) However, New York facilities such as the MCC are often backlogged, and in such cases the BOP's Northeast Regional Office ("NERO") in Philadelphia often takes responsibility for drafting disciplinary letters for the MCC. (Id. ¶¶ 63-66.)

During the disciplinary phase, the HR staff must make sure that evidence supports the disciplinary charges and that they are consistent with prior BOP charges for similar conduct. (Id. ¶ 45.) The HR staff considers third-party decisions, such as arbitration decisions and Merit Systems Protection Board ("MSPB") rulings as guidance regarding the best way to charge certain types of misconduct. (Id. ¶ 52., Decl. of Kenneth M. Abell ("Abell Decl.") (Dkt. 52), Ex. H, Connors Dep. at 29:1-6.) As it prepares the proposals for discipline, the HR staff has the authority to modify the charges, and it is not uncommon for it to do so. (Def. 56.1 St. ¶¶ 46-47.)

From the regional office, the proposal letters are sent to the BOP's Office of Labor and Management Relations ("LMR"). (Id. ¶ 54.) LMR reviews the letters for legal and technical sufficiency and also has authority to modify the charges. (Id. ¶¶ 48, 55.) If it approves a proposal letter, LMR forwards it to the local institution so that the letter may be provided to the employee. (Id. ¶ 55.)

Under the disciplinary policy, there is no specific requirement as to which official must provide the employee with the proposal letter. (Abell Decl., Ex. H, Connors Dep. at 47:1-22.) Proposal letters are "more often than not" given to the department head for issuance to an

5

employee. (Pl. 56.1 St. ¶ 47.) But anyone with knowledge of the employee and the behavior may deliver the proposal letter to the employee. (Id.)

After the proposal letter is provided to the employee, the employee is given an opportunity to respond both in writing and in person. (Id. ¶ 56.) Thereafter, the Warden makes the final decision. (Id. ¶ 58.) The HR staff then drafts a decision letter for the Warden's signature, which is again reviewed by the regional office and LMR. (Id. ¶¶ 59-60.) The disciplinary stage is complete when the final decision letter is approved and provided to the employee. (Id. ¶ 61.)

### 7. Plaintiff's Disciplinary Phase

After receiving the investigative packet and the supporting documentation regarding Plaintiff from OIA, Elizabeth Marin-Rodriguez, the HR manager at the MCC, was instructed by Scott Sussman, the Executive Assistant to the Warden, to turn Plaintiff's file over to NERO for processing. (Pl. 56.1 St. ¶¶ 42, 70-72; Def. 56.1 St. ¶ 62.) She testified that this may have been the only time Mr. Sussman expressly directed her to send an investigative file to NERO. (Pl. 56.1 St. ¶ 73.)

Thereafter, HR specialist Lois Swiderski and her supervisor, Margaret Connors, drafted Plaintiff's proposal letter at NERO. (Def. 56.1 St. ¶¶ 67, 73.) The record does not contain deposition testimony from Swiderski. However, Connors testified that during Plaintiff's disciplinary phase she was aware that Plaintiff had previously filed two EEO complaints. (Pl. 56.1 St. ¶ 79.) As a HR professional, Connors had some involvement in the settlement discussions pertaining to those complaints. (Id. ¶ 80.) Connors testified that Plaintiff's work-related injury and EEO complaints had nothing to do with his termination. (Abell Decl., Ex. H, Connors Dep. at 104:13-105:4.)

Once NERO drafted the proposal letter, it was then sent to LMR for legal review. (Def. 56.1 St. ¶¶ 73, 75.) LMR approved the proposal letter and sent it back to the MCC for provision to Plaintiff. (Id. ¶ 77.) The proposal letter contained the following charges stemming from the incident on the flight: (1) misuse of BOP credentials, (2) off-duty misconduct, and (3) engaging in outside employment without approval. (Pl. 56.1 St. ¶ 90.) On or about November 16, 2009, the MCC's Department Head for Correctional Services, Captain Lamine N'Diaye, issued the proposal letter to Plaintiff. (Def. 56.1 St. ¶ 78.)

Plaintiff submitted a written response to the letter on December 2, 2009. (Id. ¶ 80.) Although he "[did] not raise any concerns or arguments regarding the title of the charges," Plaintiff contested their grounds in his response. (Id. ¶¶ 81-82, 86.) Plaintiff also raised the issue of his prior ankle injury, maintained that he suffered discrimination at the hands of MCC management, and detailed his prior two EEO complaints. (Id. ¶¶ 87, 115; Abell Decl., Ex. L.)

In anticipation of a follow-on oral rebuttal meeting, Marin-Rodriguez prepared a three-page summary of Plaintiff's written rebuttal, investigative file, and adverse action file for Warden Suzanne Hastings, who had just begun her tenure at the MCC. (Def. 56.1 St. ¶¶ 93, 100, 111, 117.) She also provided Warden Hastings with Plaintiff's adverse action file, which included the investigative packet received from OIA. Like Connors, Marin-Rodriguez testified that because of her duties and responsibilities as the local HR manager, she was aware of Plaintiff's ankle injury and EEO complaints, but the "injury doesn't have anything to do with the misconduct." (Abell Decl., Ex. I, Marin-Rodriguez Dep. at 75:18-76:2, 113:3-115:17.)

The summary prepared for Warden Hastings provides a short timeline of Plaintiff's tenure. (Valli Decl., Ex. 26.) The timeline states that on April 29, 2006 Plaintiff "escorted Sean Combs from LaGuardia to Atlanta—walking in airports, etc. performing similar duties to that in

7

a correctional environment." (Pl. 56.1 St. ¶¶ 146-48.) A sentence reads, "how was Jenkins able to walk through airports, but not come to work?" (Id.) The document states that the "work-related injury is, for the most part, independent of the misconduct." (Id. ¶ 149.) The summary also explains that at least one of the charges against Plaintiff was retitled during the disciplinary stage. (See Valli Decl., Ex. 26.)

On January 19, 2010, Plaintiff met with Warden Hastings to provide his oral response to the proposal letter. (Def. 56.1 St. ¶ 119.) After the meeting, Warden Hastings filled out a worksheet that she uses in determining appropriate discipline for employees. (Id. ¶ 135.) Completing the form, Warden Hastings indicated that she had decided that there were no alternative sanctions other than termination because Plaintiff's integrity had been compromised. (Id. ¶ 144.) NERO then drafted a decision letter. (Id. ¶¶ 146-47.) Plaintiff's termination became effective on the same date as the final letter, July 7, 2010. (Id. ¶ 156.)

### B. Procedural History

#### 1. The Administrative Process

Soon after his removal, Plaintiff signed a Charge of Discrimination, which he filed directly with the Equal Employment Opportunity Commission ("EEOC") on August 19, 2010, and which the EEOC received on August 30, 2010. (Id. ¶ 158.) On October 19, 2010, the EEOC dismissed Plaintiff's Charge of Discrimination and closed its file because it did not have jurisdiction over this type of charge. (Id. ¶ 161.) The EEOC's Dismissal and Notice of Rights letter stated that Plaintiff had 90 days from its receipt to file suit in federal court. (Abell Decl., Ex. T.)

Also on August 19, 2010, Plaintiff contacted an EEO counselor at the BOP, and requested EEO counseling. (Def. 56.1 St. ¶ 157.) On September 20, 2010, the BOP issued

8

Plaintiff a Notice of Right to File a complaint. (Id. ¶ 159.) Plaintiff then filed a formal Complaint of Discrimination with the BOP's EEO on October 5, 2010, alleging that the BOP terminated his employment based on race, disability, and retaliation. (Id. ¶¶ 160, 163.)

On November 15, 2010, the BOP accepted Plaintiff's allegations for investigation, and notified Plaintiff that his complaint was considered a "mixed case complaint." (Id. ¶ 163.) By a separate letter dated November 15, 2010, the BOP appointed an outside investigative company, Resolution Services, to investigate Plaintiff's complaint. (Id. ¶ 165.) The investigator assigned to conduct the EEO investigation, Eric Pines, contacted Plaintiff's attorney on December 20, 2010. (Id. ¶ 166.) The investigator was in regular contact with Plaintiff's counsel and scheduled an interview with Plaintiff for January 31, 2011. (Id. ¶¶ 166-78.)

### 2. The Civil Action

On January 19, 2011, without notifying the EEO investigator, Plaintiff filed his Complaint in the instant civil action, which is limited solely to claims involving the termination of his employment at the BOP. (Id. ¶¶ 179, 183; Am. Compl. (Dkt. 11).) Plaintiff alleges that the termination of his employment violated Title VII of the Civil Rights Act, as amended, 42 U.S.C. §§ 2000e-16, et seq., and the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791, et seq., because it was discriminatory on the basis of race and disability and in retaliation for pursuing protected activity—namely, filing his two prior EEO complaints. (See Am. Compl. ¶¶ 68-85.)

On February 3, 2011, Plaintiff's counsel notified the EEO investigator that Plaintiff had chosen to file a lawsuit in federal court and was no longer participating in the EEO investigation. (Def. 56.1 St. ¶ 181.)

Defendant requested a pre-motion conference on January 31, 2013. (Def. Ltr. (Dkt. 46).) On February 4, 2013, the court granted leave to Defendant to file his summary judgment motion. (Feb. 4, 2013, Order.) On June 10, 2013, Defendant moved for summary judgment on all claims. (Def. Mot. for Summ. J. (Dkt. 49).)

## II.    PARTIES' CONTENTIONS

### A.    Defendant's Arguments

Defendant argues that he is entitled to dismissal of Plaintiff's claims because Plaintiff failed to exhaust his administrative remedies before filing this civil action. (Def. Summ. J. Mem. (Dkt. 50) at 4.) Specifically, Plaintiff did not wait the required 120 days to allow the EEO to investigate his claims before filing suit in federal court. (Id.)

Further, Defendant argues that he is entitled to dismissal of Plaintiff's claims of discrimination and retaliation on the merits. (Id.) According to Defendant, Plaintiff cannot meet his burden of establishing a prima facie case of race and disability discrimination because he cannot demonstrate that Defendant's actions occurred under circumstances giving rise to an inference of discrimination. (Id.) Similarly, Defendant argues that Plaintiff cannot meet his burden of establishing a prima facie case of retaliation because Plaintiff cannot show a causal connection between his removal and his protected activity. (Id.)

Lastly, Defendant argues that even if Plaintiff can establish a prima facie case of discrimination or retaliation, he cannot demonstrate that Defendant's stated nondiscriminatory reason for removing Plaintiff from the employment—due to Plaintiff's misconduct—was pretextual. (Id.)

10

### B.     Plaintiff's Arguments

For his part, Plaintiff concedes that he failed to exhaust his administrative remedies before filing in federal court. (Pl. Summ. J. Mem. (Dkt. 53) at 21.) However, he argues that the exhaustion requirement is not a jurisdictional defect and is thus subject to equitable defenses. (Id.) Plaintiff contends that several grounds exist for the court to excuse his failure to exhaust the administrative process. (Id. at 19.)

Plaintiff also argues that summary judgment is improper on the merits because Defendant has failed to meet his burden of establishing that there remains no genuine issue of material fact for trial. (Id. at 11-18.) Plaintiff contends that he has met his modest burden of establishing a prima facie case of employment discrimination and retaliation. (Id.)

### III.     SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if its existence or non-existence "might affect the outcome of the suit under the governing law," and an issue of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The burden of making this showing rests upon the party moving for summary judgment. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). "[T]he court must draw all reasonable inferences in favor of the nonmoving party." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149 (2000).

Once the moving party has met its initial burden of demonstrating the absence of a genuine issue of material fact, the non-moving party, in order to defeat the motion, "must do more than simply show that there is some metaphysical doubt as to the material facts."

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The non-moving party "must set forth specific facts showing that there is a genuine issue for trial" in order to avoid summary judgment. Anderson, 477 U.S. at 250. Only "specific facts" grounded in testimony or other admissible evidence create a genuine issue. Id. "[M]ere allegations or denials" of the adverse party's pleadings, id., and "the presentation of assertions that are conclusory," Patterson v. Cnty. of Onieda, N.Y., 375 F.3d 206, 219 (2d Cir. 2004), or "conjecture[] or speculation" from the non-movant, Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996), do not create a genuine issue.

## IV. ADMINISTRATIVE EXHAUSTION

### A. Legal Standard

EEOC regulations provide that as a prerequisite to bringing an employment discrimination action in federal court under either Title VII or the Rehabilitation Act, a federal employee must first exhaust his administrative remedies. See Boos v. Runyon, 201 F.3d 178, 181 (2d Cir. 2000) (Rehabilitation Act); Downey v. Runyon, 160 F.3d 139, 145 (2d Cir. 1998) (Title VII and Rehabilitation Act); Briones v. Runyon, 101 F.3d 287, 289 (2d Cir. 1996) (Title VII).

Where a federal employee alleges employment discrimination based on race or disability in relation to an employment action that can be appealed to the MSPB—i.e., in relation to an adverse employment action—the case is called a "mixed case," and the employee may initially file a "mixed case complaint" with his agency's EEO office, or a "mixed case appeal" directly with the MSPB, but not both. See 29 C.F.R. § 1614.302(b); Downey, 160 F.3d at 141-42.

If the aggrieved employee files with his agency's EEO office, EEOC regulations require the employee to: (1) consult with a counselor at the agency's EEO within 45 days of the alleged

discriminatory act, see 29 C.F.R. § 1614.105(a)(1), and, if the matter is not resolved after a mandatory counseling period, (2) file a formal written administrative complaint with the agency within 15 days of receipt of the EEO counselor's notice of final interview and right to file a formal complaint, see id. § 1614.106(a), (b). The employee may then file a civil action after 120 days from the filing of the EEO complaint if the agency has not yet rendered a decision. See id. § 1614.302(d)(1)(i); 1614.310(g).

The purpose of these exhaustion requirements "is to provide an opportunity for the resolution of discrimination complaints by means of 'conciliation, conference, and persuasion.'" Wrenn v. Sec'y, Dep't of Veterans Affairs, 918 F.2d 1073, 1078 (2d Cir. 1990). They also give the agency "the opportunity to investigate, mediate, and take remedial action." Stewart v. U.S. Immigration & Naturalization Serv., 762 F.2d 193, 198 (2d Cir. 1985). See generally McKart v. United States, 395 U.S. 185, 193-95 (1968).

Typically, a failure to comply with the exhaustion requirements is grounds for dismissal of a plaintiff's civil action. Briones, 101 F.3d at 289; see also Martin v. Donahoe, No. 12-CV-672 (JFB), 2013 WL 1181437, at *3 (E.D.N.Y. March 22, 2013) (dismissing for failure to exhaust). A plaintiff's *early termination* of his administrative complaint also constitutes a failure to exhaust, which is grounds for dismissal of a civil action. See Baber v. Runyon, No. 97-CV-4798 (DLC), 1998 WL 912065, at *5 (S.D.N.Y. Dec. 30, 1998) ("Although not yet addressed by the Second Circuit, courts considering whether a plaintiff who withdraws an administrative complaint has exhausted administrative remedies have concluded that the withdrawal constitutes a failure to exhaust administrative remedies.") (dismissing for failure to exhaust). "Allowing a plaintiff to abandon the administrative remedies he has initiated would tend to frustrate the ability of the agency to deal with complaints." Wrenn, 918 F.2d at 1078 (internal citation

13

omitted); see also Greenlaw v. Garrett, 59 F.3d 994, 1000 (9th Cir. 1995) ("abandonment or failure to cooperate in the administrative process prevents exhaustion and precludes judicial review.").

Nevertheless, the Supreme Court has held that bringing a timely administrative complaint is not a jurisdictional prerequisite to filing suit in a federal court and may be waived if equity requires. Downey, 160 F.3d at 145 (citing Zipes v. Trans World Airlines Inc., 455 U.S. 385, 393 (1982)); see also Briones, 101 F.3d at 290 ("[T]he statutory requirement for filing is analogous to a statute of limitations and is, therefore, considered subject to waiver, estoppel, and equitable tolling.").

Courts have recognized three scenarios in which a plaintiff's interests are so significant that a failure to exhaust may be excused: (1) when the exhaustion requirement occasions undue prejudice to subsequent assertion of a court action; (2) where the administrative agency is not empowered to grant effective relief; and (3) when there are clear indicia of agency bias or taint. See McCarthy v. Madigan, 503 U.S. 140, 146-49 (1992), superseded by statute on other grounds as recognized in Odumosu v. Keller, 53 F. Supp. 2d 545 (N.D.N.Y. 1999); Fernandez v. Chertoff, 471 F.3d 45, 58 (2d Cir. 2006). Still, "[f]ederal courts have typically extended equitable relief only sparingly," Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96 (1990), and the plaintiff bears the burden of proving that he is entitled such relief. See Boos, 201 F.3d at 185.

**B.    Discussion**

Plaintiff concedes that he has failed to exhaust his administrative remedies because he did not wait the required 120 days from filing the EEO complaint to file suit. (Pl. Summ. J. Mem. at

21.) However, he contends that the court should excuse his failure to exhaust on the grounds of undue prejudice and agency bias or taint. (Id. at 19.)

          1.     Undue Prejudice

Plaintiff argues—without citing any case law—that requiring administrative exhaustion would have resulted in undue prejudice. (Id. at 21.) Plaintiff contends that after the EEOC rejected his Charge of Discrimination, the EEOC's Dismissal and Notice of Rights letter stated that Plaintiff had 90 days from its receipt to file suit in federal court. (Id.) Plaintiff argues that the "onerous language contained within the EEOC Right to Sue letter" placed him "between the proverbial rock and a hard place." (Id.) Plaintiff maintains that he felt compelled by this EEOC letter to file suit before his EEO process at the BOP was exhausted because he feared that otherwise he would forfeit his right to sue. (Id.) According to Plaintiff, his failure to exhaust the EEO process should therefore be excused.

In McCarthy v. Madigan, the Supreme Court provided several examples that clarify the scope of the "undue prejudice" exception to the administrative exhaustion requirement. See 503 U.S. at 147. One such scenario is where a particular plaintiff, such as a disability-benefit claimant, "may suffer irreparable harm if unable to secure immediate judicial consideration of his claim." Id. Another example is where "an unreasonable or indefinite timeframe for administrative action"—such as a possible delay of 10 years in administrative proceedings—makes it impractical to wait to exhaust such proceedings. Id.

Plaintiff's circumstances here by no means fit the intended scope of this exception. At the time that his EEO complaint was pending, Plaintiff was already removed from employment. Although he sought reinstatement and retroactive pay, his situation was not as dire as that of a disability-benefit claimant whose very livelihood would be threatened by an inability to secure

15

an immediate consideration of a claim in federal court. Nor did Plaintiff face an administrative procedure of "unreasonable or indefinite timeframe," such as one dragging on for years. On the contrary, Plaintiff had already waited for 106 days of the required 120 days before filing suit, and had only 14 days left to wait when he abruptly and voluntarily abandoned his administrative claims.

The only hardship that Plaintiff cites—the expiration of the 90-day window to sue referenced in the EEOC's Dismissal and Notice of Rights—is insufficient to make out undue prejudice. While courts may excuse a plaintiff's failure to exhaust where it resulted from the receipt of contradictory and misleading information from a government entity, such relief is only available in the "most serious of circumstances." Pollock v. Chertoff, 361 F. Supp. 2d 126, 133-34 (W.D.N.Y. 2005). As the Pollock court emphasized, such equitable principles are invoked against the Government "only in those limited cases where the party can establish both that the Government made a misrepresentation upon which the party reasonably and detrimentally relied and that the Government engaged in affirmative misconduct." Id. (citing City of New York v. Shalala, 34 F.3d 1161, 1168 (2d Cir. 1994)).

These requirements cannot be met here. In this case, Plaintiff signed a Charge of Discrimination, which he voluntarily and incorrectly filed directly with the EEOC. Plaintiff was clearly incorrect in his stated belief that he could forego exhausting his EEO claim and file directly in federal court because he was no longer a federal employee. (See Def. 56.1 St. ¶ 182.) The law does not allow federal employees to file charges of discrimination directly with the EEOC and instead requires them to file a mixed case complaint with their employing federal agency's EEO office or with the MSPB. See 29 C.F.R. § 1614.302(b).

16

Plaintiff's mistaken reliance on the EEOC Dismissal and Notice of Rights and misunderstanding of the procedure were not reasonable because at all relevant times Plaintiff was represented by counsel who "can be charged with constructive knowledge of the law's requirements." Pollock, 361 F. Supp. 2d at 131. As a represented party, Plaintiff's misunderstanding of the law is not proper basis for equitable excuse from the duty to exhaust. See Economou v. Caldera, No. 99-CV-12117 (AJP), 2000 WL 1844773, at *19-20 (S.D.N.Y. Dec. 18, 2000) ("Equitable relief is particularly inappropriate where the plaintiff was represented by counsel during the relevant period."), aff'd, 286 F.3d 144 (2d Cir. 2002). See also Irwin 498 U.S. at 96 (noting that equitable principles "do not extend to what is at best a garden variety claim of excusable neglect"); Baldwin Cnty. Welcome Ctr. v. Brown, 466 U.S. 147, 151 (1984) ("One who fails to act diligently cannot invoke equitable principles to excuse that lack of diligence.").

### 2.    Agency Bias or Taint

Plaintiff also argues that his failure to exhaust should be excused because his EEO claim would have been futile given evidence of bias or taint present at the BOP's administrative process. (Pl. Summ. J. Mem. at 19, 22.) According to the Supreme Court, courts may waive administrative exhaustion requirements where "the administrative body is shown to be biased or has otherwise predetermined the issue before it." McCarthy, 503 U.S. at 148. Although the Second Circuit has not yet addressed the scope of the exception, particularly in an employment discrimination case, the First Circuit has emphasized that reliance on the exception must be anchored in demonstrable reality. "A pessimistic prediction or a hunch that further administrative proceedings will prove unproductive is not enough to sidetrack the exhaustion rule." Portela-Gonzalez v. Sec'y of the Navy, 109 F.3d 74, 78 (1st Cir. 1997); see also Kennedy

v. Empire Blue Cross and Blue Shield, 989 F.2d 588, 594 (2d Cir. 1993) (ERISA case) (noting that a plaintiff must make "clear and positive showing that pursuing available administrative remedies would be futile").

To justify his reliance on this exception, Plaintiff asserts that his prior two EEO complaints (concerning grievances arising from his ankle injury) were *pending* while he was terminated and that the BOP maintained an aggressive posture during the investigation of these prior claims and was not interested in settling them. (Pl. Summ. J. Mem. at 22.) Under Plaintiff's theory, because Plaintiff was failing to make progress with his prior two EEO complaints and was terminated during their pendency, it would have been futile for him to file a third EEO complaint regarding his termination before the very agency that was responsible for his grievance.

Although Plaintiff's theory has some force, he has failed to raise a genuine issue of material fact that would support this theory. On the contrary, the undisputed declaration of Plaintiff's counsel demonstrates that Plaintiff was engaged in settlement discussions regarding his two EEO complaints as early as the summer of 2009, while employed at the BOP and *prior* to the issuance of the proposal letter in November 2009. (Valli Decl. ¶ 5.) Plaintiff settled the second EEO complaint in August 2010, *prior* to filing his third EEO complaint pertaining to his termination. (Id. ¶¶ 10-11.) He settled his first EEO complaint on January 19, 2011, the *same* day that he filed suit in this case. (Id.)

There is no inference of bias or predetermination that can reasonably be made from these undisputed facts. On the contrary, the settlement discussions that preceded his termination and the settlement reached prior to his filing the instant suit suggest that the administrative remedies were fulfilling the very purpose of the exhaustion requirement—providing an opportunity for the

resolution of Plaintiff's discrimination and retaliation complaints by means of conciliation. See Wrenn, 918 F.2d at 1078. The court can find no inference of bias or predetermination as to Plaintiff's third EEO complaint, which he later abandoned, that would justify excusing his failure to exhaust the required administrative process.

## V. RETALIATION CLAIMS

Although Plaintiff's discrimination claims are barred due to his failure to exhaust the EEO administrative remedies, his retaliation claims are not. The Second Circuit has recognized three situations in which certain unexhausted EEO claims may nevertheless be raised in court: (1) where the conduct complained of would fall within the scope of the EEO investigation which can reasonably be expected to grow out of a properly exhausted prior EEO complaint; (2) where the complaint is one alleging retaliation by an employer against an employee for filing a prior EEO complaint; and (3) where the complaint alleges further incidents of discrimination carried out in precisely the same manner alleged in a properly exhausted prior EEO complaint. Terry v. Ashcroft, 336 F.3d 128, 151 (2d Cir. 2003).

In the instant case, the first and third Terry exceptions do not apply because the prior two EEO complaints and the unexhausted claim before this court arise from substantially separate conduct. The two prior exhausted EEO complaints pertained to the alleged failure by the MCC to accommodate Plaintiff's needs that arose from his ankle injury, whereas this civil action is limited only to his termination from BOP. However, the second Terry exception is squarely on point, since Plaintiff's third and fourth claims in this case allege retaliation by the BOP against him for previously filing two EEO complaints. Plaintiff's prior two EEO complaints are thus sufficient to exhaust his administrative remedies. The court excuses Plaintiff's failure to exhaust the retaliation claims and proceeds to address the merits below.

19

## A.  Legal Standard

To establish a prima facie case of retaliation under Title VII and the Rehabilitation Act, the plaintiff must show that: (1) he participated in protected activity; (2) his employer was aware of that protected activity; (3) he suffered a materially adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. See, e.g., Kessler v. Westchester Cnty. Dep't of Soc. Servs., 461 F.3d 199, 205-06 (2d Cir. 2006) (Title VII); Weixel v. Bd. of Educ., 287 F.3d 138, 148 (2d Cir. 2002) (Rehabilitation Act).

If a plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer to proffer a legitimate non-retaliatory reason for the adverse employment decision. Ibok v. Sec. Indus. Automation Corp., 369 F. App'x 210, 213 (2d Cir. 2010); Stafford v. N.Y. Presbyterian Hosp., 06-CV-2150 (ENV), 2011 WL 1131104 (E.D.N.Y. Mar. 28, 2011) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 802-05 (1973)). If the defendant carries this burden of production, the plaintiff must then prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were merely a pretext for impermissible retaliation. Ibok, 369 F. App'x. at 213.

The plaintiff's burden in establishing a prima facie case "is not onerous" and is met if he "introduces evidence that raises a reasonable inference that the action taken by the employer was based on an impermissible factor." Holcomb v. Iona Coll., 521 F.3d 130, 138 (2d Cir. 2008).  In making out a prima facie case, "[d]irect evidence is not necessary, and a plaintiff . . . is usually constrained to rely on the cumulative weight of circumstantial evidence." Luciano v. Olsten Corp., 110 F.3d 210, 215 (2d Cir. 1997).

## B.    Discussion

The only issue contested in this case is whether Plaintiff has established triable issues of fact with regard to the fourth prong of his prima facie case of retaliation—the causal connection between the protected activity and the adverse employment action. Defendant argues that Plaintiff cannot show that the prior EEO complaints were causally related to his removal; rather, Plaintiff's removal was a result of his conduct on the flight on April 29, 2006, and the ensuing OIG and OIA investigations, which commenced before Plaintiff filed his first EEO complaint in December 2007. (Def. Summ. J. Mem. at 17-18.)

For his part, Plaintiff argues that he is entitled to establish proof of causation indirectly, by showing that the protected activity was followed closely by an adverse employment action. (Pl. Summ. J. Mem. at 17 (citing Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000)).) Plaintiff's principal argument is that the protracted timeline of investigation and disciplinary process leading to his termination gives rise to an inference that the real reason for his termination was retaliation for his EEO complaints. (Id. at 2, 5.)

Plaintiff also alleges a number of irregularities in procedure surrounding his termination. These alleged irregularities include: (1) the handling of the case by NERO rather than the local HR staff (id. at 2, 3); (2) the HR staff's knowledge of Plaintiff's prior injury and EEO claims (id. at 4, 6, 14); (3) the retitling of the charges against him during the disciplinary stage (id. at 5, 8, 12-13); (4) the failure to involve Plaintiff's direct supervisor (id. at 4, 13); and (5) the provision of materials to the Warden that included biased opinions and references to Plaintiff's prior ankle injury (id. at 4, 6, 7, 14). Plaintiff is not altogether clear if these alleged irregularities give rise to an inference of discrimination or that of retaliation. For the purpose of completeness, the court considers all of these allegations in sequence below.

1. Temporal Proximity

Plaintiff's principal argument as to why his proposed removal was retaliatory is grounded in the timing of the disciplinary phase. (Def. 56.1 St. ¶ 88.) Plaintiff believes that charges sustained by OIG and OIA were not the real reason for his removal given that "incredulously, the first three charges stemmed from an incident which had occurred over three years prior." (Id. ¶ 236; Pl. Summ. J. Mem. at 5.) Plaintiff speculates that the disciplinary proceedings against him were purposefully delayed. (Def. 56.1 St. ¶ 235.) Under Plaintiff's theory, the lapse between the OIG and OIA investigations and his termination and the closer temporal proximity between his prior two EEO complaints and the termination suggests that retaliation was the employer's true motive.

Under Second Circuit case law, temporal proximity between a plaintiff's participation in protected activity and a materially adverse employment action can be sufficient to prove a causal nexus. See Manoharan v. Columbia Univ., 842 F.2d 590, 593 (2d Cir. 1988). However, where a gradual adverse job action began well *before* the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise. Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001) (affirming summary judgment for the defendant); see also Tomasino v. St. John's Univ., 476 F. App'x 923, 925 (2d Cir. 2012) (same).

Here, the timeline is undisputed. The original incident on the plane took place on April 29, 2006. (Def. 56.1 St. ¶¶ 5-8.) OIG did not conclude the investigation until October 12, 2007, at which point it referred the case to the BOP. (Id. ¶¶ 22, 30.) Plaintiff filed his first EEO complaint on December 27, 2007, and his second EEO complaint on March 3, 2009. (Pl. 56.1 St. ¶¶ 10-11.) The OIA concluded the investigation on April 24, 2009, and Plaintiff was

informed about the proposed termination on November 16, 2009. (Def. 56.1 St. ¶¶ 38, 78.) The final termination became effective on July 7, 2010. (Pl. 56.1 St. ¶ 156.)

Although the termination followed the filing of EEO complaints, under controlling Second Circuit precedent, the timeline does not raise an inference of retaliation because the termination was the ultimate product of "an extensive period of progressive discipline," which began after Plaintiff boarded a flight armed on April 29, 2006—long before Plaintiff engaged in protected activity. See Slattery, 248 F.3d at 95.

### 2. Failure to Follow Standard Practices

Plaintiff also alleges that a number of irregularities in the procedure surrounding his termination raise an inference of retaliatory causation. Under Second Circuit precedent, failure to follow standard internal procedures and policies in terminating an employee can be the basis for inferring causation in a retaliation claim. See Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993). The court reviews the alleged irregularities sequentially below.

### a. *Handling of Plaintiff's case by NERO rather than local HR staff*

Plaintiff argues that "[i]nstead of following standard protocol and having local HR work on Plaintiff's proposed discipline, [NERO] requested the file" and drafted the charges against him. (Pl. Summ. J. Mem. at 2.) Plaintiff ascribes retaliatory motives to this alleged irregularity.

It is undisputed that it is usual and customary for the local institution's HR staff to draft proposals for discipline and discipline letters. (Def. 56.1 St. ¶ 66.) It is also undisputed that after receiving the OIA's investigative packet regarding Plaintiff, the MCC's HR Department was instructed to hand the file over to NERO. (Id. ¶ 62.) Specifically, Marin-Rodriguez testified that Scott Sussman, the Executive Assistant to the Warden, instructed her to turn Plaintiff's file over to the regional office for processing. (Pl. 56.1 St. ¶¶ 70-72.) Marin-Rodriguez also testified that

this may have been the only time Mr. Sussman verbally directed her to send an investigative file to NERO. (Id. at ¶ 73.) Plaintiff's proposal letter was thereafter developed at NERO by HR Specialist Lois Swiderski and her supervisor, Margaret Connors. (Def. 56.1 St. ¶¶ 67, 73.)

However, Plaintiff has already admitted the non-discriminatory explanations offered by Defendant for the process that was followed in this case. Specifically, Plaintiff has admitted that New York facilities such as the MCC are often backlogged with respect to the disciplinary procedures and that NERO often takes responsibility for drafting disciplinary letters for the MCC. (Id. ¶¶ 63-66.) Plaintiff has not offered any additional facts about the transfer from the MCC to NERO that would demonstrate that this explanation is mere pretext.

     b. *HR staff's knowledge of Plaintiff's prior injury and EEO claims*

Plaintiff also notes that the HR staff responsible for his termination was aware of and involved in his EEO complaints, which raises a specter of impropriety. (Pl. Summ. J. Mem. at 4, 6, 14, 17.) Plaintiff notes that Connors was involved in the settlement of his prior EEO claims and was also involved in drawing up the disciplinary charges against him. (Id. at 4.) Referencing the summary of his case that Marin-Rodriguez prepared for Warden Hastings, Plaintiff adds that at the time "HR was intimately aware that Jenkins had made prior complaints of discrimination." (Id. at 6.)

Surely, undisputed deposition testimony demonstrates that Connors was made aware that Plaintiff had previously filed prior EEO claims and was involved in the settlement of these two complaints. (Pl. 56.1 St. ¶¶ 79-80.) Connors also testified that the work-related injury and complaints of discrimination had nothing to do with his termination. (Abell Decl., Ex. H, Connors Dep. at 104:13-105:4.) Similarly, Marin-Rodriguez testified that because of her duties and responsibilities she was aware of Plaintiff's ankle injury and prior EEO complaints when

24

drafting the summary for the Warden, but the "injury doesn't have anything to do with the misconduct." (Abell Decl., Ex. I, Marin-Rodriguez Dep. at 75:18-76:2, 113:3-115:17.)

This undisputed testimony certainly tends to support the knowledge prong of the four-part prima facie case of retaliation. However, under Second Circuit precedent, knowledge of Plaintiff's prior EEO complaints is separate and distinct from the element of causation. The mere fact that the HR staff was aware of or involved in settling Plaintiff's prior EEO complaints and also drawing up the charges that led to his termination, does not give rise to an inference that Plaintiff was fired *because of* his EEO complaints.

      c.    *Retitling of the charges against him during the disciplinary stage*

Plaintiff underscores that HR staff retitled the charges against him in the course of the investigative and disciplinary process. (Pl. Summ. J. Mem. at 5, 8, 12-13.) Plaintiff notes that the proposal letter included charges against him that differed from those charges of which he was advised prior to his interview with the Special Investigative Agent. (Id. at 6.) According to Plaintiff, this retitling of charges raises an inference of retaliation.

The undisputed record demonstrates that prior to interviewing Plaintiff on March 4, 2009, Special Investigative Agent Mary Wade-Jones advised him that he was being interviewed in connection with the following charges: (1) misuse of official position/badge, (2) failure to follow policy, and (3) failure to obtain outside employment approval. (Pl. 56.1 St. ¶¶ 34-35.) Ultimately, Agent Wade-Jones sustained these identical charges. (Def. 56.1 St. ¶¶ 35, 68.)

By contrast, Plaintiff's proposal letter contained the following charges that arose from the incident on the flight: (1) misuse of BOP credentials, (2) off-duty misconduct, and (3) engaging in outside employment without approval. (Pl. 56.1 St. ¶ 90.) Although all three charges were retitled between the conclusion of the investigation and the proposal letter, Plaintiff primarily

underscores the change from "failure to follow policy" to "off-duty misconduct." (Pl. Summ. J. Mem. at 12-13.)

Plaintiff emphasizes that HR retitled the charge in light of an intervening decision by the MSPB involving another BOP employee who brought a gun on a commercial flight. (Id.) In that case the MSPB ruled that a charge of violating the Law Enforcement Officers Safety Act (LEOSA) could not be sustained against the employee for using his BOP credentials to get on a commercial flight with a service weapon. (Id.) Connors testified that the charge against Plaintiff may have been retitled in the aftermath of the MSPB decision. (Abell Decl., Ex. H, Connors Dep. at 107:8-23.) The three-page summary that Marin-Rodriguez prepared for Warden Hastings also states that Plaintiff's charge was modified in light of the MSPB decision. (See Valli Decl., Ex. 26.) Plaintiff argues that his termination was "far from normal" because BOP altered the title of charges "without notice" to him "to ensure the charges . . . would be sustained." (Pl. Summ. J. Mem. at 12-13.)

Plaintiff's arguments are unavailing. Critically, Plaintiff does not articulate how the retitling of his charges is causally related to his prior filing of EEO charges. Equally importantly, Plaintiff has already admitted the non-discriminatory explanations offered by Defendant. Plaintiff has conceded that at times the HR department reviews decisions of other entities as guidance regarding the best charge title for certain types of misconduct. (Def. 56.1 St. ¶ 52.) Plaintiff has also admitted that "the HR Department has the authority to change the charge at the disciplinary level," as does LMR. (Id. ¶¶ 47-48.) Finally, Plaintiff has conceded that when he was notified of the charges against him in the proposal letter, he contested the substance of the accusations but "[did] not raise any concerns or arguments regarding the title of the charges." (Id. ¶¶ 81-82.) Having admitted Defendant's legitimate explanation for the retitling of

the charges, Plaintiff has not come forward with any additional facts that would demonstrate that Defendant's neutral explanation is mere pretext.

### d. *Failure to involve Plaintiff's direct supervisor*

Plaintiff argues that Defendant violated policy by having an MCC employee act as the proposing official of Plaintiff's termination, instead of his department head in the BOP's Central Office in Washington, D.C. (Pl. Summ. J. Mem. at 4, 13.) It is undisputed that Captain Lamine N'Diaye, a superior officer at the MCC, issued the proposal letter to Plaintiff on November 16, 2009. (Pl. 56.1 St. ¶ 78.) Plaintiff contends that this is a departure from standard practice that raises an inference of retaliation.

However, Plaintiff has not identified a *mandatory* policy under which only a department head is permitted to issue the proposal letter to an employee. In fact, Plaintiff has conceded that proposal letters are "more often than not" given to the department head for issuance to an employee, which suggests that the BOP's practice is not inflexible. (Id. ¶ 47.) Similarly, the record contains undisputed deposition testimony by Connors that the BOP disciplinary policy contains no requirement as to *who* the proposing official must be. (Abell Decl., Ex. H, Connors Dep. at 47:1-22.) The policy expressly allows variations to fit unique circumstances of each case. (Id. at 49:1-2.) Therefore, anyone who would have knowledge of the employee and the behavior could deliver the proposal letter. Id. As a superior officer at the MCC, Captain N'Diaye has issued such letters in the past and had knowledge of Plaintiff and the behavior at issue in this case. (Abell Decl., Ex. K, N'Diaye Dep. at 20:6-8; 25:4-13; 35:24-36:9.)

In sum, given the undisputed flexibility of the BOP's disciplinary policy, the court is unable to find that the delivery of the proposal letter to Plaintiff by Captain N'Diaye constituted an irregularity. More importantly, Plaintiff has not articulated—and the court is unable to find—

27

any link between the alleged irregularity and Plaintiff's prior EEO complaints that would raise an inference of causal retaliation.

e. *Provision of materials to the Warden that included biased opinions and references to Plaintiff's prior ankle injury*

Plaintiff also highlights the materials prepared by the HR staff and provided to Warden Hastings prior to Plaintiff's oral rebuttal to the proposed termination letter. (Pl. Summ. J. Mem. at 6, 7, 14, 17, 18.) Plaintiff argues that the BOP violated policy by allowing Warden Hastings to receive Plaintiff's tabbed, highlighted, and annotated adverse action file. (Id. at 14.) Plaintiff also argues that the BOP violated policy by including "biased comments, thoughts and opinions" in the accompanying three-page summary provided to the Warden. (Id. at 6.) Specifically, Plaintiff complains that the summary included a reference to Plaintiff's ankle injury, the subject of his prior EEO complaints, raising the specter of retaliation. (Id.)

Plaintiff's broad-brush argument regarding the provision of the tabbed, highlighted, and annotated adverse action file to the Warden is unpersuasive. Although Plaintiff argues that established policy does not allow the deciding official to view the investigative files pertaining to an employee, his interpretation is inconsistent with the plain text of the OIG memorandum which he references. (See Valli Decl., Ex. 29.) The OIG memorandum recommends that the BOP remove Chief Executive Officers ("CEOs") of its facilities from reviewing and approving investigative reports of employee misconduct for cases in which they will later act as the deciding official in the disciplinary stage. (Id.) It recommends that local investigative agents forward the completed investigative packet directly to OIA for approval "*before* forwarding it to the CEO for action." (Id. (emphasis added).) The memorandum does not state that CEOs are not allowed to access the investigative packet *after* it has been approved by OIA.

28

In this case, consistent with the recommended practice, Warden Hastings, as the CEO of the MCC, had no prior involvement in with the investigative stage. (Def. 56.1 St. ¶¶ 102-03; Abell Decl., Ex. J, Hastings Dep. at 10:13-16.) Rather, an OIA supervisor approved the Special Investigative Agent Wade-Jones's investigative packet and instructed her to forward it to the MCC's Warden for appropriate disposition. (Def. 56.1 St. ¶ 38.) Therefore, there is no violation of referenced policy and no possible inference of retaliation from the provision of Plaintiff's tabbed, highlighted, and annotated adverse action file to Warden Hastings.

Plaintiff's more specific argument regarding the accompanying three-page summary is more persuasive. Marin-Rodriguez testified that she was asked to provide Warden Hastings with an overview of the case and his written response. (See Abell Decl., Ex. I, Marin-Rodriguez Dep. at 101:4-5.) She prepared the summary based on Plaintiff's written rebuttal, investigative file, and adverse action file. (Def. 56.1 St. ¶ 117.) Prior to discussing the substance of the charges against Plaintiff, the document provides a short timeline of Plaintiff's tenure. (See Valli Decl., Ex. 26.) The timeline states that on April 29, 2006 Plaintiff "escorted Sean Combs from LaGuardia to Atlanta—walking in airports, etc. performing similar duties to that in a correctional environment." (Pl. 56.1 St. ¶¶ 146-48.) A sentence reads, "how was Jenkins able to walk through airports, but not come to work?" (Id.) The document further states that the "work-related injury is, for the most part, independent of the misconduct." (Id. ¶ 149.) Marin-Rodriguez and Warden Hastings conceded at their respective depositions that the mention of the ankle injury was not relevant to Plaintiff's termination. (Abell Decl., Ex. I, Marin-Rodriguez Dep. at 112:14-16; Id., Ex. J, Hastings Dep. at 95:3-7.)

The statement is certainly problematic for Defendant because it demonstrates that the HR staff members brought their skepticism of the genuineness of Plaintiff's unrelated ankle injury

29

into his termination proceeding. Inferences drawn in Plaintiff's favor would likely offer some support to his case of retaliation. However, even drawing reasonable inferences in Plaintiff's favor, it is hard to see how a reasonable jury would find on the basis of this one questionable statement that Plaintiff was fired *because of* his filing two prior EEO claims. Although the court's task on a motion for summary judgment is not to weigh the evidence, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." Anderson, 477 U.S. at 252. Even assuming that Plaintiff satisfied his burden of making out a prima facie case of retaliation, Plaintiff has failed to present any evidence suggesting that Defendant's proffered legitimate reasons for his termination—sustained findings of misconduct by two independent investigative bodies—were mere pretexts.

As detailed above, the OIG was the first agency to investigate the incident in which Plaintiff boarded a commercial airline with his personal firearm while providing bodyguard services to a celebrity. (See Def. 56.1 St. ¶ 18.) This investigation found that Plaintiff violated two different BOP Standards for Employee Conduct and a separate BOP Program Statement after multiple witness interviews. (Id. ¶ 25.) After OIG referred the case for administrative action to the BOP, Special Investigative Agent Mary Wade-Jones conducted the local investigation. (Id. ¶ 31.) This investigation also sustained charges of misconduct against Plaintiff. (Id. ¶¶ 35, 68.) At the completion of the investigation, the investigative packet was approved by OIA and sent to the HR staff for disciplinary proceedings. (Id. ¶ 38.)

Like the multi-step investigative stage, the disciplinary stage involved several layers of independent review by HR staff members who were not involved in the investigative process. (Id. ¶¶ 43, 102, 103, 108.) First, Lois Swiderski and her supervisor, Margaret Connors, drafted Plaintiff's proposal letter at NERO. (Id. ¶¶ 67, 73.) Then the draft proposal letter was routed to

30

LMR for legal review, which approved the letter. (Id. ¶¶ 73, 75, 77.) After the letter was provided to Plaintiff, he exercised his right to submit a written and oral response to Warden Hastings, who had just arrived at the MCC. (Id. ¶¶ 80, 93, 119.) Finally, after the meeting with Plaintiff, Warden Hastings weighed relevant considerations and decided that there were no alternative sanctions other than termination because Plaintiff's integrity had been compromised. (Id. ¶¶ 135, 144.)

In sum, the record demonstrated "overwhelming evidence" that Plaintiff was terminated for legitimate reasons—extensive disciplinary proceedings based on sustained findings of misconduct by two independent investigative bodies. See McDonald v. U.S. Postal Serv. Agency, 12-CV-4114, 2013 WL 5681331 (2d Cir. Oct. 21, 2013). Under these circumstances, the court finds that a reasonable jury could not return a verdict for the Plaintiff on his retaliation claims.

## VI.   CONCLUSION

For these reasons, Defendant's motion for summary judgment is GRANTED on all claims.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
       March 26, 2014

NICHOLAS G. GARAUFIS
United States District Judge